## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HORNBECK OFFSHORE TRANSPORTATION, LLC** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 1:07-1030 (RCL)** |
| **v.** ) | **Judge Lamberth** |
| ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS UNDER RULES 12(b)(1) OR 12(b)(6)

Plaintiff Hornbeck Offshore Transportation, LLC ("Hornbeck") opposes the Government's motion to dismiss Hornbeck's action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) & 2671-2680. The Government erroneously invites the Court to dismiss Hornbeck's Complaint allegedly because (1) there is no private party analog for the tort of "misinterpretation of a statute," (2) the statute of limitation expired before Hornbeck submitted its FTCA administrative claim to the Agency, and (3) the doctrine of claim preclusion bars this FTCA Complaint because Hornbeck had to bring the FTCA action when it filed its complaint under the Administrative Procedure Act ("APA").

The Government continues to withhold key evidence from Hornbeck about its misconduct, misrepresents undisputed facts to the Court, and misconstrues the Complaint to misdirect the Court into erroneously dismissing it. Therefore, the Government's arguments lack

merit, should be rejected, and the Government's motion denied so that discovery can begin. Also, in accordance with Local Rule 7(f), Hornbeck requests oral argument.

## BACKGROUND

Hornbeck is a limited liability company which owns and operates oil transport vessels, including the tank barge ENERGY 8701 (the "Barge") which is the subject of this FTCA Complaint and the preceding APA action in this Court. Complaint ¶¶ 3-4; *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37, 38 (D.D.C. 2006) (Ex. 1). As this Court explained in that decision, in connection with a planned voyage to Canada in early 2004, Hornbeck was compelled by international law to obtain a tonnage measurement of the Barge under the International Tonnage Convention ("ITC"). On February 24, 2004, the American Bureau of Shipping ("ABS"), a classification society,[1] issued and delivered an International Tonnage Certificate ("ITC") for the Barge showing that ABS had determined the vessel's gross tonnage of 4660 gross tons using the ITC measurement system. (Ex. 2); *Hornbeck*, 424 F. Supp. 2d at 41. It was this ITC tonnage that Hornbeck requested the Agency to apply to the Barge's Certificate of Inspection ("COI") for the assignment of a proper phase-out date of January 1, 2015 under the Oil Pollution Act of 1990 ("OPA 90"). Complaint ¶¶ 17-18; *Hornbeck*, 424 F. Supp. 2d at 41-42.

The Barge's COI was and is issued to Hornbeck as part of the Agency's inspection and certification services for which Hornbeck was required by law to pay the Agency the annual user fee of $500. 46 C.F.R. §§ 2.01-5, 2.10-101. The COI expressly subjected the Barge to

---

[1] Classification societies are private organizations that, like the Coast Guard, certify vessels for many purposes. 46 C.F.R. § 8.320 (authorizing classifications societies to issue nine international certificates); 72 Fed. Reg. 28,650-51 (May 22, 2007) (Coast Guard proposed rule explaining that classification societies issue International Maritime Organization certificates, and proposing that they be authorized to issue more certificates).

"Conditions of Operation" including an OPA 90 phase-out date of January 1, 2005. (Ex. 3.) As the Coast Guard explained in its user-fee rulemaking in 1995:

> Just as a business cannot operate legally without applicable . . . licenses, a U.S. commercial vessel of a certain size or tonnage cannot legally carry . . . cargo in U.S. waters unless it has a valid COI issued by the Coast Guard. The Coast Guard's position is that the vessel owner or operator is the primary beneficiary of Coast Guard inspection services.

60 Fed. Reg. 13,549, 13,555 (Mar. 13, 1995).

Therefore, on March 8, 2004, Hornbeck requested the Agency to recognize the ITC tonnage measurement and issue a new COI for the Barge with the proper OPA 90 phase-out date of January 1, 2015, because under the applicable law that date applied to a tank barge under 5000 gross tons. Complaint ¶¶ 17-18; *Hornbeck*, 424 F. Supp. 2d at 41-42. On March 29, 2004, the Coast Guard Marine Safety Center disapproved Hornbeck's request in an initial decision and instructed Hornbeck that it could seek "final agency action" from the Commandant of the U.S. Coast Guard ("Headquarters"). (Ex. 4); *Hornbeck*, 424 F. Supp. 2d at 42.

After the initial disapproval, on April 8, 2004, Hornbeck submitted a request for information to the Agency under the Freedom of Information Act ("FOIA") regarding the Agency's treatment of similarly situated barges, Bouchard Barges B-95 and B-105. (Ex. 5.) On May 25, 2004, the Agency (1) withheld 42 pages of responsive documents which it continues to refuse to produce and (2) produced other evidence responsive to the FOIA request that showed the Agency had granted the Bouchard barges the new OPA 90 phase out date of January 1, 2015 that it had initially disapproved for Hornbeck's Barge. (Ex. 6.) Therefore, on July 29, 2004, Hornbeck appealed the initial decision to Agency Headquarters. *Hornbeck*, 424 F. Supp. 2d at 42. Based on this newly discovered evidence provided *after* the initial disapproval by the Marine Safety Center, Hornbeck's appeal to Headquarters expressly explained that the Agency had

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 3 of 46**

erroneously applied the tonnage laws of the United States and had treated other vessels – namely, the two barges owned by its competitor Bouchard and identified as barges B.NO. 95 and B.NO.105 – in a disparate manner.  Complaint  ¶¶ 20-22; *Hornbeck*, 424 F. Supp. 2d at 42.

On September 15, 2004, the Agency issued its "final agency action" denying Hornbeck's request for the issuance of a COI for the Barge with a proper phase-out date of January 1, 2015. *Id.*  On October 8, 2004, Hornbeck filed suit against the Government under the APA alleging that the Government's failure to issue the Barge's COI with a proper phase out date was a violation of the APA.  *Id.*  On March 27, 2006, the Court ruled that the Agency's "refusal to apply the plain language" of the law to the Barge "was arbitrary capricious and otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A)."  *Hornbeck*, 424 F. Supp. 2d at 58 (Kollar-Kotelly, J.).

On September 12, 2006, Hornbeck filed its FTCA administrative claim with the Agency for loss of use of the vessel as of December 29, 2004.  (Ex. 7.)  Hornbeck offered to answer the Government's questions and to provide additional information required.  (Ex. 7.)  On February 27, 2007, the Agency requested no information from Hornbeck and denied the administrative claim asserting only that "the United States has not waived sovereign immunity for tort claims based on the Coast Guard's exercise of discretion in making a vessel certification decision." (Ex. 8.)  Notably, the Agency did not describe Hornbeck's claim as "vague" or "nebulous" as the Government now does.  Nor did the Agency assert any of the grounds raised by the Government in its motion to dismiss, e.g. no private party analog, claim preclusion, or expiration of the statute of limitations.  (Ex. 8.)  On June 8, 2007, Hornbeck filed the FTCA Complaint.

Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 4 of 46

On August 23, 2007, counsel for Hornbeck met with Government counsel and renewed Hornbeck's longstanding requests for documents that the Government had refused to disclose pursuant to Hornbeck's FOIA requests.  The Government again refused.  (Ex. 9.)

## LEGAL STANDARDS FOR THE MOTIONS TO DISMISS

On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure ("FRCP") 12(b)(1) the plaintiff bears the burden of establishing that the Court has jurisdiction.  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.C.C. 2001).  Importantly, however, at the pleading stage the Court must "accept all of the factual allegations in [the] complaint as true."  *United States v. Gaubert*, 499 U.S. 315, 327 (1991) (quoting *Berkowitz v. United States,* 486 U.S. 531, 540 (1988)).  Additionally, the Court may consider material beyond the allegations in the plaintiff's complaint when determining whether there is subject matter jurisdiction.  *Equal Employment Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).  In doing so, the Court need not convert a motion to dismiss under Rule 12(b)(1) into a motion for summary judgment where the matters outside the pleadings are "undisputed factual contentions."  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).  However, ruling on a 12(b)(1) motion where the facts are disputed may be error because plaintiff will have not been afforded discovery necessary to establish jurisdiction.  *Collins v. N.Y. Cent. Sys.*, 327 F.2d 880 (D.C. Cir. 1963).  Indeed, it is an abuse of discretion for a court to refuse to grant discovery on a disputed jurisdictional fact that results in prejudice to the plaintiff.  *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320 (5th Cir. 2002).

On a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), the movant bears the burden to prove that no legally cognizable claim for relief exists and the Court should

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 5 of 46**

not dismiss unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69 (1984). Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987). "[T]he question on a motion to dismiss under Rule 12(b)(6) is whether in the light most favorable to the plaintiff, and with every doubt resolved in the pleader's behalf, the complaint states any legally cognizable claim for relief. If the answer to the question is in the affirmative, the motion to dismiss must be denied and the action should be permitted to continue." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004) (internal citations omitted). In evaluating dismissal under Rule 12(b)(6), if the Court considers certain matters incorporated by reference in the Complaint, the motion to dismiss for failure to state a claim need not be construed as a motion for summary judgment. FRCP 12 (b)(6); *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384-85 (10th Cir. 1997); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993); 5C Wright & Miller, *supra*, § 1366.

## <u>ARGUMENT</u>

The Government's arguments fail because they fundamentally misrepresent both Hornbeck's FTCA action and the facts. First, the Government mischaracterizes Hornbeck's FTCA action as solely for "misinterpretation of a statute." The Government posits this straw-man tort so that it can then argue there is no private-party analog for such a tort. Government's Statement of Points and Authorities at 2, 9, 13, & 15-18 (hereinafter Mem.). The Government argues incongruously that while "there is no doubt" that the "gravamen of Hornbeck's claim" is the tort of "misinterpretation of a statute," *Id.* at 15, that the tort was not alleged with sufficient

particularity. *Id.* at 11-13. Second, the Government argues mistakenly that the FTCA action, which did not accrue until March 27, 2006, actually expired two days later, on March 29, 2006, instead of after the passage of the two-year period following accrual as provided by the FTCA. *Id.* at 29-32. Third, the Government argues erroneously that the doctrine of claim preclusion bars Hornbeck's FTCA action because Hornbeck allegedly should have brought the straw-man tort of "misinterpretation of a statute" before the Court ruled that is what occurred. *Id.* at 19-21.

## I.    The Government Mischaracterizes Hornbeck's FTCA Action.

### A.    Hornbeck Did Not Allege The Tort of "Misinterpretation of a Statute."

The Government argues erroneously that "Hornbeck's claim against the United States is that a federal agency *misinterpreted a statute* and that this misinterpretation caused Hornbeck economic losses." *Id.* at 15. However, that misstates the Complaint which contains neither those words nor their equivalent. Instead, in accordance with FRCP 8(a)(2) Hornbeck alleged "a short and plain statement of the claim":

> 6.    Plaintiff Hornbeck brings this action against the United States to recover damages for injuries caused by the United States through the Coast Guard's lack of due care, negligence and/or wrongful act or omission in assigning an improper OPA 90 phase-out date for the Barge and failing to apply the proper phase-out date for the Barge. . . .
> 39.    The Coast Guard's lack of due care, negligence and/or wrongful act or omission in assigning an improper phase-out date and failing to assign the proper phase out date for the ENERGY 8701 caused Hornbeck injuries and damages in the amount of $6,578,789.65. . . .

Complaint ¶¶6 & 39.

Contrary to the Government's argument, the Complaint contains neither the words "misinterpretation of a statute" nor "misinterpreted a statute." Mem. at 15 (misrepresenting the Complaint as stating the "agency's misinterpretation of the statutory language caused the

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 7 of 46**

company more than $6.5 million in losses").[2]  By a sleight of hand, the Government switches the

Agency's belated and self-serving excuse for its misconduct, i.e. "misinterpretation of a statute,"

in place of Hornbeck's allegations.  Similar attempts by the Government to mischaracterize a

complaint are rejected by courts.  *Block v. Neal,* 460 U.S. 289, 297-99 (1983); *Black v. Sheraton

Corp. of America*, 564  F.2d 531, 540-41 (D.C. Cir. 1977); *Hicks v. United States,* 511 F.2d 407,

414 (D.C. Cir. 1975); *Quinones v. United States,* 492 F.2d 1269, 1279-81 (3d Cir. 1974).

### B.    Hornbeck's Complaint Alleges Actionable Torts.

Having misrepresented Hornbeck's Complaint as alleging only "misinterpretation of a

statute," the Government next argues there is no private person analog to this tort of

"misinterpretation of a statute," and therefore the Complaint must be dismissed.  Mem. at 13-18

This is a red herring.

Hornbeck's Complaint alleges actionable torts with private party analogues.   The

Complaint follows the long line of cases against the Coast Guard, the Federal Aviation

Administration ("FAA"), and other Government entities holding tort actions properly lie for

failing properly to issue a certificate, permit, license, or other authorization, in this case the

Barge's COI.  *Berkowitz v. United States,* 486 U.S. 531 (1988) (negligent issuance of vaccine

license actionable); *Harr v. United States*, 705 F.2d 500 (D.C. Cir. 1983) (negligent failure to

issue FAA certificate actionable); *Beins v. United States*, 695 F.2d 591, (D.C. Cir. 1982)

(negligent failure to issue Federal Aviation Administration certificate actionable); *Hicks v.

United States*, 511 F.2d 407, 415-19 (D.C. Cir. 1975) (negligent certification of mental condition

actionable in negligence for lack of due care); *Duncan v. United States*, 355 F. Supp. 1167 (D.C.

---

[2] Also, the Government's only citation to the words "interpret" or "interpretation" appearing in the Complaint occurs in the Government's reference to the Complaint's quotation of language setting forth the Agency's own words in denying Hornbeck's request for the assignment of a proper phase-out date for the Barge's COI.  Mem. 14 (quoting the Agency's initial disapproval and final agency action appearing at Complaint ¶¶ 19 and 21 and citing to the Court's decision in *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37, 42 (D.D.C. 2006)).

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 8 of 46**

Cir. 1973) (negligent failure to issue FAA certificate actionable); *Hendry v. United States,* 418 F.2d 774, 779-83 (2d Cir. 1969) (negligent withholding of Coast Guard license actionable); *Dupree v. United States,* 247 F.2d 819, 823-25 (3d Cir. 1957) (explaining that while challenge to regulation was not actionable, an allegation of lack of due care in Coast Guard application of license regulation would be actionable); *In re Sabine Oral Polio Vaccine Prods. Liab. Litig.*, 763 F. Supp. 811, 774 F. Supp. 952 (D. Md. 1991), *aff'd,* 984 F.2d 124 (4th Cir. 1993) (violation of regulations governing license of polio vaccine constituted negligence); *Fireman's Fund Ins. Co. v. United States,* 527 F. Supp. 328, 332 (D. Mich. 1981) (negligent issuance of FAA certificate actionable); *Penn. R.R. Co. v. United States*, 124 F. Supp. 52 (D.N.J. 1954) (negligent issuance of Coast Guard permit actionable).

Likewise, Hornbeck's complaint is fully consistent with cases against the Government for misfeasance, nonfeasance, negligence, and tortious interference with the use of property. *Hatahley v. United States,* 351 U.S. 173, 181 (1956) (Government liable for tort of trespass); *Dalehite v. United States,* 346 U.S. 15, 45 (1953) (FTCA also includes torts of misfeasance, nonfeasance, or trespasses); *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1084-91 (D.C. Cir. 1980) (intentional tort actionable against Coast Guard for arbitrary action in violation of regulation); *Devlin v. United States,* 352 F.3d 525, 533 (2d Cir. 2003) (FTCA includes misfeasance, nonfeasance, i.e. improper performance of an act a person may lawfully do); *Sowell v. United States,* 835 F.2d 1133, 1134-35 (5th Cir. 1988) (Army liable for negligent processing of allotment form); *Downs v. United States,* 522 F.2d 990, 1003-04 (6th Cir. 1975) (Government official's unreasonable exercise of authority actionable under the FTCA for the tort of trespass); *United States v. De Vane,* 306 F.2d 182, 185-87 (5th Cir. 1962) (upholding district court decision that Coast Guard's substandard administrative action was actionable under FTCA); *United States*

*v. Gavagan,* 280 F.2d 319, 327-28 (5th Cir. 1960) (Coast Guard liable under the FTCA for ignoring information and negligent failure to evaluate information); *Ira S. Bushey & Sons, Inc., v. United States,* 276 F. Supp. 518, 526 (E.D.N.Y. 1967) (Coast Guard liable in trespass under the FTCA).

Indeed, even if as the Government asserts, the only tort alleged is "misinterpretation of a statute," that tort is also actionable in these circumstances where the arbitrary, capricious, and unlawful acts of the Agency injured Hornbeck. In *Hatahley v. United States,* 351 U.S. at 179-82, the Supreme Court ruled that the Government's misinterpretation of the Taylor Grazing Act under which Government agents trespassed against plaintiff's chattels was actionable. In *Devlin v. United States,* 352 F.3d. at 536, the court explained that the legal malpractice of Coast Guard lawyers was actionable under the FTCA. And, in *Tri-State Hospital Supply Corp. v. United States,* 341 F.3d 571, 576-78 (D.C. Cir. 2003), the court upheld an FTCA action for wrongful legal process under the laws of the District of Columbia.

Anticipating the fundamental flaw in its position, the Government strains preemptively to distinguish three of these cases, *Harr*, *Beins*, and *Duncan*, as involving "a *factual* error, not a *legal* error" while failing to bring the others to the Court's attention. Mem. at 20. However, the Government's effort is half-hearted. First, it cites no statutory language showing that the FTCA distinguishes between "factual" and "legal" errors for purposes of jurisdiction. Second, it cites no authority supporting its bald assertion that the three cases should be distinguished, nor does it even explain any reason why that should be so. Moreover, even assuming the Government's belated and self-serving confession of "legal error" is correct and that the "legal error" the Government now advances for its own purpose is the sole tort, the FTCA provides no exemption

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 10 of 46**

for liability for the Government because of legal error as compared to factual error.  28 U.S.C. §§ 2680(a) - (h) (listing exemptions, e.g. discretionary function).

To the contrary, when invited to engraft new exemptions to the FTCA like the novel exemption the Government posits here, the Supreme Court has repeatedly declined and emphasized that "[t]here is no justification for this Court to read exemptions into the Act beyond those provided by Congress.  If the Act is to be altered that is a function for the same body that adopted it." *Rayonier, Inc. v. United States,* 352 U.S. 315, 320 (1957).  *See also United States v. Muniz,* 374 U.S. 150, 159 (1963) (rejecting Government request to add another exemption to the FTCA and declaring that Government liability under the FTCA "extends to novel and unprecedented forms of liability").

**C.     The Cases Cited By the Government Do Not Support Its Argument.**

Having misconstrued the nature of Hornbeck's Complaint, the Government argues erroneously that "Hornbeck's Complaint must be dismissed for lack of subject matter jurisdiction because its putative tort does not – and cannot – assert the requisite private party analog to support an FTCA claim arising out of the Coast Guard's (mis)interpretation of a statute that Congress has delegated to the agency to administer."  Mem. at 9.  Citing to only one decision, *Employers Ins. of Wausau v. United States,* 830 F. Supp. 453 (N.D. Ill. 1993), the Government argues that "Hornbeck cannot maintain an action for money damages against the United States" where the "gravamen of Hornbeck's claim . . . is that a federal agency misinterpreted a statute . . . ."  Mem. at 15.

But that decision is inapposite.  In *Employers Insurance*, the district court dismissed Wausau's allegation of negligence under the FTCA for lack of a private party analog because Wausau apparently only alleged that the Environmental Protection Agency ("EPA") misread the

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 11 of 46**

relevant provisions of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") and designated Wausau as a "Potentially Responsible Person" causing Wausau it to expend $2 million for a removal action at an oil recycling facility. *Id.* at 454-55. However, Hornbeck's Complaint does not involve such an allegation. And, unlike this case, *Employers Insurance* did not involve the tortious failure to properly issue a COI for the Barge. As set forth in the long line of authority cited, such an act or omission in the failure to properly issue a certificate, license, permit, or other authorization is actionable. But, the district court in *Employers Insurance* simply did not address that line of authority. Therefore, the Government's reliance on that case is misplaced.

Likewise, the authority upon which *Employers Insurance* relies is inapposite to this case. Relying principally on *Akutowicz v. United States,* 859 F.2d 1122 (2d Cir. 1988), the *Employers Insurance* court analogized the EPA's designation of Wausau as a CERCLA "Potentially Responsible Person" to the "quasi-adjudicative" action of the "withdrawal of a person's citizenship" and adopted *Akutowicz*'s conclusion that no private cause of action exists. *Employers Ins.,* 830 F. Supp. at 456-57 (quoting *Akutowicz,* 859 F.2d at 1125-26). In *Akutowicz,* plaintiff had alleged a procedural due process violation by the State Department for failing to afford him a proper hearing. *Id.* at 1124.

For its conclusion, *Akutowicz* relied heavily on *C.P. Chemical Co. v. United States,* 810 F.2d 34, 37-38 (2d Cir. 1987), and *Chen v. United States*, 854 F.2d 622, 626-27 (2d Cir. 1988). *C.P. Chemical* held that an FTCA action against the Consumer Products Safety Commission ("CPSC") for failing to follow proper procedures in promulgating a regulation had no private party analog. And *Chen* held that an FTCA action against the General Services Administration for failing to follow the notice and hearing procedures of federal procurement and debarment

regulations had no private party analog.  Both the *Employers Insurance* and the *Chen* courts also cited to *Art Metal U.S.A. v. United States*, 753 F.2d 1151, 1156-59 (D.C. Cir. 1985) for the proposition that the federal due process rights afforded by procurement regulations provide no private party analog.  And *Chen* and *C.P. Chemical* also cite to *Jayvee Brand v. United States*, 721 F.2d 385, 390 (D.C. Cir 1983) for the proposition that private persons could not engage in "quasi-legislative" or "quasi-adjudicative" action.  In *Jayvee Brand*, the CPSC had failed to follow the notice and hearing procedures in promulgating a regulation and the court held that the "wrongful act" was "legislative in nature" and therefore, without a private analog.  *Id.* at 390-93.

However, Hornbeck alleges none of those federal due process violations in this FTCA action.  It does not allege that the Agency failed to accord it federal due process in the promulgation of a new regulation, the conduct of a debarment proceeding, or the withdrawal of citizenship.  Nor does it allege that the Agency failed to follow its own internal procedures.  Therefore, the cases upon which *Employers Insurance* relied are simply inapposite to Hornbeck's FTCA action.

**D.    Hornbeck's Complaint Properly Alleges Actionable Torts.**

The Government also erroneously criticizes Hornbeck's allegations as "insufficient." Mem. at 12.  First, relying on inapposite authorities the Government erroneously asserts that Hornbeck failed to allege "that a private individual in like or analogous circumstances would have violated a comparable duty owed to Hornbeck that has been imposed by the law of the District of Columbia."  *Id.* at 11.  Second, the Government again cites to inapposite authority and inaccurately asserts that Hornbeck's pleading "says little about what tort the agency is alleged to have committed."  *Id.* at 12.  But, the Government cites no authority supporting its mere assertions that Hornbeck's allegations are insufficiently pled, or if so, that dismissal is the proper

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 13 of 46**

remedy.  Rather, the Government's insufficient pleading argument merely reprises its previous argument that the Government "remains immunized" as a matter of law for the Government's straw-man tort of "misinterpretation of a statute."  *Id.* at 12.  And, the Government's assertion that Hornbeck's allegation of negligence is vague is contradicted by the Government's own admissions and other facts the Government failed to disclose to the Court.

### 1.    The Cases Cited By the Government Are Inapposite.

The cases cited by the Government do not apply here because they do not address any alleged insufficiency in the allegation of negligence or a wrongful act in the failure to properly issue a certificate, license, permit, or other authorization.  *Johnson v. United States,* 547 F.2d 688, 691-92 (D.C. Cir. 1976) upon which the Government principally relies actually dismissed the plaintiff's allegations of false arrest, imprisonment, and negligence as "immunized" by express statutory exemptions set forth in the FTCA and local law.  These express exemptions are inapplicable here.  Likewise, as explained above, the Government's reliance on *Art Metal,* 753 F.2d at 1151 & 1160 n.16, is misplaced.  Unlike the plaintiff in *Art Metal,* Hornbeck has not alleged a violation of federal procedural due process.  Finally, the Government's citation to *Sterling v. United States,* 798 F. Supp. 47, 48 (D.D.C. 1992) fails because that case merely restates the holding of *Art Metal* in the context of an alleged violation of the federal Privacy Act not present here.  Therefore, the cases cited by the Government lend it no support.

### 2.    Hornbeck's Allegations Conform to FRCP 8's Simplified Pleading Standard.

The Government also erroneously asserts that Hornbeck's allegations are insufficient because they are nothing more than a "vague legal incantation" and a "nebulous assertion." Mem. at 12.  Hornbeck's Complaint complies with the modern federal practice standard of notice pleading.  Moreover, the Government's contradicts itself.  On one hand, the Government argues

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 14 of 46**

the tort Hornbeck alleges is "vague" and "nebulous" while on the other hand the Government decisively declares that the only tort alleged is "misinterpretation of a statute."  Mem. at 15.  Such contradictory assertions rob the Government's arguments of any force.

Hornbeck's allegations conform to the requirement that its Complaint allege "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson,* 355 U.S. 41, 47 (1957).  This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues to dispose of unmeritorious claims.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168-69 (1993); *Conley*, 355 U.S. at *Id.* at 47-48.

Furthermore, even if Hornbeck's complaint is "vague" and "nebulous," dismissal is not the proper remedy.  *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 762 (D.C. Cir. 1997).  Rather, the Government should have moved for a more definite statement under FRCP 12(e) *before* answering.  *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002).  As the Supreme Court has explained, "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Conley,* 355 U.S. at 48.

3.    **The Government Misrepresents the Facts to the Court.**

Moreover, the undisputed facts flatly contradict the Government's "vagueness" assertion.  The Government knows full well what duty it breached.  The Government's own motion expressly admits that the Complaint alleges failure by the Agency to properly issue the Barge's COI.  Mem. at 4 ("the Coast Guard Certificate of Inspection [COI] for ENERGY 8701 . . .

specifically states that the OPA 90 phase-out date for the barge is January 1, 2005"); Mem. at 6

("On remand the Coast Guard amended the single hull tank barge's COI to allow it to continue

operating until January 1, 2015.") (citing Hornbeck's Complaint ¶ 38); Mem. at 24 (claims "arise

from the Coast Guard's denial of a later phase-out date to the ENERGY 8701 tank barge).

Likewise, the Government understood precisely that the subject of Hornbeck's claim

concerned the failure to issue the Barge's COI with the proper OPA 90 phase out date which

forced the Barge out of service on December 29, 2004. As Hornbeck explained specifically:

> As set forth in detail in the decision of the Court, this claim arises from the unlawful act of the Coast Guard which "arbitrarily and capriciously" refused to assign the proper phase-out date to the vessel as required by law. Consequently, the Coast Guard misconduct mandated Hornbeck to remove the vessel from service, thereby causing it to sustain damages because of the loss of use of the vessel, costs incurred in laying up the vessel, and returning the vessel to service, etc.

> The Coast Guard's act has prevented Hornbeck from operating the vessel from late 2004 and thereby caused Hornbeck continuing injury and damages. . . .

> As you know, the FTCA waives sovereign immunity of the United States in circumstances where a party sustains injury caused by a lack of due care, negligence, and/or a wrongful act of any employee of the Government acting within the scope of his employment. 28 U.S.C. § 1346(b). The law provides that the United States is liable where the negligence or wrongful act of its employees takes the form of a failure to comply with the law where the function is not discretionary. 28 U.S.C. § 2680(a); *Berkowitz v. United States,* 486 U.S. 531 (1988) (failure to test vaccine lots as required by regulation not discretionary). And as Judge Kollar-Kotelly made clear, the failure to issue a license, permit, or certificate under the circumstances of this case is plainly not discretionary. *Hendry v. United States,* 418 F.2d 774 (2d Cir. 1969) (Coast Guard refusal to issue license not discretionary function). The Supreme Court adopted the Second Circuit's formulation of the discretionary function doctrine as applied to the Coast Guard in *Hendry* in its decision in *United States v. Varig Airlines*, 467 U.S. 797 (1984). *Simply put, where the denial of the certificate involves nothing more than the matching of facts against a clear rule or standard – as in this case – the agency action is not discretionary and the Government is liable.*

Hornbeck's FTCA administrative claim at 2 & 4 (emphasis added) (Ex. 7).

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 16 of 46**

Furthermore, in denying Hornbeck's FTCA administrative claim, the Agency expressly cited the Coast Guard's "vessel certification decision" as the object of the claim.  (Ex. 8.) ("[T]he United States has not waived sovereign immunity for tort claims based on the Coast Guard's exercise of its discretion in making a vessel certification decision.").  This Agency admission was specifically alleged in Hornbeck's Complaint as the basis of the claim. Complaint ¶ 42.  Therefore, the Government's own admissions contradict its newfound litigation position alleging "vagueness."

This incredible assertion of "vagueness" is all the more reprehensible considering the Government's obstinate refusal to disclose 42 pages of the Agency's underlying documents concerning the Agency's action.  (Ex. 9.)  The Government has only itself to blame for any "vagueness" and its argument should also be rejected in light of its own stonewalling.

### 4.    The Government Misstates Hornbeck's Duty to Plead.

As an initial matter, the Government erroneously asserts that Hornbeck failed to allege that "a private individual in like or analogous circumstances would have violated a comparable duty owed to Hornbeck that has been imposed by the law of the District of Columbia."  Mem at 11.  As set forth above, Hornbeck satisfied the simplified pleading requirements of FRCP 8.  *See* Complaint, ¶¶ 6, 21, 23, 39, & 40.

Contrary to the Government's assertion, Hornbeck was not required to plead the specific elements of its claim as the Government asserts.  *Doe v. Smith,* 429 F.3d 706, 708 (7th Cir. 2005).  And, Hornbeck "had no duty to set out all the relevant facts in [the] . . . complaint." *Atchison Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 568 n. 15 (1987).  That is especially true where, as here, the Government obstinately persists in concealing key documents.

Hornbeck was only required to provide a statement sufficient to put the defendant on notice of the claim. As the Supreme Court has explained, "[t]he illustrative forms appended to the Rules plainly demonstrate this. Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery . . . established by the Rules to disclose more precisely the basis of both claim and defense. . . ." *Conley*, 355 U.S. at 47-48. *See* Form 9 for the "Complaint for Negligence" in the Appendix to the FRCP which establishes that it is not necessary to expressly allege a legal duty at all in a complaint. "Form 9 . . . demonstrates the simplicity and generality with which these elements [of negligence] may be pleaded." 5 Wright & Miller, *supra*, § 1249 (3d ed. 2004).

The Government erroneously cites inapposite cases for the alleged duty to plead an analogous private duty. Mem. at 11. None of the cases cited by the Government actually stand for that proposition. Rather they address the private person analog in other irrelevant respects and other settings. For example, in *Olson v. United States,* 546 U.S. 47-48, the Supreme Court did not consider the sufficiency of the pleadings under FRCP 12 (b)(1) or (6) and explained instead that the Government conceded that "a private person analogy exists in this case" and remanded the case to the lower courts to decide "which Arizona tort law doctrine applies here." *Appleton v. United States,* 180 F. Supp. 2d 177 (D.D.C. 2002) is the only case cited by the Government's that even mentions a specific pleading requirement (but not at the page cited by the Government). The opinion's passing reference to a pleading requirement, *Id.* at 182, is plainly *dictum* in a case decided on the merits after a trial on a motion for a judgment under FRCP 50, and not on a motion to dismiss under FRCP 12(b)(6). Finally, as a review of Form 9 and the others approved in the Appendix to the FRCP illustrates, modern federal pleading

expressly permits "conclusory allegations of fact and law."  1 Jenner & Block, LLC, *Federal Litigation Guide* § 1.34[1] (2007).

  5.    **Local Tort Law Provides Relevant Analogues.**

  (a)  **The Duty of Due Care For The Defendant That Undertakes An Act.**

Hornbeck's Complaint expressly alleges that the Government breached the duty of due care under the laws of the District of Columbia for the failure to properly issue the Barge's COI. *See, supra* at 6-11; Complaint ¶¶ 6 & 39.  Under the law of the District of Columbia, the duty of due care arises when a defendant undertakes to perform an act and injury to the defendant is reasonably foreseeable.  As the D.C. Court of Appeals explained in *Security Nat'l Bank v. Jacob C. Lish*, 311 A.2d 833, 834-835, (D.C. 1973), with respect to a negligent defendant, the defendant "is not exempt from the general principle that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."  The D.C. Court of Appeals cited to the decision of the Court of Appeals of New York in *Glanzer v. Shepard,* 233 N.Y. 236 (1922) where the defendant failed to properly issue a certificate of weight and the court held that "assumption of the task of weighing was the assumption of a duty to weigh carefully" and that the duty to exercise due care was "imposed by law."  *Id.* at 239.  On this precise point, the *Glanzer* court also cited to the seminal case, *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 390 (1916) which as Dean Prosser has explained stood for "the conclusion that the duty is one imposed by the law because of the defendant's affirmative conduct, which he must know to be likely to affect the interests of another."  *Prosser and Keeton on Torts* § 96 (5th ed. 1984).  "This decision found immediate acceptance, and at the end of some forty years is universal law in the United States. . . ."  *Id.*

As the *Glanzer* court explained, "here the defendants are held not merely for careless words . . . but for the careless performance of a service – the act of weighing – which happens to be found in the words of a certificate its culmination and its summary. . . ." *Id.* at 241. The *Glanzer* court further explained, "There is nothing new here in principle . . . . It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Id.* at 239. The D.C. Court of Appeals has repeatedly reaffirmed its bedrock law of duty grounded in the *Glanzer* decision. *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 991 (1980) (expressly reaffirming both *Glanzer* and *Security National Bank*); *Carolyn Warren v. Dist. of Columbia,* 444 A.2d 1, 34-35 (1981) (expressly reaffirming those cases and the "cardinal principle of tort that, even where no duty to act may exist originally, once one undertakes to act, he has a duty to do so with due care").

The federal courts applying the FTCA have also repeatedly approved of this local law duty of due care. Upholding a FTCA negligence tort action against the Government, the Supreme Court explained that when the Coast Guard undertakes to provide a service "it is obligated to use due care" in performing that service. *Indian Towing Co. v. United States,* 350 U.S. 61, 69 (1955). In *Block v. Neal,* 460 U.S. 289, 297 (1983), the Supreme Court ruled plaintiff's tort of negligence against the Government actionable where the Government "officials voluntarily undertook" to perform a supervisory service and "the officials failed to use due care in carrying out their supervisory activity; and that she suffered some pecuniary injury. . . ." In *Biscoe v. Arlington County,* 738 F.2d 1352, 1364 (D.C. Cir. 1984), the court ruled that under District of Columbia law the same principle applied to the tort of negligence which was actionable where a government official "having . . . chosen to act fails to act reasonably." Relying on *Biscoe,* the court applied this principle to an FTCA action for negligence and

imposed the duty of "due care" when there was "no readily available private analogue upon which to premise liability under the FTCA." *Hetzel v. United States,* 43 F.3d 1500, 1503-04 (D.C. Cir. 1995). Likewise, the court in *Sowell v, United States,* 835 F.2d 1133, 1134 (5th Cir. 1988) applied the local law that "a person who undertakes to voluntarily perform a service they would otherwise not be obligated to perform, must perform that undertaking with due care."

### (b) The Duty of Due Care For Intentional Torts.

The FTCA "encompasses a wide sweep of intangible tort claims . . . ." *Devlin v. United States,* 352 F.3d. 525, 536 (2d Cir. 2003). But, based on the limited information available to Hornbeck at this early stage of the case before any discovery has occurred, the wrongful act of the Government in failing to properly issue the Barge's COI forced the Barge out of service and constitutes trespass and other intentional torts. Complaint ¶¶ 6, 39 & 40.

Under the law of the District of Columbia, the intentional tort of trespass to chattel arises, as occurred in this case, when a defendant, here the Government, intentionally intermeddles with another's chattel, here Hornbeck's Barge. As the D.C. Court of Appeals explained in *Cleveland Park Club v. Perry*, 165 A.2d 485, 488 (D.C. 1960), "trespass is an intentional tort." And deprivation of the use of a chattel for a substantial period of time, as occurred here, constitutes intermeddling actionable as a trespass to chattels. 75 *Am. Jur. 2d Trespass* § 17 (2007). Where there is a trespass to chattels, damages are measured by the diminution of the property's value caused by the interference, here the loss of use of the Barge, etc. *Pearson v. Dodd,* 410 F.2d 701, 707 (D.C. Cir. 1969) (while the tort of conversion permits nominal damages, trespass of chattel requires showing of actual damage). The D.C. Circuit has also expressly approved application of the District of Columbia's tort of trespass in an FTCA action and held that a

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 21 of 46**

business suffering damage as a result of Government trespass can recover loss of income. *Black v. Sheraton Corp. of America,* 564 F.2d 531, 539-41 (D.C. Cir. 1977).

Additionally, federal courts in FTCA actions have repeatedly approved the local common law tort of trespass. *Hatahley v. United States*, 351 U.S. 173, 181 (1956) (Government liable for tort of trespass for wrongful act); *Dalehite v. United States*, 346 U.S. 15, 45 (1953) (FTCA includes tort of trespass); *Downs v. United States,* 522 F.2d 990, 1003-34 (6th Cir. 1975) (Government official's unreasonable exercise of authority actionable under the FTCA for the tort of trespass); *Bushey v. United States,* 276 F. Supp. 518, 526 (E.D.N.Y. 1967) (Coast Guard liable in trespass under the FTCA).

Likewise, the D.C. Circuit recognized a similar intentional tort action against the Coast Guard for arbitrary acts, such as those alleged here, that interfered with the use of a vessel. *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1090-91 (D.C. Cir. 1980) (arbitrary conduct actionable under the Suits in Admiralty Act which permits the tort of intentional interference with contract rights). Therein, plaintiff alleged an intentional tort against the Coast Guard for arbitrarily implementing its classified "Special Interest Vessel Program," barring a vessel from entry in the United States.

6.    **The Government Misconstrues the Private Person Analogue.**

The Government erroneously asserts that no private person analogue exists for the actions of the Coast Guard here which it describes as "the Coast Guard's discharge of its administrative duties in interpreting an amendment to OPA 90." Mem. at 13. But, in *Indian Towing Co. v. United States*, 350 U.S. 61, 64-65 (1955), the Supreme Court soundly rejected this argument. In that case, the Government also argued that the FTCA "must be read as excluding liability in the

Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 22 of 46

performance of activities which private persons do not perform."   As the Supreme Court explained, however, the Government misconstrued the statute:

> The Government reads the statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.'  But the statutory language is 'under like circumstances,' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner.
>
> . . . [W]e would be attributing bizarre motives to Congress were we to hold that it was predicating liability on such a completely fortuitous circumstance – the presence of identical private activity.

*Id.* at 64-66.

By styling the Agency's action as "misinterpretation of a statute," the Government seeks to portray that action as "uniquely governmental," i.e. without a private party analogue.  Thus, as a practical matter, here the Government erroneously asserts the FTCA's discretionary function doctrine under the guise of the private analogue requirement.  But applying a new label to an inapplicable doctrine fails to make it any more applicable.  In *Berkowitz v. United States,* 486 U.S. 531, 538 (1988), the Supreme Court soundly rejected the Government's argument that the discretionary function doctrine "precludes liability for any and all acts arising out of the regulatory programs of federal agencies."  As the Supreme Court explained, the plain language of the FTCA "protects 'discretionary' functions, rather than 'regulatory' functions."  *Id.* Moreover, the Supreme Court has emphasized that the "exception was designed to cover not all acts of regulatory agencies and their employees, but *only* such acts as are 'discretionary' in nature . . . " that is, "political, social, and economic judgments of governmental – including regulatory agencies."  *Id* at 539 (emphasis added).  Yet, the Government offers no evidence in support of its assertion that the interpretation of a statute here was a "discretionary" act involving

"political, social and economic judgments." *Berkowitz,* 486 U.S. at 538.  Instead, it steadfastly conceals the evidence.

Moreover, federal courts have repeatedly ruled complaints actionable under the FTCA involving the administrative actions of federal agencies applying statutes or regulations.  *See* discussion and cases cited *supra* at 8-11.  Contrary to the Government's argument, the mere performance of "administrative duties" involving "interpretation" of a statute does not exempt the Government from liability under the FTCA.  The Coast Guard's erroneous or arbitrary application of a legal standard to facts is not a discretionary function.  *Canadian Transp. Co.,* 663 F.2d at 1084-91; *Hendry v. United States,* 418 F.2d at 779-83.  As here, "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Berkowitz,* 486 U.S. at 544.

Importantly, the only authority the Government offers in support of its argument that no private analogue exists is its citation to inapposite cases allegedly standing for the proposition that "the lack of a private party analogue precludes an FTCA claim based on analogous administrative action by federal agencies in the conduct of their own affairs."  Mem. at 16.  *See also supra* at 12-13.  But as explained above, that argument errs by comparing the Complaint here to dissimilar cases involving attempts to vindicate federal due process rights.

Instead, the proper legal analysis is to ascertain if there are private analogues which Hornbeck has already amply demonstrated.  In *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957), the court explained, ascertainment of the analogous tort in accordance with local law is not "an insurmountable difficulty" in a regulatory situation.  "Whether it be negligence or an intentional tort, the court must characterize the situation in terms the local law will permit." *Id.* And as the Fifth Circuit has explained, "The Government may not escape liability because we

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 24 of 46**

cannot find any private person . . . who had done so. . . .  The court trying the case has the obligation to determine on appropriate standards what the law would be were there such a private person performing the unusual function."  *United States v. Gavagan,* 280 F.2d 319, 327 (5th Cir. 1960).  In *Canadian Transport,* the D.C. Circuit expressly rejected the Government's argument that there was no private party analogue for a classified national security program, explaining: "Many recent cases have imposed liability upon the United States for its performance of activities that are not usually performed by private persons. . . .  We believe that the appellants' claim was not barred merely because the Coast Guard was engaged in an activity not usually engaged in by private persons."  663 F.2d at 1090-91.

Moreover, by ignoring the purpose of the statute, the Government turns the FTCA on its head.  As the Supreme Court has explained:

> The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws.

*Indian Towing,* 350 U.S. at 68.  And more recently, the Supreme Court reaffirmed its holding in *Indian Towing* that with respect to the private analogue requirement that "the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield."  *United States v. Olson*, 546 U.S. 43, 46 (2005).  The Supreme Court further illustrated its ruling by citing examples of diverse inspection scenarios involving private persons and explained that private persons who do not perform the identical act as the Government alleged in the tort action may nevertheless "create a relationship with third parties that is similar to the relationship" between the Government and the plaintiff in an FTCA action.  *Id.* at 47.

In this instance, private entities, e.g. marine surveyors, classification societies, and other organizations, issue certificates to vessel owners similar to the Coast Guard's issuance of certificates. 46 C.F.R. § 8.320. Contrary to its misrepresentation to the Court, the Government has long understood this fact. In its 1995 rulemaking levying user fees on Hornbeck and other vessel owners receiving the Coast Guard's vessel certification services, it stated:

> The Coast Guard is aware that inspections or surveys done by other agencies such as FCC, by classification societies like ABS, and by marine surveyors are subject to fees. Although activities of the *same type* done by different agencies may appear to be at least partially *duplicative*, the activities have a different purpose."

60 Fed. Reg. 13,558 (Mar. 13, 1995) (emphasis added). The Agency recently reaffirmed its understanding that private entities issue similar vessel certificates. 76 Fed. Reg. 28,650 - 28,651 (May 22, 2007).

Moreover, even if Hornbeck's FTCA action was novel, that is no bar. The Supreme Court has emphasized that "[t]he Act extends to novel and unprecedented forms of liability as well." *Muniz v. United States,* 374 U.S. 150 159 (1963). And in *Quinones v. United States,* 492 F.2d 1269, 1278 (3d Cir. 1974), the Third Circuit explained that:

> New and nameless torts are being recognized constantly and the progress of the common law is marked by many cases of first impression. . . . When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy. . . . As a leading case expresses the scope of the law's protection: 'We see no good reason why a wrongful invasion of a legal right, causing an injury to the body or mind . . . should not give rise to a right of action.'

Judge Huvelle recently illustrated the application of this principle in a FTCA action implicating the Army's chemical weapons program finding that a private person analogue is not as difficult as the Government contends. In that case the Government also argued vigorously that "no analogous private liability can be demonstrated," but she concluded that the Government's

misconduct "can be analogized to private action" because it did not involve a "quasilegislative or quasi-adjudicative action." *Loughlin v. United States,* 230 F. Supp. 2d 26, 45 (D.D.C. 2003). Likewise, in this instance the Court should reach the same conclusion.

## II.    Hornbeck's FTCA Claim Is Not Barred by the Statute of Limitations.

The Government's motion to dismiss on statute of limitations grounds is subject to FRCP 12(b)(6). *Smith v. United States,* 2007 WL 2932569 at *7 (D.D.C. 2007).  As set forth above, this standard strongly disfavors dismissal.

Proper analysis of the occurrence of the injury and damages to Hornbeck for the purpose of the accrual of the FTCA action establishes that (1) Hornbeck's FTCA claim accrued on March 27, 2006; (2) the injury and damages did not occur until the end of 2004, and (3) they could not occur until *after* the "final agency action" of September 15, 2004, and even under the Government's theory, the continuing tort doctrine renders the September 15, 2004 Agency wrong a complete tort, leaving the March 29, 2004 date advanced by the Government irrelevant. Therefore, in all events Hornbeck's administrative claim was timely filed on September 12, 2006, and the Court should deny the Government's motion on statue of limitations grounds.

### A.    Hornbeck's FTCA Claim Accrued on March 27, 2006.

The Government argues erroneously that Hornbeck failed to file its FTCA administrative claim timely, because Hornbeck's claim allegedly accrued on March 29, 2004, the date of the Agency's initial disapproval of Hornbeck's request.  Mem. at 29.  However, the Government errs because Hornbeck's claim did not as a matter of fact and could not as a matter of law have accrued on March 29, 2004.  Rather, Hornbeck's claim accrued on March 27, 2006 when Hornbeck finally realized a complete FTCA cause of action.  And, Hornbeck's September 12, 2006 administrative claim was therefore timely filed.

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 27 of 46**

There is no dispute that an action under the FTCA must be "presented in writing to the appropriate Federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). The FTCA coincides with other "accrual" statutes wherein the statute of limitation begins to run when the plaintiff "has a complete cause of action," *Graham County Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 418 (2005). This does not occur for limitations purposes "until the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 200 (1997). Thus, a tort cause of action cannot accrue, and a statute of limitations does not commence to run, until the time of the injury, "when the wrongful act or omission results in damages." *Wallace v. Kato*, 127 S. Ct. 1091, 1097, (2007); *United States v. Kubrick*, 444 U.S. 111, 119 (1979) (FTCA tort claim accrues *at its earliest* at the time of the plaintiff's injury).

Hornbeck's legal injury did not accrue until March 27, 2006, when this Court determined the Agency's conduct wrongful. *Hartford Life Ins. Co. v. Title Guar. Co*., 520 F.2d 1170, 1173 (D.C. Cir. 1975); *Slatten v. United States*, 990 F.2d 1038, 1042-43 (8th Cir. 1993). In *Hartford Life*, plaintiff had been seeking vindication of its legal rights under a note in another proceeding for several years before filing its tort claim. And when plaintiff brought its tort action, the district court erroneously dismissed it as time barred under the three-year statute of limitations for torts. In reversing the dismissal, the D.C. Circuit explained that the "right to sue did not accrue until the plaintiff had a cause of action" and that did not occur until plaintiff "suffered a legally cognizable damage." *Hartford Life*, 520 F.2d at 1173.

More recently, in *Communications Vending Corporation of Arizona v. Federal Communications Commission,* 365 F.3d 1064, 1075 (D.C. Cir. 2004), the Court expressly reaffirmed *Hartford Life* because the underlying legal ruling there "established for the first time a

predicate fact of injury central to the action." The same rule applies in this instance when the legally cognizable nature of Hornbeck's damage was established by Judge Kotelly's decision of March 27, 2006.

Likewise, in *Statten*, the plaintiff had long complained of the Government's wrongful exercise of control over her property (mineral royalties retained by the Government), but the court found that a FTCA cause of action did not accrue until an administrative decision overturned the Government's prior legal position. The court explained that while the fact of physical injury is easily determined, cognizable injury to property rights depends on the determination of legal wrong:

> Slaaten's knowledge of her injury . . . was dependent upon the legal determination of whether the government's conduct was wrongful. Without the wrongful exercise of control, Slaaten has not suffered an injury. Thus, knowledge of the fact of the injury is complex because it involves a critical legal determination: whether the government's exercise of control over Slaaten's property was unlawful, and thus, wrongful. . . . The Board's determination of law, as opposed to a fact of physical injury which would be readily known to a plaintiff, completed Slaaten's knowledge of the fact of her injury. Slaaten's claim, therefore, did not accrue, and consequently, the statute of limitations did not begin to run until the Board denied the Bureau's petition for reconsideration on September 19, 1989.

*Id.* at 1042-43 (internal citations omitted).

Here, Hornbeck's legal injury for the Agency's failure to properly issue a COI hinged in the first instance upon this Court's decision of March 27, 2006. *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37, 58 (D.D.C. 2006). Thus, the legal determination of the *fact* that the Agency's action wrongfully impaired Hornbeck's use of the Barge is the *sine qua non* for accrual of the FTCA action.

**B.    Hornbeck Had No Injury And Damages on March 29, 2004.**

Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 29 of 46

Moreover, on March 29, 2004, the date alleged by the Government for accrual, Hornbeck had sustained no injury and damages.  As plainly stated in the Complaint, Hornbeck first incurred damages near the end of 2004 following the Agency's "final agency action" forcing Hornbeck to remove the Barge from service prior to January 1, 2005.  Complaint ¶ 39. Additionally, the Government knows full well that Hornbeck expressly stated in its administrative claim on Standard Form 95, in block 6 of the form entitled "Date and Day of Accident" that the date of injury was "12/29/04." (Ex. 7.)  And in its administrative claim to the Agency, Hornbeck also explained that "[T]he Coast Guard's act has prevented Hornbeck from operating the vessel from late 2004 and thereby caused Hornbeck continuing injury and damages." (Ex. 7.)  Thus, contrary to the Government's suggestion, Hornbeck did not allege that it sustained injury or damages on March 29, 2004.  Furthermore, Hornbeck lacked any injury or damages on that date and has not claimed any.  Complaint ¶ 39.  And the Government failed to provide any evidence in its motion that Hornbeck did sustain actual injury and damages on that date.  Absent damage, the claim simply did not accrue as the Government asserts.  *Wallace v. Kato*, 127 S. Ct. 1091, 1097, (2007); *United States v. Kubrick*, 444 U.S. 111, 119 (1979); *Prosser and Keeton on Torts*, § 30 (5th ed. 1984).

Since the purpose of an FTCA claim is the recovery of *money damages*, an FTCA action cannot be brought without submission of an administrative claim specifying a "sum certain" damage amount.  28 U.S.C. § 2675; 28 C.F.R. § 14.2(a).  If, as the Government argues, Hornbeck had filed an FTCA claim on March 29, 2004, when Hornbeck had no damages to claim, Hornbeck's administrative claim would have had to state a "sum certain" of zero dollars. In the Government's scenario, its own regulations mandated rejection of such an FTCA claim as fatally flawed.  28 U.S.C. §§ 1346 & 2675; 28 C.F.R. §§ 14.2 & 14.4(c).  As a practical matter,

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 30 of 46**

had Hornbeck filed an administrative claim on March 29, 2004, it would have been rejected for failure to state a claim.  *See Loughlin v. United States*, 230 F. Supp. 2d 26, 39 (D.D.C. 2002) (citing *Lhotka v. United States*, 114 F.3d 751, 753 (8th Cir. 1997)) (If an FTCA claim was filed even after the wrongful act but before property was actually damaged "the trial court would have then dismissed the action for failure to state a claim:  at the time, the fact of injury and its cause were simply too speculative for a court to provide any remedy.").

The Government's assertion that accrual is not delayed until "the full extent" of the injury is known is both unremarkable and unavailing.  Mem. at 31.  That unexceptional principle applies when a plaintiff already has sustained injury and damages in fact, in which case accrual is not deferred simply because the full amount of the damages is unknown.  *See, e.g., Sprint Comms. Co. v. Fed. Commc'n Comm'n*, 76 F.3d 1221, 1226 (D.C. Cir. 1996).  Unlike Hornbeck's circumstance on March 29, 2004, when it had not yet sustained any injury and damages, the injury in the three cases cited by the Government had already occurred.  The cases are inapposite, and the Government's argument fails.

As an initial matter, the Government's erroneous argument that the FTCA action accrued on March 29, 2004 derives from its misrepresentation of the allegations of the Complaint.  Mem. at 31.  First, contrary to the Government's misrepresentation, nowhere in the Complaint did Hornbeck allege that its FTCA claim accrued on March 29, 2004.  The Government misdirects the Court and fails to disclose to the Court the specific section of the Complaint prominently titled "***Hornbeck's Injuries and Damages***" wherein Hornbeck alleged its injuries and damages in detail and explained that they arose when Hornbeck was forced to take the vessel out of service at the end of the year 2004 in advance of the January 1, 2005 phase-out date.  The Complaint states simply and plainly:

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 31 of 46**

*Hornbeck's Injuries and Damages*

39.     The Coast Guard's lack of due care, negligence and/or wrongful act or omission in assigning an improper phase out date and failing to assign the proper phase out date for the ENERGY 8701 caused Hornbeck injuries and damages in the amount of $6,578,789.65 comprised of:

a.  $4,778,040 for loss of hire during the period from January 1, 2005 until September 30, 2006 during which time the Barge could not operate as a tank barge;

b.  $231,869 for drydocking required by the Coast Guard prior to taking the vessel out of service;

c.  $208,482.16 for costs incurred in taking the vessel out of service and laying it up; and

d.  $1,360,407.49 in damages to return the vessel to service from its layup and repair layup related damages, including $155,498.49 in damages for legal costs incurred in overturning the Coast Guard's unlawful action.

Complaint ¶ 39(a)-(d).

Second, the Government's citation to Complaint ¶ 19 in support of its argument misrepresents that allegation of the Complaint.  Although not disclosed by the Government, that portion of the Complaint simply and plainly recounts the Agency's "***Acts and Omissions Denying the Barge the Proper OPA 90 Phase-out Date***," Complaint ¶¶ 17-23, not "***Hornbeck's Injuries and Damages***" which, as explained above, appear later in the Complaint.

The "acts and omissions" portion of the Complaint, properly alleges that the Agency's acts and omissions of March 29 and September 15, 2004 *later* resulted in injury and damages to Hornbeck that were *foreseeable*.  Thus, the allegation upon which the Government erroneously relies does not actually allege that Hornbeck incurred injury and damages on March 29, 2004.  Instead, the Complaint simply and plainly states that Hornbeck "removed the vessel from operation prior to January 1, 2005" as mandated by the Agency.  Complaint ¶ 23.  And, while the Agency's "acts and omissions' occurred on March 29 and September 15, 2004, Hornbeck's "injuries and damages" did not occur until *later* in 2004 as the Complaint plainly states when Hornbeck had to remove the vessel from service, etc.

Furthermore, the language of the Government's motion belies the weakness of its argument. The Government does not state that the March 29, 2004 initial disapproval actually caused injury and damages sustained by Hornbeck on that date, that the Government has any evidence of that, or even that Hornbeck alleged that it sustained injury and damage on that date. Instead, the Government argues only that the initial disapproval allegedly "*would* result in damages." Mem. at 31-32 (emphasis added). This assertion is consistent with what Hornbeck actually alleged and also stated in the administrative claim. And the damages occurred in "late 2004." (Ex. 7). Despite the Government's misrepresentation of the Complaint to suggest the FTCA claim accrued on March 29, 2004, the Government knows full well that Hornbeck's injury and damages were not incurred on March 29, 2004, but only occurred in "late in 2004." (Ex. 7).

### C.    Accrual Could Not Occur Before September 15, 2004.

In all events, under no circumstances could Hornbeck's FTCA claim have accrued before September 15, 2004, when the Agency issued its "final agency action." Prior to that date, and specifically on March 29, 2004, Hornbeck had received only an initial disapproval with an invitation to seek "final agency action." (Ex. 4); *Hornbeck*, 424 F. Supp. 2d at 41-42. Contrary to the Government's wholly unsupported assertion, Mem. at 31, the initial disapproval did not "ensure" that the Barge would be removed from service unless the Government is also admitting that the Agency appeal process was a sham.

The Agency did not issue its "final agency action" until September 15, 2004. By advancing the March 26, 2004 accrual date, the Government argues that knowledge of a *potential* injury that *might* occur in the future – in this instance many months later – triggers accrual of a cause of action for the later injury. The Government's observes that "[t]he statute of limitations begins to run on the first date that the injured party possesses sufficient critical facts

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 33 of 46**

to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." Mem. at 30 (quoting *Loughlin*, 230 F. Supp. 2d at 39). "That date," argues the Government, was "March 29, 2004" because the denial "ensur[ed] that the company had to remove the barge from service at the end of the year," Mem. at 31, and "the company became aware that the agency had taken action that *would* result in damages to the company." *Id.* at 32 (emphasis added).

The Government's argument, however, misapplies the law of accrual. The language quoted by the Government from *Loughlin* concerned the degree of due diligence a plaintiff must exercise for the discovery rule to delay the accrual from a prior injury. *Id.* at 40. Accrual can be delayed when an injury occurs, but does not manifest itself until a later time when a plaintiff has or should have discovered the (1) fact of the injury and (2) its cause. *United States v. Kubrick*, 444 U.S. 111, 119 (1979). Properly applied, the discovery rule works to *delay* accrual of an FTCA claim *after* an injury has occurred. *Id.*; *Sprint Comms. Co. v. Fed. Commc'n Comm'n*, 76 F.3d 1221, 1226 (D.C. Cir. 1996); *Hall v. Admin. Offices of the U.S. Courts*, 496 F. Supp. 203 (D.D.C. 2007). It does not stand for the proposition advanced by the Government that accrual occurs upon notice of potential damages that might occur many months in the future.

The two cases cited by the Government are inapposite. In *Loughlin,* the court held dismissal was inappropriate where the discovery rule applied to delay accrual of an FTCA action for injury to property that occurred in excess of two years prior to the administrative claim. The *Loughlin* court cited with approval to *Lhotka v. United States*, 114 F.3d 751, 753 (8th Cir. 1997) where the court noted that the statute of limitations was triggered when abnormal levels of flooding *actually damaged the property at issue* as a result of construction, not when the agency negligently completed the construction. *Id.* (citing *Lhotka*, 114 F.3d at 753).

In *Hall v. Administrative Offices of the United States Courts*, 496 F. Supp. at 206-07, the court rejected application of the discovery rule to delay accrual of an action for a negligently prepared pre-sentence report that erroneously caused a lengthy prison sentence. Importantly, the Court found the claim accrued when the plaintiff was injured at sentencing, not at the earlier date when the report was negligently prepared. *Id*. at 207.

The proper application of the discovery rule protects plaintiffs that are injured but not aware of the injury by delaying the date of accrual to the date of discovery of the injury. In contrast, the Government's perversion of the discovery rule here prejudices the injured plaintiff by advancing the date of accrual to the date it become aware that it might be injured in the future. Thereby, the Government turns on its head the discovery rule, designed to protect those the Government harms so the Government can harm its citizens with impunity.

The Government also argues erroneously that the continuing tort doctrine causes accrual of the tort on March 29, 2004. But, this argument fails because as explained above there was no injury or damage to Hornbeck on that date. Additionally, the Government misapplies the doctrine. The doctrine only applies to shift an accrual date to the cessation of tortious conduct "[w]hen a tort involves continuing injury" resulting from more than one tort event. *Page v. United States*, 729 F.2d at 821-22 (D.C. Cir. 1984). Because the FTCA claim did not accrue on March 29, 2004, the doctrine has no application here.

But, even if the initial disapproval of March 29, 2004 established a complete tort cause of action as the Government argued, the "final agency action" of September 15, 2004 would have as well. Contrary to the Government's argument, the Agency's "final agency action" did not "merely affirm[]" the initial disapproval. Rather, Hornbeck presented its appeal to the Agency Headquarters with newly discovered evidence of disparate and arbitrary treatment of the Barge

as compared to the Bouchard barges as an additional basis for the request for a proper COI. *Hornbeck*, 424 F. Supp. 2d at 42. As this Court in *Hornbeck* reasoned, the failure of the agency to properly address that basis demonstrated that the Agency's decision should be accorded no deference because it was an attempt to cover up its wrongful disparate and arbitrary treatment of similarly situated vessels. *Id*. at 47-49. Thus, even if the March 29, 2004 initial disapproval was a complete tort (which it was not), the continuing tort doctrine would apply to toll the accrual of the cause of action until the last wrongful act, since both wrongful acts denying Hornbeck's COI with the proper phase out date would have caused the removal of the vessel from service. *Page*, 729 F.2d at 822 (cumulative effect of the conduct is actionable). The protection the Government seeks contradicts both the facts and the principle that "one should not be allowed to acquire a right to continue the tortious conduct." *Id.* (internal citations omitted).

## III.     The FTCA Action Is Not Barred By Claim Preclusion.

The Government's motion to dismiss on the basis of claim preclusion is also subject to FRCP 12(b)(6) and the highly deferential standard favoring the plaintiff and disfavoring dismissal. Claim preclusion is an affirmative defense generally pleaded in a defendant's answer, but which can be brought in a pre-answer FRCP 12(b)(6) motion when "all relevant facts are shown by the court's own records, of which the court takes notice." *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992); *Bethel v. Jendoco Constr. Corp*., 570 F.2d 1168, 1174 n.10 (3d Cir. 1978); *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 76-77 (D.C. Cir. 1997). As the party seeking to establish claim preclusion, the Government has the burden of proof. *Does I through III v. Dist. of Columbia*, 238 F. Supp. 2d 212, 217 (D.D.C. 2002). Here, the Government failed to carry its burden because the defense is not apparent on the face of the Complaint and the Government has offered no other evidence.

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 36 of 46**

**A.      Government Has Not Met Its Burden to Prove Claim Preclusion.**

The general principle of claim preclusion is that a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action. *U.S. Indus., Inc. v. Blake Constr. Co.*, 765 F.2d 195, 205 (D.C. Cir. 1985) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

The D.C. Circuit has adopted the *Restatement (Second)'s* "transactional" approach toward a "'cause of action,' for purposes of claim preclusion.  *U.S. Indus.*, 765 F.2d at 205. "Cause of action" is "determined pragmatically," considering "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id*. (quoting *Restatement (Second) of Judgments* § 24(1) (1982)).  Proper application of the standard establishes that Hornbeck's FTCA action is not precluded.

**1.  The Facts Of The APA And FTCA Claims Are Not Sufficiently Related In Time, Space, Origin, Or Motivation.**

The Government's claim preclusion argument hinges on the unsupported, inaccurate and, unproven counter-allegation that the FTCA claim accrued on March 29, 2004, before the accrual of the APA claim on September 15, 2004.  Mem. at 28.  But, as established above, the Government errs because neither the predicate fact of legal injury nor actual injury and damages occurred on March 29, 2004.  Claim preclusion does not bar claims based on facts not yet established at the time of the first action, even if the two actions may share the same nucleus of facts. *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 66 (D.C. Cir. 2002); *Velikonja v. Ashcroft*, 355 F. Supp. 2d 197, 202  (D.D.C. 2005); *Does I through III*, 238 F. Supp. 2d at 219.  The legal injury to Hornbeck's property interest at issue in this FTCA action simply was not established until this Court's decision of March 27, 2006, and the injury in fact caused by the Agency's

"final agency action" did not occur until the vessel was removed from service in late 2004 *after* the Agency's "final agency action" dated September 15, 2004.

The necessary predicates to the FTCA action did not arise until after the APA action was filed on October 8, 2004, which is the operative date for determining when claims could have been brought for the purposes of claim preclusion. *Velikonja*, 355 F. Supp. 2d at 202 ("for *res judicata* purposes, claims that " could have been brought" are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings," not claims that came into existence when the action could have been amended). Therefore, the FTCA action based on facts arising after the October 8, 2004 APA filing are not barred.

Similarly, claim preclusion does not bar parties from bringing claims that would have been "utterly impracticable" to bring in the earlier suit. *Velikonjat*, 355 F. Supp. 2d at 204. Hornbeck simply could not have submitted its FTCA administrative claim before the tort accrued on March 27, 2006, when its legal injury was established, *Hartford Life*, 520 F.2d at 1173; *Slatten*, 990 F.2d at 1042-43, nor before late 2004 when injury and damages were incurred to remove the Barge from service. *United States v. Kubrick*, 444 U.S. 111, 119 (1979).

Thereafter, as the Government knows, Hornbeck must have waited an additional six months for Agency consideration of the administrative claim before filing the FTCA action. Consequently, the earliest FTCA filing date following the injury and damages incurred in late 2004 was not until approximately mid-2005. That was long after the APA action filing in October 8, 2004, thereby rendering the filing of the FTCA action with the APA claim on October 8, 2004 "utterly impracticable." *Velikonjat*, 355 F. Supp. 2d at 204.

Moreover, claim preclusion "does not apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate the claim or issue." *Wise v.*

*Glickman*, 257 F. Supp. 2d 123, 131 (D.D.C. 2003) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480-81 (1982). *See also U.S. Indus.*, 765 F.2d at 206. And here, the Government has failed to carry its burden of showing that Hornbeck had a full and fair opportunity to litigate the FTCA claim in the APA action. *Neumann v. Vidal*, 710 F.2d 856, 860 (D.C. Cir. 1983).

The evidence establishes otherwise. The Government's wrongful act and/or negligence, Hornbeck's injury and damages, and other FTCA elements, were not before the Court in the APA action. This Court decided the APA action only on the administrative record on cross motions for summary judgment. There was no discovery. *Hornbeck*, 424 F. Supp. 2d at 38-39. Additionally, the Government withheld – and continues to withhold – from Hornbeck key evidence concerning its actions. (Ex. 9). Even if the FTCA claim could have been brought on October 8, 2004, which it could not, "[t]he critical point" in determining whether there was a "full and fair opportunity to litigate" is whether the plaintiff "in fact enjoyed an opportunity to present evidence on each of the[] claims in the [earlier] proceeding." *U.S. Indus.*, 765 F.2d at 206. No such opportunity existed in the APA action.

The Government relies principally on *Lafayette Fed. Credit Union v. United States*, 76 F. Supp. 2d 645 (D. Md. 1999), to argue the APA action bars Hornbeck's FTCA action. Mem. at 26-29. However, that case is inapposite. In *Lafayette,* the APA and FTCA claims both accrued prior to the first action. *Id*. at 650 ("Plaintiff's presumably had all the information they would need to file the . . . complaint on November 2, 1996 and to present their administrative claims). Thus, unlike Hornbeck's FTCA action here, in *Lafayette* the plaintiff's could have brought both causes of action, but did not and "failed to articulate any sufficient justifications for their failure to file the FTCA claims in the prior litigation." *Id*. In *Lafayette* the claims were identical, seeking redress from the defendant's liquidation of a credit union, even claiming damages in

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 39 of 46**

both lawsuits.  *Id*. at 647-48  After the plaintiffs lost the APA action, they brought the FTCA action on the same facts, again seeking damages.  *Id.*

*Lafayette* is nothing more than a rather unremarkable example of the application of claim preclusion to bar a disappointed plaintiff from re-filing the *same* cause of action under a different legal theory.  *See, e.g., Corey v. Property Clerk*, 209 F. Supp. 2d 19, 23 (D.D.C. 2002) (dismissing subsequent claim where "[t]he only difference between the plaintiff's two suits is that the plaintiff asserts different theories of recovery in each); *Velikonja,* 355 F. Supp. 2d at 203 (distinguishing the newly accrued claim from several cases involving "a plaintiff attempting to file a second suit based on the same set of facts as relied on in an earlier case").  Not surprisingly, the same is true for the three APA and FTCA cases cited in the Government's motion.

Applying the logic of *Lafayette*, but ignoring the key factual differences, the Government erroneously asserts that it would not have been "utterly impractical" for Hornbeck to bring both claims if the FTCA claim accrued on March 29, 2004.  Mem. at 28.  But that argument is wholly defeated by the different facts here.  Furthermore, to the extent that the Government seeks to rely on the *dicta* in *Lafayette*, Mem. at 28,  to argue that to avoid claim preclusion a plaintiff must delay filing an accrued APA claim to include a potentially later accruing FTCA claim, or requiring a plaintiff to amend an APA claim when an FTCA claim subsequently accrues, those views are contrary to the holding of this Court in *Velikonja*, 355 F. Supp. 2d at 203.

Moreover, such a view would lead to an absurd result in the instant case.  Hornbeck filed its APA claim promptly, consistent with a tort plaintiff's legal duty to mitigate damages. Hornbeck hoped to avoid injury and damages altogether (as the action was filed before Hornbeck was forced to remove the Barge from service and sought expedited consideration).  *See, e.g., La*

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 40 of 46**

*Marca v. United States*, 31 F. Supp. 2d 110, 131 (E.D.N.Y. 1998) (plaintiff is under a duty to mitigate damages in an FTCA case).   However,   the course the Government now argues Hornbeck must have followed – delaying filing the ripe APA claim to await the accrual of an FTCA action – would have (1) imposed an extra-legal requirement on Hornbeck which had a ripe APA claim as of September 15, 2004 and (2) barred Hornbeck from mitigating its future damages which for loss of use of the Barge after December 29, 2004 accrued at the rate of $7,429.00 per day or $222,870.00 per month.  (Ex. 7.)  The Government's argument also rings particularly hollow considering how it directly contradicts its previous allegation that Hornbeck failed to mitigate damages.  Answer ¶ 56, Doc. No. 7.  Simply put, the Government can't have it both ways, on the one hand alleging Hornbeck failed to mitigate damages and on the other hand arguing Hornbeck should have delayed bringing the APA action that sought to return the Barge to service, so it could bring it and the FTCA action together.

### 2. The APA And FTCA Claims Here Do Not Form A Convenient Trial Unit.

The Government's own argument constitutes an admission that the APA and FTCA actions do not form a convenient trial unit.  On one hand, the Government admits, the APA action was decided on the administrative record on cross-motions.  Mem. at 25.  This followed the Government's firm assertion in the APA action "that discovery is not appropriate in this case because the case involves judicial review under the APA and FOIA."  Joint Scheduling Report in APA action (Ex. 10).  On the other hand, the Government argues that even if a court believed an APA action relevant to a FTCA action, it should "stay the FTCA case pending the outcome."  Mem. at 25.  Thus, according to the Government, the APA and FTCA claims should not be in the same trial at all, let alone forming a convenient trial unit.

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 41 of 46**

As the Court of Appeals for the D.C. Circuit has explained in *Beins v. United States*, the APA and FTCA actions raise different concerns, decide different questions, and have different remedies:

> [I]t is obvious that an appeal under the APA will not provide any remedy in damages, while the prime purpose of the FTCA is to compensate victims of negligent government conduct. . . .
>
> In addition, an administrative appeal determines whether the agency action was in excess of statutory jurisdiction and authority . . . these determinations are distinct conceptually from a finding of negligence, the lynchpin of the FTCA.

695 F.2d 591, 598 (D.C. Cir. 1982).

The APA action was strictly limited to the administrative record (with key Government documents withheld). The remedy under the APA was in the nature of a declaratory judgment of the applicable law and Hornbeck's legal rights. And the Court's establishment of the fact of the Agency's legal wrong to Hornbeck's property interest in that action will not be re-litigated because that fact has already been determined.

By contrast, Hornbeck's FTCA action involves discovery and a trial, on issues not part of the APA proceeding including on the Government's intentional tort, negligence, lack of due care, and Hornbeck's injury and damages. Unlike the APA action, Hornbeck's remedy in the FTCA action is an award of damages. Claims that involve such divergent characteristics do not form a convenient trial unit. *See, e.g., Nixon v. United States*, 978 F.2d 1269, 1298 (D.C. Cir. 1992) (Henderson, J., concurring) (first case challenging regulations and second related case that would have would have required an evidentiary record not likely to form a "convenient trial unit"); *In re Auto-Train Corp.*, 49 B.R. 605, 613 (D.D.C. 1985) (action involving a "relatively straightforward question" and second action requiring a "thorough . . . analysis, including a detailed examination . . . do not form a convenient trial unit.").

### 3.  Treatment As A Unit Does Not Conform To The Parties' Expectations.

Once again, the Government has failed to carry its burden to establish that the parties expected that the APA and FTCA claims would be brought as a unit.  The Government has offered no evidence on this requirement at all and cannot properly offer any in its reply.

To the contrary, the Government's own motion directly contradicts the position it has the burden of proving.  After all, the Government's principal argument in its motion is that Hornbeck has no actionable tort against the United States in the first place.  Mem. at 9-20 ("Hornbeck's Complaint must be dismissed for lack of subject matter jurisdiction because its putative tort claim does not – and cannot – assert the requisite private party analog. . . .").  Therefore, since the Government position is that Hornbeck has no actionable tort against the United States, the Government admits that it cannot have expected that Hornbeck would have brought its FTCA action as a unit with its APA action on October 8, 2004.

Furthermore, as explained above, the Government's allegation in its Answer that Hornbeck failed to mitigate damages manifests the Government's position that Hornbeck had a legal duty to mitigate damages by taking steps to return the vessel to service.  This Government allegation also contradicts the requirement that it has the burden of proving.  Since according to the Government, Hornbeck had to mitigate its damages, delaying the filing of Hornbeck's APA so that it could bring the APA and FTCA actions as a unit was not consistent with the expectations of the parties that Hornbeck must mitigate its damages.

### IV.    Claim Preclusion Does Not Apply to Declaratory Judgment Actions.

Finally, even if the APA and FTCA actions here were considered the same causes of action, the doctrine of claim preclusion simply does not apply because the APA action which sought judicial determination of Hornbeck's legal right to a proper phase-out date for the Barge

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 43 of 46**

was declaratory in nature.  *Hornbeck*, 424 F. Supp. 2d at 58; 5 U.S.C. § 702; *James Madison Limited v. Ludwig,* 82 F.3d 1085, 1094 (D.C. Cir. 1996); *Roberts v. U.S. Dept. of Justice,* 366 F.Supp.2d 13, 17 (D.D.C. 2005).   And, the D.C. Circuit adopts the *Restatement (Second) of Judgments* § 33, which provides:

> A valid and final judgment in an action brought to declare rights . . . of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.

*See Horn & Hardart Co. v. Nat'l R.R. Passenger Corp.*, 659 F. Supp. 1258, 1264-66 (D.D.C. 1987) (awarding damages following declaratory relief).   In these circumstances, this Court's March 27, 2006 decision operates as a valid and final declaratory judgment, determining the legal fact of Hornbeck's injury because the Agency erred as a matter of law, declaring the "corrected legal standards," and remanding the matter to the agency for further action consistent with those standards.  *Hornbeck*, 424 F. Supp. 2d at 58.

The exception to the rule where actions for joint declaratory and coercive relief are asserted together is inapplicable here.   Hornbeck did not (and could not) seek damages in its APA action and where as this Court explained, it could only provide declaratory relief:

> [u]nder well-settled principles of administrative law, when a court reviewing administrative action determines that an agency made an error of law, the court's inquiry is at an end:  the case must be remanded to the agency for further action consistent with the corrected legal standards.

*Id.* (quoting *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 38 (D.D.C. 2003) (internal citations omitted).[3]   Therefore, even if the APA and FTCA claims were

---

[3] The court in *Horn & Hardart* expressed skepticism regarding the mechanical application of the exception for joined declaratory and coercive forms of relief.  Accordingly, while Hornbeck's APA action requested judicial review of the decision, and an award recognizing the correct phase out date, to the extent that the prayer for relief might viewed as coercive, the exception does not apply as only declaratory relief was available as a matter of law.

considered to be the same "causes of action," which they are not, the doctrine of claim preclusion simply does not apply here because of the declaratory nature of the APA action.

## <u>CONCLUSION</u>

For the foregoing reasons, Hornbeck respectfully submits that the Government's motion to dismiss should be denied and discovery should be scheduled to proceed forthwith.

<u>December 10, 2007</u>                                    Respectfully submitted,

WINSTON & STRAWN LLP

<u>    S/LAWRENCE I. KIERN</u>
Lawrence I. Kiern #441154
Thomas L. Mills #911495
Gerald A. Morrissey III #488730
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5811 (direct)
(202) 282-5100 (fax)
email:  lkiern@winston.com
email:  tmills@winston.com
email:  gmorrissey@winston.com
*Attorneys for Plaintiff*

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 45 of 46**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of December, 2007, I electronically filed the

foregoing Opposition to the United States' Motion to Dismiss Under Rule 12(b)1 or, In the

Alternative 12(b)(6) with the Clerk of Court using the CM/ECF system which will send a notice

of electronic filing to the following:

Rodney Patton
John S. Luce Jr.
Trial Attorney, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P.O. Box 14271
Washington, D.C. 20044-4271
(202) 616-4105
(202) 616-4035
Rodney.Patton@usdoj.gov
John.Luce@usdoj.gov


    S/LAWRENCE I. KIERN
Lawrence I. Kiern #441154
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5811 (direct)
(202) 282-5100 (fax)
email:  lkiern@winston.com

**Hornbeck's Opposition to the
Government's Motion to Dismiss
Page 46 of 46**

# EXHIBIT 1

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*

Westlaw.

424 F.Supp.2d 37

Page 1

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

**H**

United States District Court, District of Columbia.
HORNBECK OFFSHORE TRANSPORTATION,
LLC, Plaintiff,
v.
UNITED STATES COAST GUARD, et al.,
Defendants.
**No. Civ.A. 04-1724 CKK.**

March 27, 2006.

**Background:** Owner of tank barge brought action against United States Coast Guard and the United States of America, alleging that the agency's assignment of a phase-out date under the Oil Pollution Act (OPA) was contrary to law, arbitrary and capricious, and in violation of the Administrative Procedure Act (APA). Parties filed cross-motions for partial summary judgment.

**Holding:** The District Court, Kollar-Kotelly, J., held that Coast Guard's construction of the relevant statutes was contrary to their plain language and therefore was in violation of Administrative Procedure Act.
Plaintiff's motion granted; remanded.

West Headnotes

**[1] Statutes ☞219(1)**
361k219(1) Most Cited Cases
If agency's interpretation unduly compromises the statute's purposes, it is not a reasonable accommodation under Administrative Procedure Act (APA), and it would therefore not be entitled to deference. 5 U.S.C.A. § 706(2)(A).

**[2] Administrative Law and Procedure ☞507**
15Ak507 Most Cited Cases

**[2] Administrative Law and Procedure ☞763**
15Ak763 Most Cited Cases
Reasoned analysis requirement of Administrative

Procedure Act (APA) is not particularly demanding, and is satisfied if the agency enables reviewing court to see what major issues of policy were ventilated and why the agency reacted to them as it did. 5 U.S.C.A. § 706(2)(A).

**[3] Administrative Law and Procedure ☞790**
15Ak790 Most Cited Cases
Court must affirm if a rational basis for the agency's decision exists. 5 U.S.C.A. § 706(2)(A).

**[4] Statutes ☞219(1)**
361k219(1) Most Cited Cases
Degree of deference a court should pay an agency's statutory construction is affected by the thoroughness, validity, and consistency of an agency's reasoning.

**[5] Statutes ☞219(1)**
361k219(1) Most Cited Cases
Where court can easily discern Congressional intent from the statutes' plain language, the court's Administrative Procedure Act (APA) review terminates at step one of the *Chevron* review and the agency's construction is owed no deference. 5 U.S.C.A. § 706(2)(A).

**[6] Administrative Law and Procedure ☞753**
15Ak753 Most Cited Cases
Agency decisions must generally be affirmed on the grounds stated in them; post-hoc rationalizations, developed for litigation, are insufficient.

**[7] Statutes ☞219(4)**
361k219(4) Most Cited Cases
Where an agency's construction of a statute lacks both logic and consistency, no deference is due.

**[8] Environmental Law ☞418**
149Ek418 Most Cited Cases

**[8] Shipping ☞9**
354k9 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

In determining that gross tonnage of tank barge was the gross tonnage that would have been recognized by the Secretary of Transportation on July 1, 1997, Coast Guard's construction of the relevant statutes in assigning phase-out date to tank barge under the Oil Pollution Act (OPA) was contrary to their plain language and therefore was in violation of Administrative Procedure Act (APA); statutes allowed barge owner to select the tonnage measurement system to be used in accord with the tonnage laws' optional provisions allowing for either regulatory measurement system or Convention measurement system. Oil Pollution Act of 1990, § 4115(a), 46 U.S.C.A. § 3703a(e); Omnibus Budget Reconciliation Act of 1986, § 5101(3), 46 U.S.C.A. §§ 14302, 14502.

**[9] Administrative Law and Procedure ☞796**
15Ak796 Most Cited Cases

**[9] Administrative Law and Procedure ☞817.1**
15Ak817.1 Most Cited Cases
When a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end, and the case must be remanded to the agency for further action consistent with the corrected legal standards. 5 U.S.C.A. § 706(2)(A).
**\*38** Lawrence I. Kiern, Winston & Strawn, Washington, DC, for Plaintiff.

Diane M. Sullivan, United States Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

Plaintiff Hornbeck Offshore Transportation, LLC ("Hornbeck"), a limited liability company which owns and operates oil transport vessels, brings this action against Defendants the United States Coast Guard and the United States of America (collectively, "Defendants" or "the Agency") alleging that (1) the Agency's assignment of a phase-out date under the Oil Pollution Act of 1990 ("OPA 90"), Pub.L. 101-380, 104 Stat. 484 (1990), of January 1, 2005, rather than January 1, 2015, for

its tank barge "ENERGY 8701" was contrary to law, arbitrary and capricious, and in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq., see* First Am. Compl. ¶¶ 31-35 (Count I--Violation of APA), ¶¶ 36-40 (Count II--Violation of APA); and (2) the Agency's failure to provide certain requested documents constituted a violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *id.* ¶¶ 41- 47 (Count III--Violation of FOIA), ¶¶ 48-54 (Count IV--Violation of FOIA). [FN1] Currently **\*39** before the Court is Plaintiff's Motion for Summary Judgment as to Counts I and II of Plaintiff's First Amended Complaint (Plaintiff's APA claims), Defendants' Opposition and Cross-Motion for Summary Judgment on Counts I and II, and Plaintiff's Opposition and Reply.

> FN1. This Court, on March 20, 2006, issued a Memorandum Opinion and Order that granted-in-part and denied-in-part Defendants' Motion for Summary Judgment as to Counts III and IV of Plaintiff's First Amended Complaint, and denied Plaintiff's Cross-Motion for Summary Judgment on Counts III and IV (FOIA Claims). Specifically, the Court granted Defendants' Motion for Summary Judgment with respect to the adequacy of its search, and its withholdings/productions pursuant to FOIA Exemptions 4 and 6. However, due to the identified problems with the Agency's *Vaughn* Index and accompanying affidavits with respect to the documents withheld pursuant to FOIA Exemption 5, the Court denied Defendants' Motion for Summary Judgment with respect to its Exemption 5 withholdings. As such, the Court ordered Defendants to submit a new *Vaughn* Index as to the documents withheld pursuant to FOIA Exemption 5 with proper detailed document descriptions and reasons for withholding that illuminate the contents of the documents and the reasons for nondisclosure by Monday, May 8, 2006, with supplemental briefing to follow. *See Hornbeck Offshore Transp., LLC v. U.S.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

*Coast Guard,* Civ. No. 04-1724, 2006 WL 696053 (D.D.C. Mar.20, 2006).

Upon a searching examination of the parties' filings, the attached exhibits, the relevant case law, and the entire administrative record provided, the Court shall grant Plaintiff's Motion for Summary Judgment as to Counts I and II of Plaintiff's First Amended Complaint and shall deny Defendants' Cross-Motion for Summary Judgment.

## I: BACKGROUND
*A. Statutory Framework*

*1. The Oil Pollution Act of 1990*

In response to the disastrous March 1989 oil spill involving the EXXON VALDEZ in Prince William Sound, Alaska, Congress passed the Oil Pollution Act of 1990 ("OPA 90"), Pub.L. 101-380, 104 Stat. 484 (1990). OPA 90 requires that all newly constructed tank vessels engaged in the marine transportation of oil in the United States be constructed with double hulls. *See* 46 U.S.C. § 3703(a) ("Except as otherwise provided in this section, a vessel to which this chapter applies shall be equipped with a double hull...."). A "double hull" is a ship hull design method where the bottom and sides of the ship have two complete layers of watertight hull surface: one outer layer forming the normal hull of the ship, and a second inner hull which is somewhat further into the ship, perhaps a few feet, which forms a redundant barrier to seawater in case the outer hull is damaged and leaks. Double hulls are significantly safer than single hulls. In the case of grounding or other underwater damage, most of the time the damage is limited to flooding the bottom compartment, and the main occupied areas of the ship remain intact. In the case of a collision with another ship, most of the time the damage is limited to flooding the side compartment, and the main occupied compartments also remain intact. The provisions of the OPA requiring that all newly constructed tank vessels be provided double hulls apply, *inter alia,* to a U.S. vessel if it "is constructed or adapted to carry, or carries, oil in bulk as cargo or cargo residue" and when the vessel is "operating on the waters subject to the jurisdiction of the United States, including the Exclusive Economic Zone." *Id.* § 3703a(a)(1) & (2).

In addition to its requirements regarding the construction of double hulled tank vessels, OPA 90 also requires that all U.S. single hull tank vessels, including tank barges, existing at the time of OPA 90's enactment be retrofitted with double hulls in order to qualify for operation on the navigable waters of the United States or the waters of the Exclusive Economic Zone of the United States. *Id.* § 3703a(c). Any single hull tank vessel not retrofitted in such a manner must be phased-out of service in accordance with a statutory schedule, which began to have effect on January 1, 1995. *Id.* § 3703a(c)(3). The phase-out schedule of OPA 90 is based upon the gross tonnage, hull design, and construction date of the subject vessel. *Id.* For instance, for single hull tank vessels constructed prior to 1980, OPA 90 provides that vessels with a gross tonnage of 5000 gross tons or more must be phased-out as of January 1, 2005, while vessels with a gross tonnage of less than 5000 tons must be phased out as of January 1, 2015. *See id.* *40§ 3703a(c)(3)(A) & (c)(2). Whether a single hull vessel that was built before 1980 is phased out in 2005 or 2015 depends exclusively on the vessel's gross tonnage.

*2. The 1997 Amendment to the OPA*

For the seven years following its passage, OPA 90 contained no specific authorization for waiving or extending phase-out deadlines. However, because its deadlines were based in part on the gross tonnage of the vessel, with larger vessels generally having earlier phase-out dates, owners began obtaining *de facto* extended deadlines by reducing the documented carrying capacity of their vessels. *See* U.S. Gen. Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them 10 (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B. For example, a vessel owner could reduce the gross tonnage of a vessel by deducting cargo-carrying tanks from a vessel's gross tonnage by re-designating such tanks as specially segregated tanks that carried only ballast water. *Id.* at 11.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 3

424 F.Supp.2d 37

424 F.Supp.2d 37

(Cite as: 424 F.Supp.2d 37)

Page 4

The so-called Frelinghuysen Amendment, passed on November 18, 1997, changed this landscape, eliminating this industry practice of reducing the gross tonnage of a vessel scheduled for OPA 90 phase-out so as to obtain a later phase-out date. *Id.* at 10. Through the Frelinghuysen Amendment to OPA 90, Congress amended 46 U.S.C. § 3703a by adding the following pertinent provision:

(e)(1) For the purposes of this section and except as otherwise provided in paragraphs (2) and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997, as the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title.

46 U.S.C. § 3703a(e)(1).

### 3. *Tonnage Measurement Systems*

A vessel's gross tonnage measurement describes its internal volume, not the weight the vessel can carry or the weight of the vessel itself. As is plain upon a reading of 46 U.S.C. § 3703a(e)(1), there are two measurement systems recognized by the United States. Measurement under 46 U.S.C. § 14502 is the "Regulatory" measurement system, which yields the vessel's "Regulatory tonnage" commonly denominated "GRT." *See* 46 U.S.C. § 14501 *et seq.* Measurement under 46 U.S.C. § 14302 conforms with the International Convention on Tonnage Measurement of Ships of 1969, which yields the vessel's "Convention tonnage" commonly denominated "ITC." *See* 46 U.S.C. § 14301 *et seq.* The difference between a particular vessel's Regulatory tonnage and Convention tonnage solely reflects the different measuring criteria of each system for establishing the tonnage. In a typical case, the Convention tonnage system of measurement yields a higher gross tonnage than the Regulatory system. United States law requires that "a vessel engaged in a foreign voyage" be measured under the Convention measurement system. *See* 46 U.S.C. § 14301(a)(3); 46 C.F.R. § 69.11(a)(1).

### B. *The Decision Regarding ENERGY 8701's Phase-Out*

### 1. *ENERGY 8701*

ENERGY 8701, the tank barge at the center of this dispute, is a U.S.-flag tank barge designed to carry oil or other liquid cargo. *See* Admin. R. at 4, 18. A "tank barge" is a non-self-propelled vessel specially constructed or converted to carry oil, *41 hazardous material, or other bulk liquid in tanks. *See* 46 U.S.C. § 2101(39); 33 U.S.C. § 2701(34); 46 C.F.R. § 30.10-65, 151.03-51. Constructed in 1976, *see* Admin. R. at 4; First Am. Compl. ¶ 19, ENERGY 8701 is 360 feet long, 64 feet wide, and 27 feet deep; when fully loaded, the vessel is capable of carrying 85,000 barrels (= 3,570,000 million gallons) of oil, *see* Admin. R. at 16, 31. On August 25, 1976, the United States Coast Guard issued a Certificate of Admeasurement for ENERGY 8701 which recorded the vessel's gross tonnage as 5323.19 gross tons (GRT) using the Regulatory measurement system. *See id.* at 31. Because ENERGY 8701 was only engaged in domestic trade at that time, its Convention tonnage was not measured at that point. Importantly, since its original construction, ENERGY 8701 has undergone no physical alterations to reduce its tonnage. *See id.* at 14.

The original owner of ENERGY 8701 was a company called Spentonbush/Red Star Companies. *See id.* at 4. Plaintiff acquired the barge from Spentonbush through an affiliated company, called LEEVAC Marine Inc., in June 2001. *See id.* at 4. For over two and a half years, Plaintiff operated ENERGY 8701 and made no request to modify its gross tonnage measurement of 5323 GRT. *See id.* at 15-16, 32. Indeed, for nearly 30 years following its 1976 construction, no owner or operator of ENERGY 8701 sought to have that measurement changed or to substitute an admeasurement based on Convention tonnage for the original measurement of 5323 gross tons (GRT) under the Regulatory system. *Id.* When Plaintiff acquired ENERGY 8701, it believed that the barge would be phased out of service on January 1, 2005; indeed, the Coast Guard Certificate of Inspection for ENERGY 8701, dated November 27, 2001 (five months after Plaintiff's purchase of the vessel), notes that the gross tonnage of the vessel is 5323

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

GRT and specifically states that the OPA 90 phase-out date for the barge is January 1, 2005. *See id.* at 18-19; *see also* 46 U.S.C. § 3703(c)(3)(A) (providing that single hull vessels with a gross tonnage of 5000 gross tons or more must be phased out by January 1, 2005).

2. *Plaintiff's Pleasant "Surprise" and Attempt to Extend ENERGY 8701's Phase-Out Date*

In connection with a planned commercial voyage to Canada in early 2004, Plaintiff was compelled by international law to obtain a Convention measurement for ENERGY 8701. *See id.* at 4-5. On February 11, 2004, Plaintiff hired the American Bureau of Shipping ("ABS") to determine the tonnage of ENERGY 8701 under the Convention measurement system to permit the vessel to sail on this foreign voyage. *See id.* at 32. [FN2] As requested, ABS performed the necessary calculations and conducted a survey of the ENERGY 8701 in February 2004. *See id.* at 34-60. Based upon its calculations and survey, ABS determined that the vessel's gross tonnage is 4660 gross tons (ITC) using the Convention measurement system. *See id.* at 62. ABS issued an International Tonnage Certificate for the ENERGY 8701, delivering the certificate to the Coast Guard on February 24, 2004. *See id.* at 61-62.

> FN2. ABS is the American classification society. Classification societies are officially recognized organizations that develop and apply technical requirements for the design, construction, and maintenance of ships. With respect to tonnage measurement, ABS is qualified to perform the Convention measurement and authorized by the Coast Guard to issue a certificate for the vessel. *See* 46 C.F.R. §§ 69.27, 69.15; 46 U.S.C. §§ 3316(a) & (b)(1).

**\*42** Provided this new measurement of 4660 gross tons under a different system, Plaintiff believed that it was entitled to a new phase-out date for ENERGY 8701, as 46 U.S.C. § 3703(c)(2) provides a phase-out date of January 1, 2015 for

single hull vessels with a gross tonnage of less than 5000 tons. As such, on March 8, 2004, Plaintiff requested that the Agency recognize the vessel's gross tonnage of 4660 tons and establish the ENERGY 8701's phase-out date as January 1, 2015. *See id.* at 13-14 ("Initial Request"). In support of its request, Plaintiff enclosed the International Tonnage Certificate showing the tonnage of 4660 tons and verified that ENERGY 8701 had not undergone any major conversions or substantial alternations since its 1976 construction. *Id.* In response, the Agency assigned the Convention tonnage of 4660 gross tons (ITC) to ENERGY 8701, but denied Plaintiff's request to recognize the phase-out date of January 1, 2015, rather than January 1, 2005. *See id.* at 25. The Agency reasoned:

> [W]e interpret the language of 46 U.S.C. § 3703(a)(e)(1) as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage. Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

*Id.* at 26.

On July 29, 2004, Plaintiff appealed the initial Agency decision to Agency Headquarters. *See id.* at 1-12 ("Appeal"). Plaintiff, in its appeal, contended that the Agency had erroneously applied 46 U.S.C. § 3703a(e) and had treated other vessels--namely, two barges owned by a competitor of Plaintiff, Bouchard, identified as "B. NO. 95" and "B. NO. 105"--in a disparate manner under the same statute. [FN3] *See id.* at 5-9. On September 15, 2004, the Agency denied Plaintiff's appeal. In doing so, the Agency stated:

> FN3. Plaintiff learned of these other barges after the Agency provided the initial response to its contemporaneous FOIA request. *See* Pl.'s Mot. for Summ. J. at 5 n. 28.

Section 3703a of title 46 United States Code

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 5

424 F.Supp.2d 37

Page 6

424 F.Supp.2d 37

(Cite as: 424 F.Supp.2d 37)

states that the "gross tonnage of a vehicle shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997." We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA 90 phase out. The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system used for regulatory purposes.

*See* Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter"). The Agency's only stated rationale in rebuttal to Plaintiff's accusation of disparate treatment was an argument that Bouchard had *applied* for a tonnage change before July 1, 1997 (although the tonnage change had not been issued as of that date); as such, Bouchard was allowed to extend the phase-out date for its barges from January 1, 2005 to January 1, 2015, but Plaintiff--which had not applied for such a change prior to July 1, 1997--was not allowed an extension. *Id.*

Following the Agency's denial of its appeal, Plaintiff filed a Complaint in this Court on October 8, 2004. *See* Compl. Plaintiff contends, *inter alia,* that the Agency Action violated the parameters of the APA for two reasons. First, Plaintiff *43 asserts that "[t]he Agency's action is contrary to the plain language of 46 U.S.C. § 3703a(e)." First Am. Compl. ¶ 33 (Count I-- APA). Second, Plaintiff argues that "[t]he Agency's failure to treat legally indistinguishable circumstances alike"--i.e., its application as compared to Bouchard's application--"is arbitrary and capricious and otherwise not in accordance with law and is therefore contrary to the Administrative Procedure Act." *Id.* ¶ 39 (Count II--APA).

## II: LEGAL STANDARDS

*A. Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in

dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) ; *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

Page 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Id.* at 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

*B. Standards for Administrative Agency Review*

Plaintiff in this case challenges the Agency's construction of the phase-out **\*44** provision of OPA 90, specifically, the Agency's interpretation of the 1997 Amendment to OPA 90, 46 U.S.C. § 3703a(e)(1). The standard for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.' " *Arent v. Shalala,* 70 F.3d 610, 615 (D.C.Cir.1995) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, 81 L.Ed.2d 694). Under the *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694; *see also id.* at 843 n. 9, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). "When performing this first step, [courts] employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke,* 211 F.3d 638, 643 (D.C.Cir.2000) (citing *Chevron,* 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694; *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Among these tools

is a statute's legislative history. *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n,* 333 F.3d 168, 172 (D.C.Cir.2003) (" *AFL-CIO"* ); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 38 F.Supp.2d 114, 134 (D.D.C.1999) ; *see also Nat. Res. Def. Council v. Browner,* 57 F.3d 1122, 1127 (D.C.Cir.1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.' ") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n,* 46 F.3d 1173, 1178 (D.C.Cir.1995)). However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh,* 868 F.2d 1285, 1292-93 (D.C.Cir.1989) (emphasis in original). In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL-CIO,* 333 F.3d at 173.

**[1]** If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, 81 L.Ed.2d 694. "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO,* 333 F.3d at 173. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694. Therefore

[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges--who have no constituency--have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the **\*45** wisdom of such policy choices and resolving the struggle between competing views of the public interest

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 7

424 F.Supp.2d 37

Page 8

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *Id.* at 866, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (quoting *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). However, if the Agency's interpretation unduly compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n,* 795 F.2d 156, 164 (D.C.Cir.1986) (quoting *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778, 81 L.Ed.2d 694); *see also Chevron,* 467 U.S. at 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.") (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)); *Common Cause v. Fed. Election Comm'n,* 692 F.Supp. 1391, 1396 (D.D.C.1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may--indeed must--intervene and correct the agency.").

[2][3][4] In addition to their *Chevron* challenge, Plaintiff also contends that the Agency abused its discretion in an "arbitrary and capricious" manner in failing to offer a "reasoned analysis" for its decision with respect to ENERGY 8701. According to Plaintiff, the Agency treated legally indistinguishable vessels differently and failed to follow its own rules. The Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the

choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citations and quotation marks omitted); *see also Cellco P'ship v. Fed. Commc'ns Comm'n,* 357 F.3d 88, 93-94 (D.C.Cir.2004) (noting "arbitrary and capricious" review is "highly deferential ... presum[ing] the validity of agency action ... [which] must [be] affirm[*46 ed] unless the Commission failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis" requirement is "not 'particularly demanding,' " and "is satisfied if the agency 'enables us to see what major issues of policy were ventilated and why the agency reacted to them as it did.' " *Republican Nat'l Comm. v. Fed. Election Comm'n,* 76 F.3d 400, 407 (D.C.Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting *Pub. Citizen, Inc. v. Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C.Cir.1993)) (internal punctuation omitted). Moreover, the Court "must affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield Ass'n,* 848 F.2d 201, 205 (D.C.Cir.1988). The degree of deference a court should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37                                                                                                    Page 9

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

70 L.Ed.2d 23 (1981). Moreover, this Circuit has noted that "a permissible statutory construction under *Chevron* is not always reasonable under *State Farm:* 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.' " *Republican Nat'l Comm.,* 76 F.3d at 407 (quoting *Arent,* 70 F.3d at 620 (Wald, J., concurring in the judgment)).

### III: DISCUSSION

The Court shall begin its examination of the Agency's decision vis-á-vis the proper phase-out date for ENERGY 8701 by analyzing what level of deference, if any, should be afforded to its construction of the relevant statutes. The Court shall then turn to an investigation of the statutory scheme in question, looking at the plain language of the relevant provisions, Congressional intent, and the interaction between the various subsections. Because the Court concludes that the Agency violated the APA by failing to follow plain statutory language, the Court shall grant Plaintiff's Motion for Summary Judgment with respect to Count I of their First Amended Complaint. Given that this decision essentially awards the relief requested by Plaintiff, the Court shall decline to address Plaintiff's second argument, i.e., that the Agency's disparate treatment of their vessel constituted "arbitrary and capricious" action in violation of the APA.

*A. The Agency's Construction of the Relevant Statutes Warrants No Deference*

As noted above, under APA review, a court must first apply the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n,* 372 F.3d 395, 399 (D.C.Cir.2004) (citing *Chevron,* 467 U.S. at 842-43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694). Under step one of the *Chevron* analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect to the unambiguously expressed intent of Congress. *Id.; see also Chevron,* 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694. The court is to

proceed to step two of the *Chevron* analysis--wherein it considers (1) whether the agency acted within its delegated authority, and (2) whether the agency's interpretation of the statute is reasonable--only if the statute is silent or ambiguous with respect to the specific issue. *Id.; see also Chevron,* 467 U.S. at 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694.

Here, the Agency contends that it "is entitled to *Chevron* deference," because *47 such deference is owed to agencies in the course of informal adjudications, including letter opinions, *see* Defs.' Opp'n & Cross-Mot. at 15- 16 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256-58, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)), and because the nature of the legal question presented in this case, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency had given the question over a long period of time indicate that such deference should be afforded, *id.* (citing *United States v. Mead Corp.,* 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). In the alternative, the Agency suggests that its interpretation should receive the lower *Skidmore* deference, wherein an agency's position may be accorded respect depending on its persuasiveness. *See id.* at 16-17 (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

Three central flaws exist in the Agency's deference argument. As such, the Court determines that the Agency's construction of the statutes relevant to this dispute, particularly 46 U.S.C. § 3703a(e)(1), warrants no deference.

*1. The Statutes' Plain Language Controls*

[5] Here, the Agency itself proclaims that "OPA 90, as amended by the Frelinghuysen Amendment, is clear and unambiguous" and argues "that the Coast Guard properly applied the statute to ENERGY 8701 in a straightforward manner." Defs.' Opp'n & Cross-Mot. at 17; *see also id.* (contending that "the Coast Guard's determination

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37                                                                    Page 10

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

... is consistent with the plain language of the applicable provisions of OPA 90 ...."); *see also id.* at 10, 11, 15 (extolling the "plain language" of OPA 90). Plaintiff also contends that the relevant statutes are plain on their face. *See* Pl.'s Mot. for Summ. J. at 7. Given that both parties concede both that the statutes contain no ambiguity and that the plain language controls their application, the Agency is essentially asserting--incorrectly--deference in a situation where it admits the resolution is step one of the *Chevron* review.

Indeed, the Agency's claim of deference contradicts both its own position that the plain language of the relevant statutes controls and the Supreme Court's admonition:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694. As discussed *infra,* Section III(B), the Court is in agreement with the parties that the plain language of OPA 90 and the relevant tonnage measurement statutes is clear and unambiguous, and that the Agency is bound by that language. Where the Court can easily discern Congressional intent from the statutes' plain language, the Court's APA review terminates at step one of the *Chevron* review and the Agency's construction is owed no deference.

*2. The Agency's Most Recent Construction is a Post-Hoc Rationalization Deserving of No Deference Because It Differs from the Stated Rationale in the Agency Action*

Moreover, even assuming *arguendo* the ambiguity of the relevant statutes, the Agency's most recent construction would **\*48** warrant no deference, as it differs considerably from the stated rationale in the Agency Action. Importantly, in its Opposition and Cross-Motion for Summary Judgment, the Agency asserts for the first time that it "could not have recognized [ENERGY 8701's] Convention gross

tonnage measurement as of July 1, 1997 when none existed" on that date or had been requested by that date. Defs.' Opp'n & Cross-Mot. at 6. As such, the Agency's most recent position requires that Plaintiff, in order to be successful in altering the phase-out date, should have acquired a Convention tonnage measurement on or before July 1, 1997.

However, at the time of the Agency Action, the Agency relied on a different construction of the same statute--i.e., 46 U.S.C. § 3703a(e)(1). On March 29, 2004, the Agency denied Plaintiff's request to change ENERGY 8701's phase-out date, stating:

> [W]e interpret the language of 46 U.S.C. § 3703(a)(e)(1) as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage. Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

Admin. R. at 26 ("Initial Response"). The Agency reiterated this reasoning in its September 15, 2004 denial of Plaintiff's appeal:

> Section 3703a of title 46 United States Code states that the "gross tonnage of a vehicle shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997." We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA 90 phase out. The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system used for regulatory purposes.

*See* Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter").

The shift in the Agency's position, while subtle, is important. If correct, the original rationale set forth in the Agency Action would render the Agency's treatment of the two Bouchard barges--which also only had Regulatory tonnages assigned to them on

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 10

424 F.Supp.2d 37                                                                                              Page 11

424 F.Supp.2d 37

(Cite as: 424 F.Supp.2d 37)

July 1, 1997--unlawful. With respect to the two Bouchard barges, B. NO. 95 and B. NO. 105, Bouchard applied for a tonnage reduction of its barges on December 19, 1997, shortly after the passage of the Frelinghuysen Amendment on November 18, 1997 and prior to the statutory deadline of January 1, 1998 for submission of such applications. *See* Admin. R. at 88. Although Bouchard had requested the new admeasurements for these barges in March and June 1996, respectively, it did not physically obtain the new admeasurements from ABS until June 19, 1997 (for B. NO. 95) and November 3, 1998 (for B. NO. 105). *See id.* at 83, 88. Because (1) the new Convention measurements for the Bouchard barges fell under 5000 gross tons (ITC), and (2) Bouchard sought the new admeasurements 17 months before the Frelinghuysen Amendment was passed, the Agency granted Bouchard's application and extended the OPA 90 phase-out dates for its barges to January 1, 2015. *See id.* at 83; *see also* Defs.' Opp'n & Cross-Mot. at 28-29. However, it is true that on July 1, 1997, Bouchard had not obtained a new admeasurement for one of its vessels (B. NO. 105) and it had not yet applied for a tonnage reduction. *49 As such, under the Agency's reasoning as outlined to Plaintiff during its appeals process, it appears that one or both of the Bouchard vessels should have been denied a phase-out extension. The Agency's new construction is an attempt to save it from such an outcome, and to draw a new distinction between Bouchard and Plaintiff here.

[6] Such an explanation by the Agency is clearly a *post hoc* rationalization. "Agency decisions must generally be affirmed on the grounds stated in them." *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,* 269 F.3d 1112, 1117 (D.C.Cir.2001) (citing *Fort Stewart Schs. v. Fed. Labor Relations Auth.,* 495 U.S. 641, 651-52, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) ("[I]t is elementary that if an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rationale set forth by the agency itself."); *Sec. & Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80,

93-95, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). "Post-hoc rationalizations, developed for litigation[,] are insufficient." *Id.* (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action....")). As such, even assuming *arguendo* that the relevant statutes were ambiguous and the Court was required to proceed to *Chevron* step two, the Court could only give deference to and base its decision upon the Agency's initial construction of the statute as represented to Plaintiff. *See id.* The Agency's later construction, expressed in its Opposition and Cross-Motion for Summary Judgment, is a *post hoc* rationalization improperly before the Court and unworthy of deference.

3. *Skidmore Deference Would Be Inappropriate in this Situation*

Also assuming *arguendo* that the relevant statutes were not plain on their face, the Agency's claim that its actions warrant *Skidmore* deference, i.e., "some deference whatever its form, given the specialized experience and broader investigations and information available to the [A]gency," Defs.' Opp'n & Cross-Mot. at 9 (quoting *Skidmore,* 323 U.S. at 139, 65 S.Ct. 161, 89 L.Ed. 124), is also without merit. Importantly, *Skidmore* deference, commonly referred to as "the power to persuade," ultimately hinges upon the ability of an agency to convince the court that its rationale merits respect. *See Mead,* 533 U.S. at 219, 121 S.Ct. 2164, 150 L.Ed.2d 292. As the Supreme Court has explained, "[t]he weight accorded to an administrative judgment 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *Id.* (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, 89 L.Ed. 124).

[7] Assuming that the Court reached step two of a *Chevron* review, the Agency would not be owed *Skidmore* deference, as three important factors prevent its reasoning from being persuasive. First, as discussed *infra* Section III(B), the Agency's

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

application runs counter to the relevant statutes' plain language. Second, there is nothing in the administrative record that shows that the Agency utilized any specialized knowledge or information. Indeed, the Agency itself neither required nor performed any risk analysis in this case; such a risk analysis might have implicated its specialized knowledge, but--in the absence of such analysis--there is little in the administrative *50 record reflecting such knowledge and reasoning. Third, the inconsistency with respect to the Agency's "earlier and later" pronouncements--both between Plaintiff's request and the earlier Bouchard request, and between the Agency's pronouncements in the Agency Action and its rationale in this proceeding--defeats any claim to *Skidmore* deference. Accordingly, where the Agency's construction of the statute lacks both logic and consistency, no deference would be due.

*B. The Plain Language of the Relevant Statutes Contradicts the Agency's Interpretation*

[8] Two separate but interlocking statutory schemes are relevant to this dispute. First, the Frelinghuysen Amendment, codified as 46 U.S.C. § 3703(e), is particularly important, given that the Agency exclusively relied upon this provision as the source of its authority to deny Plaintiff's phase-out date modification request. *See* Admin. R. at 26 ("Initial Response"); Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter"). Second, the laws pertaining to tonnage measurement systems are crucial as well, given that Plaintiff contends that these statutes allow it, as the owner of ENERGY 8701, to select the tonnage measurement system to be used in accord with the tonnage laws' optional provisions. The Court shall assess each of these schemes in turn. Ultimately, such a review highlights the fact that the Agency's construction of the relevant statutes is contrary to their plain language and therefore is in violation of the APA.

*1. The Agency Misreads 46 U.S.C. § 3703a(e)*

*a. Plain Language*

With respect to statutory construction, the Supreme Court has emphasized that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (citations omitted). The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal. Indep. Sys. Operator Corp.,* 372 F.3d at 400. That is, the court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of Governors,* 468 U.S. 137, 149, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984). "Where [ ] the plain language of the statute is clear, the court generally will not inquire further into its meaning." *Qi-Zhuo v. Meissner,* 70 F.3d 136, 140 (D.C.Cir.1995).

The central statutory provision at the crux of this dispute is 46 U.S.C. § 3703a(e)(1), particularly this highlighted portion:

For the purposes of this section and except as otherwise provided in paragraphs (2) and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage *that would have been recognized* by the Secretary on July 1, 1997, as the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title.

*Id.* (emphasis added).

Under the Agency's construction of this provision, only a measurement that existed as of July 1, 1997 could be recognized by the Agency for the purposes of establishing an OPA 90 phase-out date; any remeasurement after that date could not be recognized. *See* Defs.' Opp'n & Cross-*51 Mot. at 6 ("Coast Guard simply could not have recognized a Convention tonnage ... where none existed"); at 11 ("Coast Guard would not have recognized a gross tonnage ... that did not exist"); at 19 ("Coast Guard could not have recognized a gross tonnage measurement that did not exist"). In support of this interpretation, the Agency inserts verbs and tenses not enacted into law by Congress in a way that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 12

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

shifts the plain meaning of the provision's language. *See Nat'l Pub. Radio, Inc. v. Fed. Commc'ns Corp.,* 254 F.3d 226, 230 (D.C.Cir.2001) ("we must presume that Congress meant precisely what it said"). [FN4]

> FN4. Moreover, "[i]nartful drafting is not the same as ambiguity." *Nat'l Pub. Radio,* 254 F.3d at 229; *see also Meredith v. Fed. Mine Safety & Health Review Comm.,* 177 F.3d 1042, 1053 (D.C.Cir.1999) ("[T]he presence of a difficult question of statutory construction does not necessarily render that provision ambiguous for purposes of *Chevron.*").

Here, the Agency reads the relevant portion as "the gross tonnage that *was recognized* by the Secretary on July 1, 1997." Such a reading would support its ultimate finding in the Agency Action with respect to Plaintiff's request: since ENERGY 8701's only gross tonnage measurement on July 1, 1997 was 5323 gross tons (GRT), and the later Convention tonnage measurement of 4660 gross tons (ITC) was not discovered until 2004, then the gross tonnage that "was recognized" by the Secretary on July 1, 1997 was 5323 tons, entailing a phase-out date of January 1, 2005. Unfortunately for the Agency, the statute reads *"would have been recognized"*--not "was recognized." This difference is key--by employing this plain language, Congress specifically incorporated the optional nature of the tonnage measurement statutes. *See* 46 U.S.C. § 3703a(e); *see also infra* Section III(B)(2) (for a discussion of the optional nature of the tonnage measurement statutes). The subpart fixes the determination of the tonnage on a hypothetical measurement of a particular vessel on the specified date--July 1, 1997--under the optional Regulatory or Convention measurement systems. Indeed, by employing the language "would have been recognized," Congress intended that either measurement system could be applied to ENERGY 8701 as it existed on July 1, 1997.

The application of the plain language of the statute to the ENERGY 8701 shows the clear error in the Agency's Action. Here, it is uncontested that since

its original construction in 1976, ENERGY 8701 has undergone no physical alterations to reduce its tonnage. *See* Admin. R. at 14. As such, the vessel as it existed on July 1, 1997 is essentially identical to the vessel as it exists today. *See* Defs.' Opp'n & Cross-Mot. at 19 ("ENERGY 8701 is more or less the same tank barge today as it was in 1976 when it was first constructed. The barge's physical dimensions have not changed materially--at least not in a manner that is legally significant for the purposes of the Court's analysis."). Because the statute plainly does not ask what the tonnage *was* under a specific system on July 1, 1997, but instead looks at what the tonnage *would have been* if measured under either the system set forth in Section 14502 (the Regulatory measurement system) or in Section 14302 (the Convention measurement system), the fact that ENERGY 8701's tonnage on July 1, 1997 was 5323 gross tons (GRT) is not wholly determinative of its phase-out date. Rather, because the provision specifies "would have been recognized," the vessel's Convention measurement must be consulted as well. In this case, even though ENERGY 8701's Convention tonnage had not actually been recognized by the Secretary on July 1, 1997, if measured, that tonnage "would have been recognized" as 4660 gross tons *52 (ITC). Under the phase-out provisions of 46 U.S.C. § 3703a, a vessel with a weight of 4660 gross tons that "would have been recognized" by the Secretary on July 1, 1997 has a phase-out date of January 1, 2015. *See* 46 U.S.C. § 3073a(c)(2). The Agency's failure to recognize the plain language and meaning of 46 U.S.C. § 3703a(e) ensured that it gave ENERGY 8701 an incorrect phase-out date of January 1, 2005. Such an action was arbitrary, capricious, and otherwise not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2)(A).

*b. Interaction Between the Statute's Provisions*

A review of the statutory provisions *in pari materia* with 46 U.S.C. § 3703a(e) supports this reading of the plain language of the statute and contradicts the Agency's construction. This Circuit follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia* normally are

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 13

construed together to discern their meaning." *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n,* 309 F.3d 796, 801 (D.C.Cir.2002) (citing *Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (noting that the rule that statutes *in pari materia* should be construed together "is ... a logical extension of the principle that individual sections of a single statute should be construed together")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n,* 799 F.2d 755, 766 (D.C.Cir.1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States,* 768 F.2d 352, 363 (D.C.Cir.1985) ("[T]hese two statutes are *in pari materia* and must be construed together."). The Agency, by confining its analysis to 46 U.S.C. § 3703a(e)(1), misreads both the meaning and purpose of the statute.

Importantly, the Frelinghuysen Amendment to OPA 90 is codified as 46 U.S.C. § 3703a(e)(1)-(3). Upon a reading of the entirety of the amendment, it is clear that the Agency is misapplying Section 3703a(e) to ENERGY 8701. In fact, reading the amendment as a whole, rather than in isolation as the Agency did, explains the provision's true purpose.

Section 3703a(e)(1) –the part relied upon by the Agency--sets out the rule establishing July 1, 1997 as the relevant reference point in time for a vessel's *physical* configuration, and provides for exceptions from that rule in paragraphs (2) and (3). *See* 46 U.S.C. § 3703a(e)(1). Paragraph (2) allows for waivers from the rule if the Agency finds, among other things, that "the owner of the tank vessel has entered into a binding agreement to *alter* the tank vessel in a shipyard ... to reduce the gross tonnage of the tank vessel." *Id.* § 3703a(e)(2) (emphasis added). Paragraph (3) excludes any vessel that "had undergone, or was the subject of a contract for, *alterations* that reduce the gross tonnage of the tank vessel" before the July 1997 deadline set in paragraph (1). *Id.* § 3703a(e)(3) (emphasis added).

Reading the provision enacted by Congress as a whole, as it was intended, it is clear that Congress plainly sought to restrict the physical alterations of

vessels after July 1, 1997 to avoid an otherwise applicable OPA 90 phase-out schedule. Such an intention, while certainly admirable, is simply inapplicable to ENERGY 8701. It is uncontested that ENERGY 8701 has not undergone any substantial physical alterations since its construction, either before or after July 1, 1997. As such, the Agency's decision to apply a portion of a provision limiting the ability of vessel owners to escape an OPA 90 phase-out through a physical alteration to a situation where no physical alteration has occurred *53 is simply illogical and contrary to the plain meaning of the statute. Indeed, the Agency's interpretation of Section 3703a(e)(1) ignores the plain language of the provision as a whole, which is plainly contradictory to its construction of the statute.

This misconstrual of Section 3703a(e) compels the Agency to make certain arguments that are unfounded, such as an accusation that Plaintiff's construction of the statute "renders the July 1, 1997 deadline mere surplusage and meaningless." *See* Defs.' Opp'n & Cross-Mot. at 20. Such a contention is without merit. Upon a reading of both the plain language of Section 3703a(e)(1) and its reading in conjunction with paragraphs (2) and (3), the July 1, 1997 date is not "mere surplusage" or "meaningless." Rather, July 1, 1997 is an important deadline that cuts off the date on which vessels may be physically altered to avoid an otherwise applicable OPA 90 phase-out date. However, July 1, 1997 is not a remeasurement application deadline, as the Agency suggests. No portion of the statute is rendered meaningless or converted to mere surplusage under this correct construction. *Cf. Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (courts should be reluctant to treat statutory terms as surplusage in any setting, and especially when a term occupies a pivotal place within the statutory scheme). Instead, each part of the 1997 Amendment plays a function: paragraph (1) states a general rule that a vessel's tonnage measurements must relate back to the vessel's physical configuration as of July 1, 1997; paragraph (2) establishes a mechanism to obtain a waiver for future conversion; and paragraph (3) grants an exemption for those that had undergone or

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 14

Page 15

were undergoing physical alterations at the time of enactment.

*c. Legislative History*

While the plain language of the statute in question and the reading of that provision in relation to its related subparts contradicts the Agency's construction, the Agency may establish the legitimacy of its construction by looking to the legislative history of the law at issue. However, the presumption in favor of the plain language of the provision is rebuttable only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotation omitted). The Agency's burden in rebutting the clear language is onerous: the Agency must "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. Envtl. Prot. Agency*, 88 F.3d 1075, 1089 (D.C.Cir.1996); *see also Griffin v. Oceanic Contractors*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (courts may ignore plain language in a narrow category of cases where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters"). Here, the Agency cannot meet this high standard, and a consultation of the legislative history behind the Frelinghuysen Amendment actually supports Plaintiff's position.

The Agency offers three types of "background" material to support its interpretation of Section 3703a(e): (1) a GAO Report, *see* U.S. Gen. Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B; (2) a single sentence from the *54 1997 Amendment's legislative history, *see* H.R. Conf. Rep. 105-340 (1997), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. C; and (3) a prior draft of the 1997 Amendment, *see* 143 Cong. Rec. H4169-01

(daily ed. June 23, 1997) (draft offered by Rep. Frelinghuysen), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. D. A review of these materials indicates a lack of support for the Agency's position.

First, with respect to the Year 2000 GAO Report, two points are in order: (1) the GAO Report, drafted three years after the Frelinghuysen Amendment, is not legislative history and is not part of the administrative record; and (2) the Report does not stand for the broad proposition asserted by the Agency. As the GAO Report describes the 1997 Amendment: "Public Law 105-85 mandated that after July 1, 1997, a vessel's phase-out deadline would not change as a result of a *reduction in carrying capacity* unless the U.S. Department of Transportation (DOT) [the Coast Guard's parent agency] granted a waiver allowing it." *See* U.S. Gen. Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them 12 (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B (emphasis added). As such, neither the text nor the context of the GAO Report supports the application of the 1997 Amendment to anything more than physical alterations and associated waivers. Because no physical alteration took place with respect to ENERGY 8701, the GAO Report is consistent with the plain language of the statute indicating that Section 3703a(e) does not apply to the vessel.

Second, with respect to the single line of the 1997 Amendment's legislative history highlighted by the Agency, the Conference Report--as quoted by the Agency--refers to the "industry practice of *reducing* the gross tonnage of single hull tank vessels." *See* H.R. Conf. Rep. 105-340, at 917, *reprinted in* 1997 U.S.C. C.A.N. at 2703 (emphasis added). By referring to the reduction of tonnage, the report is consistent with the plain language of the statute that refers to physical alterations and nothing more. Indeed, the Conference Report does not discuss the circumstances of this case, where Plaintiff has merely elected to use the Convention tonnage of the unaltered vessel.

Third, and finally, a comparison between the 1997

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 15

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

Amendment as enacted with the amendment as originally proposed reveals that Section 3703a(e) does not apply to the circumstances of ENERGY 8701's remeasurement. The Frelinghuysen Amendment, as originally proposed, read:

Section 3703 of title 46, United States Code, is amended by adding at the end the following:

"(e) For purposes of this section, the gross tonnage of a vessel for which a tonnage certificate was issued or accepted by the Secretary under this title before July 1, 1997, shall be the gross tonnage of the vessel stated on the most recent certificate."

143 Cong. Rec. H4202 (daily ed. June 23, 1997). As originally proposed, the Amendment would have used only the most recent tonnage certificate that existed for a subject vessel before July 1, 1997 as the determining measurement for the vessel's OPA 90 phase-out date. Indeed, if this amendment as drafted had become the law, Plaintiff's APA claim would have ultimately failed; ENERGY 8701's most recent certificate as of July 1, 1997 stated that the vessel was 5323 gross tons (GRT), which would have ensured a phase-out date of January 1, 2005. *See* 46 U.S.C. § 3703a(c)(3)(A).

However, the conference committee specifically changed the proposed 1997 **\*55** Amendment to "clarify the circumstances under which the House provision [i.e., the 1997 Amendment as proposed] would apply." H.R. Conf. Rep. 105- 340, at 917, *reprinted in* 1997 U.S.C.C.A.N. at 2703. The committee removed the reference to the vessel's tonnage certificate as of July 1, 1997, and instead looked to "the gross tonnage of a vessel ... that would have been recognized by the Secretary on July 1, 1997." *See* 46 U.S.C. § 3703a(e)(1). By removing the reference to the vessel's tonnage certificate as of July 1, 1997 and replacing it with the detailed waiver and exclusion system, both of which deal exclusively with *physical* alterations to reduce tonnage, the conference committee revised the operation of the provision as originally proposed. As such, the history of the 1997 Amendment reaffirms the plain language of the statute and once again contradicts the Agency's construction. Had Congress intended to prevent a situation such as this one, where an owner is

requesting remeasurement of an unaltered vessel after July 1, 1997, Congress could have kept the original wording of the proposed amendment. Congress declined this option, and instead redrafted the provision to focus on physical alterations alone—a material difference. The Agency's construction, which is in accordance with the proposed amendment but not the Amendment as actually enacted, is therefore flawed and without support. The Agency cannot opt to enforce the version of the 1997 Amendment that it wishes Congress had enacted; it is bound by the statute that Congress actually enacted.

2. *The Laws Pertaining to Tonnage Measurement*

As noted above, the Agency's construction of 46 U.S.C. § 3703a(e) is contrary to its plain language, the meaning of the provision when read with an eye to its context, and its legislative history. A plain reading of Section 3703a(e) indicates that the owner of a subject vessel, such as Plaintiff, can look to what "would have been recognized" as the tonnage of the vessel as measured under 46 U.S.C. § 14502 (the Regulatory measurement) or under 46 U.S.C. § 14302 (the Convention measurement) to determine the proper OPA 90 phase-out date for the vessel. *See* 46 U.S.C. § 3703a(e)(1). However, before that reading of Section 3703a(e) can stand, the Court must determine whether anything within the other laws pertaining to tonnage measurement prevents this "reach back" on the part of Plaintiff to extend ENERGY 8701's phase-out date. A review of the relevant statutes indicates that nothing prevents this reading of Section 3703a(e) or impedes Plaintiff's requested "reach back."

a. *The Tonnage Measurement Systems Permit Plaintiff to Select the Convention Measurement System*

Part J of Title 46 of the United States Code addresses the tonnage measurement of vessels. *See* 46 U.S.C. §§ 14101-14522. Chapter 143 delineates the Convention measurement system and its applicability, *see id.* §§ 14301-14307, whereas Chapter 145 does the same for the Regulatory measurement system, *see id.* §§ 14501-14522. The

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 16

Regulatory measurement system applies only if (1) the vessel is not measured with the Convention measurement system, or (2) the vessel is measured under the Convention system, but the owner requests that the Regulatory measurement be used for certain U.S. laws. *See id.* § 14501; *see also* 46 C.F.R. § 69.11(b) ("This system [the Regulatory measurement system] applies to a vessel not required to be measured under the Convention Measurement System."). In this case, to determine which system applies, the \*56 applicability of the Convention system must be determined.

Under this scheme, the Convention system applies to vessels if (1) the vessel is engaged on a foreign voyage, *see* 46 U.S.C. § 14101(4), or (2) the owner requests its application, *id.* § 14301(b)(6). [FN5] If an owner exercises the option to measure the vessel under the Convention system, that decision is binding. *See* 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter [the Convention measurement system] at the request of the owner may be remeasured only as provided by this chapter."); *see also* 46 C.F.R. § 69.11(a)(3). In this case, Plaintiff's barge, ENERGY 8701, was to be engaged on a foreign voyage to Canada, and in anticipation of that voyage Plaintiff applied for and received remeasurement under the Convention system. *See* Admin. R. at 32-63. As such, in this case, Plaintiff was within its rights under 46 U.S.C. § 14301(b)(6) to select the Convention measurement system for ENERGY 8701, and that selection became binding absent another remeasurement request by Plaintiff. Indeed, the Agency correctly recognized this change in its Initial Response, stating:

> FN5. Ordinarily, the Convention measurement system applies to all documented vessels and vessels engaged on a foreign voyage unless exempted by Section 14301(b). *See* 46 U.S.C. § 14301(a). However, because ENERGY 8701 is a barge, Section 14301(b) applies. Section 14301(b)(6) reads: "This chapter [the Convention measurement system] does not apply to a barge (except a barge engaged on a foreign voyage) unless the

owner requests."

The new tonnage assignment [i.e., Convention tonnage] by the American Bureau of Shipping (ABS) on February 24, 2004, is 4660 GT ITC. The tonnage originally assigned to the vessel [i.e., the Regulatory tonnage] by the Coast Guard on August 25, 1976, was 5323 GRT, and is no longer assigned to the vessel.

Admin. R. at 26 ("Initial Response"). While properly recognizing and assigning ENERGY 8701's Convention tonnage on a "going-forward" basis, the Agency rejected Plaintiff's request to recognize the Convention tonnage for the purposes of OPA 90. *Id.* The Court must now look to whether such a decision was proper under applicable tonnage measurement law.

*b. OPA 90 Allows Hornbeck to Select the Tonnage Measurement System Used in Accordance With the Tonnage Laws' Optional Provisions*

As noted previously, according to the phase-out provision in OPA 90, a single-hull barge, built in 1976, of less than 5000 gross tons may operate in the navigable waters of the United States until January 1, 2015. *See* 46 U.S.C. § 3703a(c)(2). For the purposes of OPA 90, "gross ton" has the meaning given that term by the Secretary under part J of Title 46. *See* OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12). As set forth above, Congress allows the owner--not the Agency--to determine whether or not to use the Convention measurement system. *See, e.g.,* 46 U.S.C. § 14301(b)(6); *id.* § 14301(c); 46 C.F.R. § 69.11(a)(2)(v); 46 C.F.R. § 69.11(a)(3). As noted, that option--having been exercised by Plaintiff in this case--becomes the exclusive tonnage assignment on the vessel for the purposes of all U.S. laws. *See* 46 U.S.C. § 14301(c) ; 46 C.F.R. § 69.11(a)(3).

OPA 90 allows the gross tonnage of vessels to be measured in accordance with either the Regulatory or the Convention systems. *See* OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12). Indeed, OPA 90's phase-out schedule incorporates the optional nature of a vessel's tonnage by providing: "A vessel of less than 5,000 gross tons

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1
No. 1:07-1030 (RCL)
Page 17

424 F.Supp.2d 37

Page 18

424 F.Supp.2d 37

**(Cite as: 424 F.Supp.2d 37)**

as measured under section 14502 of this title [Regulatory tonnage], or an alternate **\*57** tonnage measured under section 14302 of this title [Convention tonnage], as prescribed by the Secretary under section 14104 of this title...." 46 U.S.C. § 3703a(c)(2). This optional tonnage measurement language was added to many other maritime-related statutes in the Coast Guard Authorization Act of 1996, Pub.L. No. 104-324, § 715, 110 Stat. 3901, 3937 (1996), as well as to OPA 90.

Importantly, legislative history confirms this reading. For instance, the conference committee noted:

> Under the amendments made by these actions, vessel owners have the option to measure their vessels under the new ITC tonnage system [Convention measurement system] or the regulatory system. The Committee expect ... [the provisions will] lead [ ] ultimately to the demise of the antiquated regulatory measurement system.

Conf. Rep. No. 104-854, at 116 (1996); *see also* S.Rep. No. 104-160, at 36 (1995) ("Under the amendments made by these sections, vessel owners retain their option to choose either the ITC system [Convention measurement system] or the regulatory system for the purposes of domestic requirements established prior to July 18, 1994").

As such, it is clear that the tonnage measurement statutes do not permit the Agency to pick and choose which tonnage to assign a vessel. Nor do the tonnage measurement statutes permit the Agency to unilaterally recognize one tonnage for some purposes and other tonnages for other purposes. The OPA 90 itself contemplates the use of both the Convention system and the Regulatory system. Accordingly, once an owner opts to employ the Convention measurement system, that system applies to OPA 90 and other applicable laws, and no other system governs. *See* 46 U.S.C. § 14301(c); 46 C.F.R. § 69.11(a)(3).

*c. No Statute Permits the Agency to Apply the Remeasurement Only on a "Going-Forward" Basis or to Exclude the Remeasurement from the OPA 90 Analysis*

As described, the Agency in its Initial Response to Plaintiff--without citing to any authority--reassigned ENERGY 8701 a tonnage of 4660 gross tons (ITC), but refused to apply that tonnage for the purposes of the OPA 90 phase-out analysis. *See* Admin. R. at 26 ("Initial Response"). According to the Agency, it limited the use of ENERGY 8701's Convention tonnage of 4660 gross tons (ITC) to "a going forward basis" only. *See* Defs.' Opp'n & Cross-Mot. at 16.

A review of the relevant statutes indicates that no authority exists to support the Agency's position. Once an owner, such as Plaintiff, exercises the option to measure a vessel under the Convention system, that decision is binding. *See* 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter at the request of the owner may be remeasured only as provided by this chapter."); *see also* 46 C.F.R. § 69.11(a)(3) (same). OPA 90 contemplates the use of the Convention system. *See* OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12); 46 U.S.C. § 3703a(c)(2). Following the issuance of an International Tonnage Certificate by the ABS for ENERGY 8701 on February 24, 2004, and the Agency's March 22, 2004 Initial Response, the official tonnage of ENERGY 8701 became 4660 gross tons (ITC). A single hull vessel of ENERGY 8701's age and tonnage has a OPA 90 phase-out date of January 1, 2015. *See* 46 U.S.C. § 3703a(c)(2). Section 3703a(e) does not restrict the application of ENERGY 8701's Convention tonnage to the OPA **\*58** 90 phase-out determination because (1) it applies only to the physical modification of vessels, and it is uncontested that ENERGY 8701 underwent no physical modifications; and (2) even assuming *arguendo* that it did apply, the plain language of Section 3703a(e)(1) looks to "the gross tonnage of a vessel ... that would have been recognized by the Secretary on July 1, 1997." Had ENERGY 8701 been measured according to the Convention system on July 1, 1997, it would have a Convention tonnage of 4660 gross tons (ITC).

As such, all relevant statutes indicate that the Convention tonnage for ENERGY 8701 assigned in early 2004 is the proper tonnage for the OPA 90

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

424 F.Supp.2d 37                                                            Page 19

424 F.Supp.2d 37

(Cite as: 424 F.Supp.2d 37)

analysis. While the Convention tonnage had not yet been measured as of July 1, 1997, such a fact is either (1) irrelevant to the OPA 90 analysis where no physical modification occurred, or (2) rendered irrelevant by Section 3703a(e)(1)'s "relation back" language. The Agency presents no persuasive authority to undercut this analysis, and presents no authority suggesting that it can limit the Convention tonnage afforded to ENERGY 8701 to a "going forward basis" only. Accordingly, the Court finds that the Agency's refusal to apply the plain language of Section 3703a(e), the entire OPA 90 scheme, and the tonnage measurement laws to Plaintiff's vessel was arbitrary, capricious, and otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706(2)(A).

### IV: CONCLUSION

[9] For the reasons set forth above, the Court grants Plaintiff's Motion for Summary Judgment as to Counts I of Plaintiff's First Amended Complaint, and denies Defendants' Cross-Motion for Summary Judgment. As this Court recently noted,

"[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." Accordingly, it is up to the agency to determine how to proceed next--not for the Court to decide or monitor.

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.,* 281 F.Supp.2d 1, 38 (D.D.C.2003) (quoting *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1011 (D.C.Cir.1999)) (internal citation omitted). Consequently, the Court shall remand the case to the Agency for further action consistent with this opinion. An appropriate Order accompanies this Memorandum Opinion.

424 F.Supp.2d 37

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

**Civil Action No. 1:07-1030 (RCL)**
*Hornbeck Offshore Transportation, LLC v. United States of America*



Certificate Number:
**A0400951**

# International
# Tonnage Certificate (1969)

Issued under the provisions of the
International Convention on Tonnage Measurement of Ships, 1969,
under the authority of the Government of the

## UNITED STATES OF AMERICA

for which the Convention came into force on February 10, 1983, by

### AMERICAN BUREAU OF SHIPPING

| Name of Ship | Distinctive Number or Letters | Port of Registry | * Date |
|---|---|---|---|
| **ENERGY 8701** | **576625** | **NEW ORLEANS, LA.** | **1975** |

\* Date on which the keel was laid or the ship was at a similar state of construction (Article 2(6)), or date on which ship underwent
alterations or modifications of a major character (Article 3(2)(b)), as appropriate.

### MAIN DIMENSIONS

| Length (Article 2(8)) | Breadth (Regulation 2(3)) | Molded Depth amidships to Upper Deck (Regulation 2(2)) |
|---|---|---|
| 104.53 m  ( 343.0 ft ) | 19.51 m  ( 64.0 ft ) | 8.23 m  ( 27.0 ft ) |

### THE TONNAGES OF THE SHIP ARE:

| | |
|---|---|
| GROSS TONNAGE | **4660** |
| NET TONNAGE | **3995** |

The Government of the United States of America certifies that the tonnages of this ship have been determined
in accordance with the provisions of the International Convention on Tonnage Measurement of Ships, 1969.

Issued at    **Houston, TX**

Date issued    **February 24, 2004**

The undersigned declares that he is duly authorized
by the United States Government to issue this certificate.

00062

**M. TREDER**
**Principal Engineer**

*Issuing Officer*

Exhibit 2
No. 1:07-1030 (RCL)
Page 1

## SPACES INCLUDED IN TONNAGE

| GROSS TONNAGE | | | NET TONNAGE | | |
|---|---|---|---|---|---|
| Name of Space | Location | Length (m) | Name of Space | Location | Length (m) |
| UNDERDECK | — | — | | | |
| DECK HOUSE | FR 41 1/2-43 | 3.66 | CARGO TANK 1 P/S | FR 5-12 | 17.07 EA. |
| FUEL OIL TANKS P/S | FR 31 1/2-33 1/2 | 4.88 EA. | CARGO TANK 2 P/S | FR 12-19 | 17.07 EA. |
| SLOP TANK | FR 28-30 | 3.05 | CARGO TANK 3 P/S | FR 19-26 | 17.07 EA. |
| | | | CARGO TANK 4 P/S | FR 26-33 | 17.07 EA. |
| | | | CARGO TANK 5 P/S | FR 33-41 | 19.51 EA. |
| | | | SLOP TANK | FR 28-30 | 3.05 |

### NUMBER OF PASSENGERS
(Regulation 4(1))

Number of passengers in cabins with not more than 8 berths:  0

Number of other passengers:  0

### MOULDED DRAUGHT
(Regulation 4(2))

6.74 m

**EXCLUDED SPACES**
(Regulation 2(5))

An asterisk (*) should be added to those spaces listed above which comprise both enclosed and excluded spaces.

Date and place of original measurement:    February 24, 2004 - Houston, TX

Date and place of last previous remeasurement:

**REMARKS:**

Overall length as defined under 46 CFR 69 Subpart E is 109.73 m (360.0 ft).
Vessel built by S.B.A. SHIPYARDS, INC., JENNINGS, LA.. Hull number is 232.

A U.S. Tonnage Certificate was not issued for this vessel.  The dimensions on the front of this certificate are the registered dimensions.

00063

Exhibit 2
No. 1:07-1030 (RCL)
Page 2

Rev 10-98

# EXHIBIT 3

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*



UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
UNITED STATES COAST GUARD

| CERTIFICATION DATE: | 27NOV01 |
|---|---|
| EXPIRATION DATE: | 30SEP04 |

# Certificate of Inspection

| VESSEL NAME | OFFICIAL NUMBER | CALL SIGN | SERVICE |
|---|---|---|---|
| ENERGY 8701 | D576625 | WT54766 | TANK BARGE |

| HOME PORT | HULL MATERIAL | HORSEPOWER | PROPULSION |
|---|---|---|---|
| NATL VESSEL DOC CTR | STEEL | | NA |

| PLACE BUILT | DATE BUILT | GROSS TONS | NET TONS | DWT | LENGTH |
|---|---|---|---|---|---|
| JENNINGS LA | 15DEC76 | 5323 | 5323 | | 360.00 |

| OWNER | OPERATOR |
|---|---|
| LEEVAC MARINE INC<br>414 N CAUSEWAY BLVD<br>MANDEVILLE, LA 70448 | LEEVAC MARINE INC<br>671 COURT STREET<br>PO BOX 392<br>BROOKLYN, NY 11231 |

THIS VESSEL MUST BE MANNED WITH THE FOLLOWING LICENSED AND UNLICENSED PERSONNEL, INCLUDED IN WHICH THERE MUST BE ___0___ CERTIFICATED LIFEBOATMEN AND ___0___ CERTIFICATED TANKERMEN.

| ___ MASTER | ___ MASTER & 1ST CLASS PILOT | ___ ABLE SEAMEN | ___ CHIEF ENGINEER | ___ FIREMEN-WATERTENDERS |
|---|---|---|---|---|
| ___ CHIEFMATE | ___ CLASS PILOT | ___ ORDINARY SEAMEN | ___ 1ST ASST. ENGINEER | ___ OILERS |
| ___ 2ND MATE | ___ RADIO OFFICER(S) | ___ DECKHANDS | ___ 2ND ASST. ENGINEER | |
| ___ MATES | ___ OPERATOR(S) | | ___ ENG'RS. | |

IN ADDITION, THIS VESSEL MAY CARRY ___0___ PASSENGERS, _____ OTHER PERSONS IN CREW, _____ PERSONS IN ADDITION TO CREW, AND TOTAL PERSONS ALLOWED: ___0___

ROUTE PERMITTED AND CONDITIONS OF OPERATION:

**OCEANS, UNMANNED**
ROUTE AUTHORIZED PROVIDED RESTRICTIONS ON CURRENT INTERNATIONAL LOAD LINE CERTIFICATE ARE MET.

** COASTWISE, PERMISSIVELY MANNED **
PERMISSIVE MANNING AUTHORIZED PROVIDED RESTRICTIONS ON CURRENT SPECIAL SERVICE COASTWISE LOAD LINE CERTIFICATE ARE MET. CERTIFIED WITHOUT A NAVIGATING CREW. THIS BARGE MAY CARRY 4 PERSONS AS MAINTENANCE PERSONNEL WITH NO DUTIES CONNECTED WITH THE NAVIGATION OF THE BARGE. ALL CREWMEMBERS MUST BE IN POSSESSION OF MERCHANT MARINER DOCUMENTS. WHEN ENGAGED IN A VOYAGE OF 600 NM OR GREATER, 2 ABLE SEAMEN & 1 ORDINARY SEAMAN SHALL BE CARRIED. WHEN ENGAGED IN A VOYAGE OF LESS THAN 600 NM, ONLY 1 ABLE SEAMEN AND 1 ORDINARY SEAMAN ARE REQUIRED. AT LEAST 1 CREWMEMBER MUST BE CERTIFIED AS A TANKERMAN IF THE BARGE IS NOT GAS FREE. IF MORE THAN 2 CREWMEMBERS ARE CARRIED, 2 CERTIFIED TANKERMAN ARE REQUIRED.
TOTAL PERSONS ALLOWED: 4.

*** SEE NEXT PAGE FOR ADDITIONAL CERTIFICATE INFORMATION ***

WITH THIS INSPECTION HAVING BEEN COMPLETED AT   PERTH AMBOY, NEW JERSEY   ON   27NOV01, THIS VESSEL IS CERTIFIED BY THE OFFICER IN-CHARGE, MARINE INSPECTION,   NEW YORK, NY   , TO BE IN ALL RESPECTS IN CONFORMITY WITH THE APPLICABLE VESSEL INSPECTION LAWS AND THE RULES AND REGULATIONS PRESCRIBED THEREUNDER.

| PERIODIC REINSPECTIONS | | | THIS CERTIFICATE ISSUED BY: |
|---|---|---|---|
| DATE | ZONE | SIGNATURE | |
| | | | R E BENNIS, REAR ADMIRAL, USCG |
| | | | OFFICER IN CHARGE, MARINE INSPECTION |
| | | | NEW YORK, NY |
| | | | INSPECTION ZONE |

DEPT. OF TRANSP., USCG, CG-841 (Rev 3-85) (v12)

OMB No. 2115-0617

Exhibit 3
No. 1:07-1030 (RCL)
Page 1



DEPARTMENT OF TRANSPORTATION
UNITED STATES COAST GUARD

# Certificate of Inspection

| ENERGY 8701 | PAGE 2 | CERTIFICATION DATE: 27NOV01 |
|---|---|---|

--- ROUTE PERMITTED AND CONDITIONS OF OPERATION, CONTINUED ---

### **OPA-90 PHASE OUT**
ON 01 JANUARY 2005, THIS BARGE MUST MEET THE U.S. DOUBLE HULL DESIGN
STANDARDS OF 33 CFR 157.10(d).

--- HULL EXAMS ---

| -EXAM TYPE- | -NEXT EXAM- | -LAST EXAM- | -PRIOR EXAM- |
|---|---|---|---|
| DRYDOCK | 31OCT04 | 24OCT01 | 25OCT99 |
| INTERNAL STRUCTURAL | 31OCT04 | 24OCT01 | 25OCT99 |
| CARGO TANK INTERNAL | 31OCT04 | 24OCT01 | 25OCT99 |

--- STABILITY ---
LETTER          APPROVAL DATE/ 08OCT76          OFFICE/ WNCMS

--- CARGO AUTHORITY ---
AUTHORIZATION/ SEE *CONDITIONS OF CARRIAGE*
46CFR SUBCHAPTER D AUTHORITY: HIGHEST GRADE/ A    CAPACITY/    87334 UNITS/ BBLS
46CFR SUBCHAPTER O AUTHORITY:  PART 151/ NO    PART 153/ NO    PART 154/ NO

--- LIQUID BULK CARGO AUTHORITY/CONDITIONS ---

*LOADING CONSTRAINTS - STRUCTURAL*

| TANK(S) | MAX CARGO WEIGHT/TANK (SHORT TONS) | MAXIMUM DENSITY (LBS/GAL) |
|---|---|---|
| #1 PORT/STARBOARD | 1298 | 8.800 |
| #2 PORT/STARBOARD | 1281 | 8.800 |
| #3 PORT/STARBOARD | 1462 | 8.800 |

*CONDITIONS OF CARRIAGE*
PER 46 CFR 150.130, THE PERSON IN CHARGE OF THE BARGE (VESSEL) IS
RESPONSIBLE FOR ENSURING THAT THE COMPATIBILITY REQUIREMENTS OF 46 CFR 150
ARE MET.  CARGOES MUST BE CHECKED FOR COMPATIBILITY USING THE FIGURES,
TABLES, AND APPENDICES OF 46 CFR 150 IN CONJUNCTION WITH THE REACTIVE GROUP
NUMBERS FROM THE 'REACT GRP' COLUMN LISTED ABOVE THE 'SPECIFIC DANGEROUS
(i.e., HAZARDOUS) CARGO AUTHORITY' SECTION.

--CARGO AUTHORITY--
GRADE "A" AND LOWER, FLAMMABLE OR COMBUSTIBLE CARGOES IDENTIFIED IN 46 CFR
TABLE 30.25-1 OR 46 CFR 153 TABLE 2 AS POLLUTION CATEGORY I OR III CARGOES.

--VAPOR CONTROL AUTHORITY--
IN ACCORDANCE WITH TITLE 46 CFR PART 39, EXCLUDING SUBPART 39.40, THIS
BARGE'S VAPOR COLLECTION SYSTEM HAS BEEN INSPECTED TO THE PLANS APPROVED BY
THE MARINE SAFETY CENTER LETTER # ME10714 DATED 11 OCTOBER 1991, AND FOUND
ACCEPTABLE FOR THE COLLECTION OF THOSE SPECIFIC CARGO VAPORS LISTED.

--MARPOL I DESIGNATION--
THIS BARGE HAS BEEN DESIGNATED AS A PRODUCT CARRIER PER ANNEX I OF MARPOL
73/78.

DEPT. OF TRANSP., USCG, CG-841 (Rev 8-85) (v12)    *** SEE NEXT PAGE PLEASE ***

Exhibit 3
No. 1:07-1030 (RCL)
Page 2



DEPARTMENT OF TRANSPORTATION
UNITED STATES COAST GUARD

# Certificate of Inspection

ENERGY 8701                    **PAGE** 3         CERTIFICATION DATE: 27NOV01

---

## *CONDITIONS OF CARRIAGE*

### --MARPOL I PROHIBITION--
ALL BALLAST, TANK WASHINGS & OTHER RESIDUAL MATTER SHALL BE DISCHARGED
DIRECTLY TO A SHORESIDE RECEIVING FACILITY OR A TANK VESSEL THAT COMPLIES
WITH THE REQUIREMENTS OF 33 CFR 157.11 & 157.15.

### --MARPOL ANNEX II PROHIBITION--
WHILE OPERATING SEAWARD OF THE BOUNDARY LINE THIS BARGE MAY NOT CARRY
CARGOES THAT ARE DESIGNATED AS NOXIOUS LIQUID SUBSTANCES (NLS) IN TABLE
30.25-1 OF 46 CFR 30.25, 33 CFR 151.47 AND 33 CFR 151.49.

### --- INSPECTION STATUS ---

#### *PRESSURE VESSELS*

| TYPE | LOCATION | LAST | NEXT |
|------|----------|------|------|
| AIR RECEIVER | ON DECK | 23OCT01 | 23OCT04 |
| AIR RECEIVER | ON DECK | 23OCT01 | 23OCT04 |

### --- LIFESAVING EQUIPMENT ---
NUMBER PERSONS

| | | | | REQUIRED |
|---|---|---|---|---|
| TOTAL EQUIPMENT FOR | | 4 | LIFE PRESERVERS(ADULT)... | 4 |
| LIFEBOATS(TOTAL)....... | | | LIFE PRESERVERS(CHILD)... | |
| LIFEBOATS(PORT)*..... | | | RING BUOYS(TOTAL)........ | 2 |
| LIFEBOATS(STARBD)*... | | | WITH LIGHTS*........... | 1 |
| MOTOR LIFEBOATS*..... | | | WITH LINE ATTACHED*.... | 1 |
| LIFEBOATS W/RADIO*... | | | OTHER*............... | 0 |
| RESCUE BOATS/PLATFORMS. | | | IMMERSION SUITS......... | 4 |
| INFLATABLE RAFTS....... | 1 | 6 | PORTABLE LIFEBOAT RADIOS. | |
| LIFE FLOATS/BUOYANT APP | | | EQUIPPED WITH EPIRB?..... | NO |
| WORKBOATS (NOT REQUIRED) | | | (* INCLUDED IN TOTALS) | |

### --- FIRE FIGHTING EQUIPMENT ---

#### *FIRE EXTINGUISHERS - HAND PORTABLE AND SEMI-PORTABLE*

| | | | |
|---|---|---|---|
| A-II | B-I | 7 B-II | B-III |
| B-IV | 1 B-V | C-I | C-II |

#### *CONDITIONAL PORTABLE FIRE EXTINGUISHER REQUIREMENTS*
IF THE B-V SEMI-PORTABLE FIRE EXTINGUISHER USES DRY CHEMICAL
OR CO2 AS EXTINGUISHING MEDIUM, THE AMOUNT REQUIRED TO BE
CARRIED SHALL BE DOUBLED FOR OUTSIDE USE PER 46 CFR 34.50-5.

### *** END ***

DEPT. OF TRANSP., USCG, CG-841 (Rev 3-86) (γ12)

Exhibit 3
No. 1:07-1030 (RCL)
Page 3

# EXHIBIT 4

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*

**U.S. Department of Homeland Security**

**United States Coast Guard**



**Commanding Officer**
**United States Coast Guard**
**Marine Safety Center**
**www.uscg.mil/hq/msc**

400 7th Street, S.W.
Washington, DC 20590-0001
Staff Symbol: MSC-4
Phone: (202) 366-6481
FAX: (202) 366-3877
EMAIL: ec@msc.uscg.mil

16717/P002131
Serial C3-0400784
March 29, 2004

Mr. Carl Annessa
Hornbeck Offshore Transportation, LLC
103 Northpark Boulevard, Suite 300
Covington, LA 70433

Subj: REQUEST TO USE NEW TONNAGE ASSIGNMENT TO APPLY OPA 90 DOUBLE
HULL REQUIREMENTS; DISAPPROVAL OF

Ref: (a) Activities NY Memo dated March 22, 2004

Dear Mr. Annessa:

This is in response to your letter of March 8, 2004, forwarded by reference (a), which requests acceptance of a new tonnage assignment to the barge ENERGY 8701 for purposes of applying double hull requirements of the Oil Pollution Act of 1990 (OPA 90). The new tonnage assignment by the American Bureau of Shipping (ABS) on February 24, 2004, is 4660 GT ITC. The tonnage originally assigned to the vessel by the Coast Guard on August 25, 1976, was 5323 GRT, and is no longer assigned to the vessel. You allege that due to an error in the original admeasurement, the new tonnage of 4660 GT ITC should be used to apply the OPA 90 requirements. You further suggest that notwithstanding the error, language in 46 U.S.C. 3703a(e)(1) provides for using the convention tonnage assigned to the vessel to apply the OPA 90 requirements.

Your request is disapproved. We can find no evidence of an error in the vessel's original admeasurement, based on our review of the calculations done by the Coast Guard in 1976 and our discussions with ABS. Even had an error been committed in 1976, we interpret the language of 46 U.S.C. 3703a(e)(1) as requiring the OPA 90 requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage. Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

If you feel aggrieved by this decision, you may appeal it in accordance with the provisions of 46 CFR 1.03. The appeal should be addressed to this office, and will be forwarded to Commandant (G-MS) for final agency action. The point of contact on my staff for this matter is Mr. Peter Eareckson. His phone number is 202 366-6502.

Sincerely,

R. A. NASH

**00026**

Copy: Activities NY

Exhibit 4
No. 1:07-1030 (RCL)
Page 1

# EXHIBIT 5

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*



**HORNBECK OFFSHORE TRANSPORTATION, LLC**
*Service with Energy*

April 8, 2004

<u>VIA FACSIMILE 718-354-4297 AND FIRST CLASS MAIL</u>

LCDR Paul Arnett
Chief, Flag State Inspection Department
United States Coast Guard Sector New York
Marine Safety Operations Division
212 Coast Guard Drive
Staten Island, NY 10305

Re: Freedom of Information Act Request

Dear Lt. Commander Arnett:

This is a request under the Freedom of Information Act, 5 U.S.C. Sec. 552 made on behalf of Hornbeck Offshore Transportation, L.L.C. (the "Company"). On behalf of the Company, I request that a copy of the following documents or documents containing the following information be provided to me for inspection and copying:

1) All Certificates of Inspection for the tank vessels B-95 and B-105 (the "Vessels") owned and/or operated by Bouchard Marine for the years 1990 – 2004, inclusive;

2) All documents that pertain to the determination of the OPA 90 phase-out dates for the Vessels;

3) All documents that pertain to any requests by Bouchard for administrative or legal review of the OPA 90 phase-out dates for the Vessels;

4) All documents in your agency's possession that contain correspondence between your agency or any other agency of the United States and Bouchard regarding the OPA 90 phase-out dates for the Vessels.

In order to help to determine my status for purposes of determining the applicability of any fees, you should know that I am the General Counsel of Hornbeck Offshore Services, Inc., the parent company of Hornbeck Offshore Transportation, L.L.C. The information sought is in connection with the Company's business. The Company will pay fees for this request up to a maximum of $2,000.00. If you estimate that the fees will exceed this limit, please advise me first.

00064

103 Northpark Boulevard, Suite 300
Covington, Louisiana 70433

Phone: (985) 727-2000
Fax:    (985) 727-2006

Exhibit 5
No. 1:07-1030 (RCL)
Page 1

Lt. Commander Arnett
Re:  Freedom of Information Act Request
Page 2

I ask that this request receive expedited processing because it is made in connection with an administrative appeal by the Company to your agency which requires prosecution within thirty days of the date of your agency's first decision which was rendered on March 29, 2004.  I can be present in your offices on Tuesday April 13, 2004. I also include a telephone number at which I can be contacted twenty-four hours per day, if necessary, to discuss any aspect of my request.

Thank you for your consideration of this request.

Sincerely,

Samuel A. Giberga
General Counsel

cc:     Carl Annessa, Vice President & COO

00065

Exhibit 5
No. 1:07-1030 (RCL)
Page 2

# EXHIBIT 6

**Civil Action No. 1:07-1030 (RCL)**
*Hornbeck Offshore Transportation, LLC v. United States of America*

013

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**



**Commanding Officer**
**United States Coast Guard**
**Marine Safety Center**
**www.uscg.mil/hq/msc**

400 7th Street, S.W.
Washington, DC 20590-0001
Staff Symbol: MSC-4
Phone: (202) 366-6481
FAX: (202) 366-3877
EMAIL: ec@msc.uscg.mil

RECEIVED
JUN 0 2 2004
BY: _____

16717
Serial C3-0401207
FOIA No. 04-13/2004-1708
May 25, 2004

Mr. Samuel A. Giberga
Hornbeck Offshore Transportation, LLC
103 Northpark Boulevard, Suite 300
Covington, LA 70433

Subj:  BARGE B NO. 95 AND B. NO.105;  Freedom of Information Act Request

Dear Mr. Giberga:

This is in response to your Freedom of Information Act request of April 30, 2004, concerning information related to the subject barges.  The information pertains to double hull requirements for these vessels under the provisions of the Oil Pollution Act of 1990 (OPA 90).  We have located a total of 71 pages responsive to the request.  42 pages are being withheld in their entirety.  4 pages are being redacted.  25 pages are being released in their entirety.  All pages being released accompany this letter.

27 pages are being withheld under 5 U.S.C. §552(b)(5) because they are pre-decisional.

15 pages are being withheld because they contain confidential commercial and/or financial information, submitted to the Coast Guard by a third party.  The pages are exempt from disclosure under 5 U.S.C. §552(b)(4).  Release of the information on these pages would likely cause the submitter substantial competitive harm.

4 pages are being redacted under 5 U.S.C. §552(b)(6) because they contain information that, if released, would constitute a clearly unwarranted invasion of personal privacy.  I have determined that the individual privacy interest in this information outweighs any general public interest in disclosure because the information being redacted would result in a clearly unwarranted invasion of personal privacy while shedding little or no light on how the Coast Guard carries out its statutory duties.

The total cost for providing these records is $650.10.  The actual costs for providing this information follow:

      Search/Reviw time.  AA-16 hrs at $40.45 per hour = $647.20
      Duplication.  BB-29 pages at $0.10 per page   =   $2.90
                                Total   = $650.10

Exhibit 6
No. 1:07-1030 (RCL)
Page 1

717
Serial C3-0401207
FOIA No. 04-13/2004-1708
May 25, 2004

Subj: BARGE B NO. 95 AND B. NO.105; Freedom of Information Act Request

Please send a check, draft, or money order, made payable to "Treasury of the United States," to the address above. To ensure credit for your payment, please mark your FOIA control number, 2004-1708, on the face of the instrument. You may also pay electronically by credit card through the web site https://diy.dot.gov, under this FOIA control number.

I am the person responsible for the denial of your request. Also participating in this decision is Commander Alan Marsilio, Executive Officer of the Marine Safety Center and Lieutenant Jeff Bray, Office of Regulations and Administrative Law.

If you have any further questions, please feel free to contact Mr. Peter Eareckson of my staff at 202 366-6502.

If you desire to appeal this determination, you must appeal in writing within 30 days from the date of receipt of this letter. You must include your reasons for reconsideration. You should address your appeal to:

Commandant (G-SII-2)
U.S. Coast Guard Headquarters
2100 2nd Street, S.W.
Washington, DC 20593-0001

Sincerely,

A.M. MARSILIO, CDR, USCG

FOR R. A. NASH
Captain, U.S. Coast Guard

Copy: Commandant (G-CIM-2) (Attn: Headquarters FOIA Coordinator--HFC)

00070

2

Exhibit 6
No. 1:07-1030 (RCL)
Page 2

# EXHIBIT 7

**Civil Action No. 1:07-1030 (RCL)**
*Hornbeck Offshore Transportation, LLC v. United States of America*

# WINSTON & STRAWN LLP

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

BUCKLESBURY HOUSE
3 QUEEN VICTORIA STREET
LONDON, EC4N 8NH

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

(202) 282-5000

FACSIMILE (202) 282-5100

www.winston.com

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

LAWRENCE I. KIERN
(202) 282-5811
lkiern@winston.com

September 12, 2006

<u>**VIA EMAIL**</u>

Robert Bruce
Chief, Office of Claims and Litigation
Judge Advocate General
United States Coast Guard
2100 Second Street, SW
Washington, DC 20593

Re:  *Administrative Claim Under the Federal Tort Claims Act On Behalf of Hornbeck Offshore Transportation, LLC ("Hornbeck") For Damages Incurred With Respect To The Barge ENERGY 8701*

Dear Mr. Bob:

We represent Hornbeck Offshore Transportation, LLC ("Hornbeck") the owner of the Barge ENERGY 8701 in this administrative claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*. As required by the claims regulations, 33 C.F.R. § 25.107, we have enclosed a letter from Samuel A. Giberga, Senior Vice President and General Counsel of Hornbeck, as evidence of our authority to present this claim as legal representative of Hornbeck. (Enclosure 1.)

## Introduction

As you know, on March 27, 2006, Judge Kollar-Kotelly of the United States District Court for the District of Columbia issued an order in the matter of *Hornbeck Offshore Transportation, LLC v. U.S. Coast Guard,* No. Civ. A. 04-1724 (CKK). (Enclosure 2.) The Court specifically ruled that the Coast Guard unlawfully refused to apply the plain language of 46 U.S.C. § 3703a(e), the entire Oil Pollution Act scheme, and the tonnage measurement laws of the United States to Hornbeck's Barge ENERGY 8701. The Court also concluded the Coast Guard action was "arbitrary, capricious, and otherwise not in accordance with law" in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). The Coast Guard did not appeal the Court's decision which is now final. Indeed, as required by the Court's order the Coast Guard subsequently directed assignment of the proper phase-out date. (Enclosure 3.)

Exhibit 7
No.1:07-1030 (RCL)
Page 1

**WINSTON & STRAWN** LLP

U.S. Coast Guard
ENERGY 8701 Claim
September 12, 2006
Page 2

The Coast Guard's lack of due care, negligence, and/or wrongful act or omission caused injury to Hornbeck which sustained damages as set forth in this administrative claim. The claim is presented in a duly executed Standard Form 95 which incorporates this letter and the supporting documentation by reference. (Enclosure 4.)

<u>**Summary of the Claim**</u>

As set forth in detail in the decision of the Court, this claim arises from the unlawful act of the Coast Guard which "arbitrarily and capriciously" refused to assign the proper phase-out date to the vessel as required by law. Consequently, the Coast Guard misconduct mandated Hornbeck to remove the vessel from service, thereby injuring Hornbeck and causing it to sustain damages because of the loss of use of the vessel, costs incurred in laying up the vessel, and returning the vessel to service, etc.

The Coast Guard's act has prevented Hornbeck from operating the vessel from late 2004 and thereby caused Hornbeck continuing injury and damages. The vessel has not yet returned to service because of the time required to repair damages sustained due to its removal from service. Additionally, Hornbeck incurred damages in the form of demobilization, lay up, and remobilization costs. These damages are continuing in nature. Therefore, this claim specifies the known damages and reserves the right to supplement the claim with additional information supporting damages as it becomes available as provided by the FTCA. 28 U.S.C. § 2675(b); 28 C.F.R. § 14.2(b) (allowing increase in the amount claimed based on newly discovered evidence not reasonably discoverable at the time of presenting the claim to the agency).

| Summary of Damages | | |
|---|---|---|
| **Description** | **Approximate Date(s)** | **Damages** |
| *Loss of Use* | | |
| -- Loss of hire | 1/1/05 to 9/30/06 | $4,778,040.00 |
| -- GMD Shipyard | o/a 11/04 | $231,869.00 |
| *Laying up the vessel* | | |
| -- Barge Gas Free De-Mob | o/a GMD 10/04 | $60,000.00 |
| -- Equip Barge De-Mob | 1/05 | $1,248.62 |
| -- Barge Striping & Cleaning for Storage | 01/05 | $18,136.65 |
| -- Tugs Assist - Crew Change Ft. Lauderdale & Sea Buoy Fourchon to Bollinger Larose | 01/05 | $20,800.00 |
| -- Tugs: Tow from GMD Brooklyn to Court Street dock and from NY to Sea Buoy Fourchon | 1/05 | $100,296.89 |
| -- Storage/Dockage | o/a 12/29/04 to 6/30/06 | $8,000.00 |
| *Returning the vessel to service* | | |
| -- Legal costs | 2004-2006 | $155,498.49 |
| -- Re- Mobilization | o/a 07/01/06 - 9/30/06 | $1,204,909.00 |
| | | $6,578,798.65 |

Exhibit 7
No.1:07-1030 (RCL)
Page 2

**WINSTON & STRAWN** LLP

U.S. Coast Guard
ENERGY 8701 Claim
September 12, 2006
Page 3

<u>Loss of Use of the Vessel</u>

Hornbeck claims loss of use damages in the amount of $4,778,040.00 for the period of January 1, 2005 - September 30, 2006. The claim is based on the period of time the vessel could not be used because of the Coast Guard's unlawful action. The relevant charter hire rate applied to the time period is the market rate. The market rate is established by ready reference to the bareboat charter rate earned by a similar Hornbeck tank barge, the ENERGY 7002, taking account of the larger capacity of the ENERGY 8701. Based upon the market rates prevailing at the time, the ENERGY 8701 would have earned a bareboat charter day rate of $7,429.00 per day, but for the Coast Guard's misconduct. Multiplying this day rate for all of 2005 and the first nine months of 2006 yields a total of $4,778,040.00 through September 30, 2006. (Enclosure 5.)

Additionally, just prior to the removal from service mandated by the Coast Guard, the agency required Hornbeck to dry dock the vessel for examination. This dry docking cost Hornbeck $231,869.00. (Enclosure 6.)

<u>Costs for Laying Up the Vessel</u>

Hornbeck claims $200,482.16 for costs incurred in taking the vessel out of service as required by the Coast Guard and laying it up properly. In order to accomplish this, Hornbeck had to incur substantial costs to gas-free the vessel, remove equipment, tow the vessel to the lay berth, pay for dockage/storage, and otherwise perform work to lay up the vessel properly, and mitigate its damages. (Enclosure 7.)

<u>Costs to Return the Vessel to Service</u>

Hornbeck claims $1,360,407.49 in damages to return the vessel to service. This includes $155,498.49 in damages for legal costs incurred in overturning the Coast Guard's unlawful decision. (Enclosure 8.) Hornbeck repeatedly sought to persuade the Coast Guard to assign the proper phase-out date through the administrative process. However, both Hornbeck's administrative request and its appeal were denied. Hornbeck, through its counsel, Winston & Strawn LLP, then approached the Coast Guard's Judge Advocate Rear Admiral John Crowley and asked the agency to reconsider its action in the interests of avoiding litigation. Rear Admiral Crowley consulted with headquarters staff and informed Winston & Strawn that the agency would not alter its action -- despite full knowledge that Hornbeck would likely seek judicial review and damages from the Coast Guard. Therefore, after asking the agency repeatedly to reconsider its position, Hornbeck pursued its only remaining avenue to overturn the agency's misconduct – judicial review. Obtaining judicial relief and reversal of the agency's action was the *sine qua non* to returning the vessel to service in mitigation of its damages.

Other costs claimed in this category, $1,204,909.00, were incurred in returning the vessel to service including removing the vessel from lay up, preparing the vessel and towing it to the shipyard, dry docking, and shipyard repair work for damages caused by the lay up which is

Exhibit 7
No.1:07-1030 (RCL)
Page 3

**WINSTON & STRAWN** LLP

U.S. Coast Guard
ENERGY 8701 Claim
September 12, 2006
Page 4

ongoing. (Enclosure 8.) Because the work continues, the amount of this portion of the claim may be supplemented with additional information when it becomes available.

<u>**Legal Basis for the Claim**</u>

Although not required by the claims regulations to provide a legal justification for the claim, Hornbeck provides this concise analysis to assist the agency. Of course, we are available to discuss any legal aspects of the claim as you wish.

As you know, the FTCA waives the sovereign immunity of the United States in circumstances where a party sustains injury caused by a lack of due care, negligence, and/or a wrongful act of any employee of the Government acting within the scope of his employment. 28 U.S.C. § 1346(b). The law provides that the United States is liable where the negligence or wrongful act of its employees takes the form of a failure to comply with the law where function is not discretionary. 28 U.S.C. § 2680(a); *Berkovitz v. United States*, 486 U.S. 531 (1988) (failure to test vaccine lots as required by regulation not discretionary). And as Judge Kollar-Kotelly made clear, the failure to issue a license, permit, or certificate under the circumstance of this case is plainly not discretionary. *Hendry v. United States*, 418 F.2d 774 (2d. Cir. 1969) (Coast Guard refusal to issue license not a discretionary function). The Supreme Court adopted the Second Circuit's formulation of the discretionary function doctrine as applied to the Coast Guard in *Hendry* in its decision in *United States v. Varig Airlines*, 467 U.S. 797 (1984). Simply put, where the denial of a certificate involves nothing more than the matching of facts against a clear rule or standard -- as in this case -- the agency action is not discretionary and the Government is liable.

In this matter, Judge Kollar-Kotelly has already ruled as a matter of law that the agency violated the plain language of the statutes, that it was entitled to no deference in its construction of them, and that the Coast Guard's justification for its misconduct was nothing more than a *post hoc* rationalization which the Court rejected. (Enclosure 2.) Indeed, the Court's decision establishes that the agency had no discretion with respect to its failure to assign the proper phase-out date, that the law required the agency to issue a proper phase-out date of 2015, and that it obstinately refused to comply with the law with full knowledge that it was injuring Hornbeck. Therefore, the agency's lack of due care, negligence, and/or wrongful act did not constitute a discretionary function.

The Coast Guard's unlawful act mandated Hornbeck to remove the vessel from service before January 1, 2005. The vessel has remained out of service and is currently in the shipyard undergoing work to, among other things, repair damages incurred because of the lay up and to restore it to service. Therefore, all of the damages incurred by Hornbeck caused by the Coast Guard's misconduct are compensable and are the subject of this claim. Hornbeck is having other work performed at the shipyard that was not caused by the Coast Guard's act and this unrelated work is not the subject of this claim.

Exhibit 7
No.1:07-1030 (RCL)
Page 4

**WINSTON & STRAWN** LLP

U.S. Coast Guard
ENERGY 8701 Claim
September 12, 2006
Page 5


### Processing of the Claim

In light of the Coast Guard's handling of this matter and the damages that Hornbeck continues to sustain due to the wrongful act of the agency, we respectfully request that the agency make its administrative determination regarding liability as an initial matter. The basic facts of this case are undisputed and are as set forth by the Court's decision. (Enclosure 2.) If the agency denies the claim because it concludes there is no liability under these undisputed facts, then it is pointless for Hornbeck to have to incur additional costs and delay in an unnecessary effort to provide additional documentation to support damages. On the other hand, if the agency acknowledges liability, then the additional burden and cost to Hornbeck of providing additional documentation would be more reasonable to consider incurring.

We trust that this information and the enclosures will provide sufficient information for the agency to approve the claim forthwith. However, if you have any questions, please do not hesitate to contact me directly. We would rather work through any issues you have so as to avoid any misunderstanding and unnecessary delay and litigation.

Thank you for your assistance.

Very truly yours,

Lawrence I. Kiern

Enclosures

cc. Samuel A. Giberga, Hornbeck

DC:482610.2

Exhibit 7
No.1:07-1030 (RCL)
Page 5

# ENCLOSURE 1

Exhibit 7
No.1:07-1030 (RCL)
Page 6



**HORNBECK OFFSHORE TRANSPORTATION, LLC**
*Service with Energy*

September 8, 2006

Chief, Office of Claims and Litigation
Judge Advocate General
United States Coast Guard
2100 Second Street, SW
Washington, DC  20593

Re:     *Administrative Claim Under the Federal Tort Claims Act On Behalf of
Hornbeck Offshore Transportation, LLC ("Hornbeck") For Damages
Incurred With Respect To The Barge ENERGY 8701*

Dear Sir:

On March 27, 2006, the United States District Court for the District of Columbia issued an order in the matter of *Hornbeck Offshore Transportation, LLC v. U.S. Coast Guard,* No. Civ. A. 04-1724 (CKK).

The Court ruled that the Coast Guard unlawfully refused to apply the plain language of 46 U.S.C. § 3703a(e), the entire Oil Pollution Act scheme, and the tonnage measurement laws of the United States to Hornbeck's Barge ENERGY 8701.  The Court also concluded the Coast Guard action was "arbitrary, capricious, and otherwise not in accordance with law" in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).

As a result of the Coast Guard's action, Hornbeck sustained damages which are the subject of an administrative claim which is being presented to the Coast Guard on behalf of Hornbeck by its authorized representative, Winston & Strawn, LLP.

In my capacity as Senior Vice President and General Counsel of Hornbeck, the owner of the Barge ENERGY 8701, I hereby authorize the law firm of Winston & Strawn LLP to present this claim and act as the duly authorized legal representative of Hornbeck in all respects concerning the claim.

All inquiries concerning the administrative claim should be directed to Lawrence I. Kiern at Winston & Strawn, LLP, 1700 K Street, N.W., Washington, D.C. 20006-3817.  His office telephone number is (202)282-5811 and his email address is lkiern@winston.com.

---

103 Northpark Boulevard, Suite 300
Covington, Louisiana 70433

Phone:  (985) 727-2000
Fax:      (985) 727-2006

Exhibit 7
No.1:07-1030 (RCL)
Page 7

Thank you for your assistance.

Very truly yours,

Samuel A. Giberga
Senior Vice President and General Counsel

cc.  Winston & Strawn, LLP

Exhibit 7
No.1:07-1030 (RCL)
Page 8

# ENCLOSURE 2

Exhibit 7
No.1:07-1030 (RCL)
Page 9



--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
HORNBECK OFFSHORE TRANSPORTATION,
LLC, Plaintiff,
v.
UNITED STATES COAST GUARD, et al.,
Defendants.
No. Civ.A. 04-1724 CKK.

March 27, 2006.

Lawrence I. Kiern, Winston & Strawn, Washington,
DC, for Plaintiff.
Diane M. Sullivan, United States Attorney's Office,
Washington, DC, for Defendants.

MEMORANDUM OPINION
KOLLAR-KOTELLY, J.
*1 Plaintiff Hornbeck Offshore Transportation, LLC
("Hornbeck"), a limited liability company which
owns and operates oil transport vessels, brings this
action against Defendants the United States Coast
Guard and the United States of America (collectively,
"Defendants" or "the Agency") alleging that (1) the
Agency's assignment of a phase-out date under the
Oil Pollution Act of 1990 ("OPA 90"), Pub.L. 101-
380, 104 Stat. 484 (1990), of January 1, 2005, rather
than January 1, 2015, for its tank barge "ENERGY
8701" was contrary to law, arbitrary and capricious,
and in violation of the Administrative Procedure Act
("APA"), 5 U.S.C. § § 701 et seq., see First Am.
Compl. ¶ ¶ 31-35 (Count I-Violation of APA), ¶ ¶
36-40 (Count II-Violation of APA); and (2) the
Agency's failure to provide certain requested
documents constituted a violation of the Freedom of
Information Act ("FOIA"), 5 U.S.C. § 552, id. ¶ ¶
41-47 (Count III-Violation of FOIA), ¶ ¶ 48-54
(Count IV-Violation of FOIA). Currently before the
Court is Plaintiff's Motion for Summary Judgment as
to Counts I and II of Plaintiff's First Amended
Complaint (Plaintiff's APA claims), Defendants'
Opposition and Cross-Motion for Summary
Judgment on Counts I and II, and Plaintiff's
Opposition and Reply.

Upon a searching examination of the parties' filings,
the attached exhibits, the relevant case law, and the
entire administrative record provided, the Court shall

grant Plaintiff's Motion for Summary Judgment as to
Counts I and II of Plaintiff's First Amended
Complaint and shall deny Defendants' Cross-Motion
for Summary Judgment.

I: BACKGROUND

*A. Statutory Framework*

*1. The Oil Pollution Act of 1990*

In response to the disastrous March 1989 oil spill
involving the EXXON VALDEZ in Prince William
Sound, Alaska, Congress passed the Oil Pollution Act
of 1990 ("OPA 90"), Pub.L. 101-380, 104 Stat. 484
(1990). OPA 90 requires that all newly constructed
tank vessels engaged in the marine transportation of
oil in the United States be constructed with double
hulls. See 46 U.S.C. § 3703(a) ("Except as otherwise
provided in this section, a vessel to which this
chapter applies shall be equipped with a double
hull...."). A "double hull" is a ship hull design
method where the bottom and sides of the ship have
two complete layers of watertight hull surface: one
outer layer forming the normal hull of the ship, and a
second inner hull which is somewhat further into the
ship, perhaps a few feet, which forms a redundant
barrier to seawater in case the outer hull is damaged
and leaks. Double hulls are significantly safer than
single hulls. In the case of grounding or other
underwater damage, most of the time the damage is
limited to flooding the bottom compartment, and the
main occupied areas of the ship remain intact. In the
case of a collision with another ship, most of the time
the damage is limited to flooding the side
compartment, and the main occupied compartments
also remain intact. The provisions of the OPA
requiring that all newly constructed tank vessels be
provided double hulls apply, *inter alia*, to a U.S.
vessel if it "is constructed or adapted to carry, or
carries, oil in bulk as cargo or cargo residue" and
when the vessel is "operating on the waters subject to
the jurisdiction of the United States, including the
Exclusive Economic Zone." *Id.* § 3703a(a)(1) & (2).

*2 In addition to its requirements regarding the
construction of double hulled tank vessels, OPA 90
also requires that all U.S. single hull tank vessels,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 10

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

including tank barges, existing at the time of OPA 90's enactment be retrofitted with double hulls in order to qualify for operation on the navigable waters of the United States or the waters of the Exclusive Economic Zone of the United States. *Id.* § 3703a(c). Any single hull tank vessel not retrofitted in such a manner must be phased out of service in accordance with a statutory schedule, which began to have effect on January 1, 1995. *Id.* § 3703a(c)(3). The phase-out schedule of OPA 90 is based upon the gross tonnage, hull design, and construction date of the subject vessel. *Id.* For instance, for single hull tank vessels constructed prior to 1980, OPA 90 provides that vessels with a gross tonnage of 5000 gross tons or more must be phased-out as of January 1, 2005, while vessels with a gross tonnage of less than 5000 tons must be phased out as of January 1, 2015. *See id.* § 3703a(c)(3)(A) & (c)(2). Whether a single hull vessel that was built before 1980 is phased out in 2005 or 2015 depends exclusively on the vessel's gross tonnage.

### 2. The 1997 Amendment to the OPA

For the seven years following its passage, OPA 90 contained no specific authorization for waiving or extending phase-out deadlines. However, because its deadlines were based in part on the gross tonnage of the vessel, with larger vessels generally having earlier phase-out dates, owners began obtaining *de facto* extended deadlines by reducing the documented carrying capacity of their vessels. *See* U.S. Gen. Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them 10 (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B. For example, a vessel owner could reduce the gross tonnage of a vessel by deducting cargo-carrying tanks from a vessel's gross tonnage by re-designating such tanks as specially segregated tanks that carried only ballast water. *Id.* at 11.

The so-called Frelinghuysen Amendment, passed on November 18, 1997, changed this landscape, eliminating this industry practice of reducing the gross tonnage of a vessel scheduled for OPA 90 phase-out so as to obtain a later phase-out date. *Id.* at 10. Through the Frelinghuysen Amendment to OPA 90, Congress amended 46 U.S.C. § 3703a by adding the following pertinent provision:

(e)(1) For the purposes of this section and except as otherwise provided in paragraphs (2) and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage that would have been recognized by

the Secretary on July 1, 1997, as the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title.

46 U.S.C. § 3703a(e)(1).

### 3. Tonnage Measurement Systems

*3 A vessel's gross tonnage measurement describes its internal volume, not the weight the vessel can carry or the weight of the vessel itself. As is plain upon a reading of 46 U.S.C. § 3703a(e)(1), there are two measurement systems recognized by the United States. Measurement under 46 U.S.C. § 14502 is the "Regulatory" measurement system, which yields the vessel's "Regulatory tonnage" commonly denominated "GRT." *See* 46 U.S.C. § 14501 *et seq.* Measurement under 46 U.S.C. § 14302 conforms with the International Convention on Tonnage Measurement of Ships of 1969, which yields the vessel's "Convention tonnage" commonly denominated "ITC." *See* 46 U.S.C. § 14301 *et seq.* The difference between a particular vessel's Regulatory tonnage and Convention tonnage solely reflects the different measuring criteria of each system for establishing the tonnage. In a typical case, the Convention tonnage system of measurement yields a higher gross tonnage than the Regulatory system. United States law requires that "a vessel engaged in a foreign voyage" be measured under the Convention measurement system. *See* 46 U.S.C. § 14301(a)(3); 46 C.F.R. § 69.11(a)(1).

### B. The Decision Regarding ENERGY 8701's Phase-Out

#### 1. ENERGY 8701

ENERGY 8701, the tank barge at the center of this dispute, is a U.S.-flag tank barge designed to carry oil or other liquid cargo. *See* Admin. R. at 4, 18. A "tank barge" is a non-self-propelled vessel specially constructed or converted to carry oil, hazardous material, or other bulk liquid in tanks. *See* 46 U.S.C. § 2101(39); 33 U.S.C. § 2701(34); 46 C.F.R. § 30.10-65, 151.03-51. Constructed in 1976, *see* Admin. R. at 4; First Am. Compl. ¶ 19, ENERGY 8701 is 360 feet long, 64 feet wide, and 27 feet deep; when fully loaded, the vessel is capable of carrying 85,000 barrels (= 3,570,000 million gallons) of oil,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 11

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 3

see Admin. R. at 16, 31. On August 25, 1976, the United States Coast Guard issued a Certificate of Admeasurement for ENERGY 8701 which recorded the vessel's gross tonnage as 5323.19 gross tons (GRT) using the Regulatory measurement system. *See id.* at 31. Because ENERGY 8701 was only engaged in domestic trade at that time, its Convention tonnage was not measured at that point. Importantly, since its original construction, ENERGY 8701 has undergone no physical alterations to reduce its tonnage. *See id.* at 14.

The original owner of ENERGY 8701 was a company called Spentonbush/Red Star Companies. *See id.* at 4. Plaintiff acquired the barge from Spentonbush through an affiliated company, called LEEVAC Marine Inc., in June 2001. *See id.* at 4. For over two and a half years, Plaintiff operated ENERGY 8701 and made no request to modify its gross tonnage measurement of 5323 GRT. *See id.* at 15-16, 32. Indeed, for nearly 30 years following its 1976 construction, no owner or operator of ENERGY 8701 sought to have that measurement changed or to substitute an admeasurement based on Convention tonnage for the original measurement of 5323 gross tons (GRT) under the Regulatory system. *Id.* When Plaintiff acquired ENERGY 8701, it believed that the barge would be phased out of service on January 1, 2005; indeed, the Coast Guard Certificate of Inspection for ENERGY 8701, dated November 27, 2001 (five months after Plaintiff's purchase of the vessel), notes that the gross tonnage of the vessel is 5323 GRT and specifically states that the OPA 90 phase-out date for the barge is January 1, 2005. *See id.* at 18-19; *see also* 46 U.S.C. § 3703a(c)(3)(A) (providing that single hull vessels with a gross tonnage of 5000 gross tons or more must be phased out by January 1, 2005).

### 2. Plaintiff's Pleasant "Surprise" and Attempt to Extend ENERGY 8701's Phase-Out Date

*4 In connection with a planned commercial voyage to Canada in early 2004, Plaintiff was compelled by international law to obtain a Convention measurement for ENERGY 8701. *See id.* at 4-5. On February 11, 2004, Plaintiff hired the American Bureau of Shipping ("ABS") to determine the tonnage of ENERGY 8701 under the Convention measurement system to permit the vessel to sail on this foreign voyage. *See id.* at 32. As requested, ABS performed the necessary calculations and conducted a survey of the ENERGY 8701 in February 2004. *See id.* at 34-60. Based upon its calculations and survey,

ABS determined that the vessel's gross tonnage is 4660 gross tons (ITC) using the Convention measurement system. *See id.* at 62. ABS issued an International Tonnage Certificate for the ENERGY 8701, delivering the certificate to the Coast Guard on February 24, 2004. *See id.* at 61-62.

Provided this new measurement of 4660 gross tons under a different system, Plaintiff believed that it was entitled to a new phase-out date for ENERGY 8701, as 46 U.S.C. § 3703a(c)(2) provides a phase-out date of January 1, 2015 for single hull vessels with a gross tonnage of less than 5000 tons. As such, on March 8, 2004, Plaintiff requested that the Agency recognize the vessel's gross tonnage of 4660 tons and establish the ENERGY 8701's phase-out date as January 1, 2015. *See id.* at 13-14 ("Initial Request"). In support of its request, Plaintiff enclosed the International Tonnage Certificate showing the tonnage of 4660 tons and verified that ENERGY 8701 had not undergone any major conversions or substantial alternations since its 1976 construction. *Id.* In response, the Agency assigned the Convention tonnage of 4660 gross tons (ITC) to ENERGY 8701, but denied Plaintiff's request to recognize the phase-out date of January 1, 2015, rather than January 1, 2005. *See id.* at 25. The Agency reasoned:

[W]e interpret the language of 46 U.S.C. § 3703(a)(c)(1) as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage., Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

*Id.* at 26.

On July 29, 2004, Plaintiff appealed the initial Agency decision to Agency Headquarters. *See id.* at 1-12 ("Appeal"). Plaintiff, in its appeal, contended that the Agency had erroneously applied 46 U.S.C. § 3703a(e) and had treated other vessels-namely, two barges owned by a competitor of Plaintiff, Bouchard, identified as "B. NO. 95" and "B. NO. 105"-in a disparate manner under the same statute. *See id.* at 5-9. On September 15, 2004, the Agency denied Plaintiff's appeal. In doing so, the Agency stated: Section 3703a of title 46 United States Code states that the "gross tonnage of a vehicle shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997." We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 12

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

determining the OPA 90 phase out. The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system used for regulatory purposes.

*5 See Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter"). The Agency's only stated rationale in rebuttal to Plaintiff's accusation of disparate treatment was an argument that Bouchard had *applied* for a tonnage change before July 1, 1997 (although the tonnage change had not been issued as of that date); as such, Bouchard was allowed to extend the phase-out date for its barges from January 1, 2005 to January 1, 2015, but Plaintiff-which had not applied for such a change prior to July 1, 1997- was not allowed an extension. *Id.*

Following the Agency's denial of its appeal, Plaintiff filed a Complaint in this Court on October 8, 2004. *See* Compl. Plaintiff contends, *inter alia,* that the Agency Action violated the parameters of the APA for two reasons. First, Plaintiff asserts that "[t]he Agency's action is contrary to the plain language of 46 U.S.C. § 3703a(e)." First Am. Compl. ¶ 33 (Count I-APA). Second, Plaintiff argues that "[t]he Agency's failure to treat legally indistinguishable circumstances alike"-i.e., its application as compared to Bouchard's application-"is arbitrary and capricious and otherwise not in accordance with law and is therefore contrary to the Administrative Procedure Act." *Id.* ¶ 39 (Count II-APA).

## II: LEGAL STANDARDS

### A. Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Id.* at 587, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

### B. Standards for Administrative Agency Review

*6 Plaintiff in this case challenges the Agency's construction of the phase-out provision of OPA 90, specifically, the Agency's interpretation of the 1997 Amendment to OPA 90, 46 U.S.C. § 3703a(e)(1). The standard for the Court's review of such challenges is known as *Chevron* review, after the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 13

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 5

Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).* The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala, 70 F.3d 610, 615 (D.C.Cir.1995)* (quoting *Chevron, 467 U.S. at 843, 104 S.Ct. 2778, 81 L.Ed.2d 694).* Under the *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694; see also id. at 843 n. 9, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694* ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). "When performing this first step, [courts] employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 643 (D.C.Cir.2000)* (citing *Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694; INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).* Among these tools is a statute's legislative history. *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n, 333 F.3d 168, 172 (D.C.Cir.2003)* ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin., 38 F.Supp.2d 114, 134 (D.D.C.1999); see also Nat. Res. Def. Council v. Browner, 57 F.3d 1122, 1127 (D.C.Cir.1995)* ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n, 46 F.3d 1173, 1178 (D.C.Cir.1995)).* However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh, 868 F.2d 1285, 1292-93 (D.C.Cir.1989)* (emphasis in original). In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL-CIO, 333 F.3d at 173.*

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, 467 U.S. at 843, 104 S.Ct. 2778, 81*

L.Ed.2d 694. "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO, 333 F.3d at 173.* "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694.* Therefore

*7 [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges-who have no constituency-have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Id. at 866, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694* (quoting *TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).* However, if the Agency's interpretation unduly compromises the statute's purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n, 795 F.2d 156, 164 (D.C.Cir.1986)* (quoting *Chevron, 467 U.S. at 845, 104 S.Ct. 2778, 81 L.Ed.2d 694); see also Chevron, 467 U.S. at 845, 104 S.Ct. 2778, 81 L.Ed.2d 694* (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.") (quoting *United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)); Common Cause v. Fed. Election Comm'n, 692 F.Supp. 1391, 1396 (D.D.C.1987)* ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may-indeed must-intervene and correct the agency.").

In addition to their *Chevron* challenge, Plaintiff also contends that the Agency abused its discretion in an "arbitrary and capricious" manner in failing to offer a "reasoned analysis" for its decision with respect to ENERGY 8701. According to Plaintiff, the Agency treated legally indistinguishable vessels differently and failed to follow its own rules. The Administrative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 14

Procedure Act ("APA") provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*8 Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citations and quotation marks omitted); see also Cellco P'ship v. Fed. Commc'ns Comm'n, 357 F.3d 88, 93-94 (D.C.Cir.2004) (noting "arbitrary and capricious" review is "highly deferential ... presum[ing] the validity of agency action ... [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis" requirement is "not 'particularly demanding,' " and "is satisfied if the agency 'enables us to see what major issues of policy were ventilated and why the agency reacted to them as it did.' " Republican Nat'l Comm. v. Fed. Election Comm'n, 76 F.3d 400, 407 (D.C.Cir.1996), cert. denied, 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C.Cir.1993) (internal punctuation omitted). Moreover, the Court "must affirm if a rational basis for the agency's decision exists." Bolden v. Blue Cross & Blue Shield Ass'n, 848 F.2d 201, 205 (D.C.Cir.1988). The degree of deference a court

should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). Moreover, this Circuit has noted that "a permissible statutory construction under Chevron is not always reasonable under State Farm: 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.' " Republican Nat'l Comm., 76 F.3d at 407 (quoting Arent, 70 F.3d at 620 (Wald, J., concurring in the judgment)).

III: DISCUSSION

The Court shall begin its examination of the Agency's decision vis-à-vis the proper phase-out date for ENERGY 8701 by analyzing what level of deference, if any, should be afforded to its construction of the relevant statutes. The Court shall then turn to an investigation of the statutory scheme in question, looking at the plain language of the relevant provisions, Congressional intent, and the interaction between the various subsections. Because the Court concludes that the Agency violated the APA by failing to follow plain statutory language, the Court shall grant Plaintiff's Motion for Summary Judgment with respect to Count I of their First Amended Complaint. Given that this decision essentially awards the relief requested by Plaintiff, the Court shall decline to address Plaintiff's second argument, i.e., that the Agency's disparate treatment of their vessel constituted "arbitrary and capricious" action in violation of the APA.

A. The Agency's Construction of the Relevant Statutes Warrants No Deference

*9 As noted above, under APA review, a court must first apply the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n, 372 F.3d 395, 399 (D.C.Cir.2004) (citing Chevron, 467 U.S. at 842-43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694). Under step one of the Chevron analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect to the unambiguously expressed intent of Congress. Id.; see also Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694. The court is to proceed to step two of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 15

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

the *Chevron* analysis-wherein it considers (1) whether the agency acted within its delegated authority, and (2) whether the agency's interpretation of the statute is reasonable-only if the statute is silent or ambiguous with respect to the specific issue. *Id.;* see also *Chevron,* 467 U.S. at 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694.

Here, the Agency contends that it "is entitled to *Chevron* deference," because such deference is owed to agencies in the course of informal adjudications, including letter opinions, see Defs.' Opp'n & Cross-Mot. at 15-16 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256-58, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)), and because the nature of the legal question presented in this case, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency had given the question over a long period of time indicate that such deference should be afforded, *id.* (citing *United States v. Mead Corp.,* 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). In the alternative, the Agency suggests that its interpretation should receive the lower *Skidmore* deference, wherein an agency's position may be accorded respect depending on its persuasiveness. *See id.* at 16-17 (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

Three central flaws exist in the Agency's deference argument. As such, the Court determines that the Agency's construction of the statutes relevant to this dispute, particularly 46 U.S.C. § 3703a(e)(1), warrants no deference.

### 1. *The Statutes' Plain Language Controls*

Here, the Agency itself proclaims that "OPA 90, as amended by the Frelinghuysen Amendment, is clear and unambiguous" and argues "that the Coast Guard properly applied the statute to ENERGY 8701 in a straightforward manner." Defs.' Opp'n & Cross-Mot. at 17; *see also id.* (contending that "the Coast Guard's determination ... is consistent with the plain language of the applicable provisions of OPA 90 ...."); *see also id.* at 10, 11, 15 (extolling the "plain language" of OPA 90). Plaintiff also contends that the relevant statutes are plain on their face. *See* Pl.'s Mot. for Summ. J. at 7. Given that both parties concede both that the statutes contain no ambiguity and that the plain language controls their application, the Agency is essentially asserting-incorrectly-deference in a

situation where it admits the resolution is step one of the *Chevron* review.

**\*10** Indeed, the Agency's claim of deference contradicts both its own position that the plain language of the relevant statutes controls and the Supreme Court's admonition:
The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694. As discussed *infra,* Section III(B), the Court is in agreement with the parties that the plain language of OPA 90 and the relevant tonnage measurement statutes is clear and unambiguous, and that the Agency is bound by that language. Where the Court can easily discern Congressional intent from the statutes' plain language, the Court's APA review terminates at step one of the *Chevron* review and the Agency's construction is owed no deference.

### 2. *The Agency's Most Recent Construction is a* Post-Hoc *Rationalization Deserving of No Deference Because It Differs from the Stated Rationale in the Agency Action*

Moreover, even assuming *arguendo* the ambiguity of the relevant statutes, the Agency's most recent construction would warrant no deference, as it differs considerably from the stated rationale in the Agency Action. Importantly, in its Opposition and Cross-Motion for Summary Judgment, the Agency asserts for the first time that it "could not have recognized [ENERGY 8701's] Convention gross tonnage measurement as of July 1, 1997 when none existed" on that date or had been requested by that date. Defs.' Opp'n & Cross-Mot. at 6. As such, the Agency's most recent position requires that Plaintiff, in order to be successful in altering the phase-out date, should have acquired a Convention tonnage measurement on or before July 1, 1997.

However, at the time of the Agency Action, the Agency relied on a different construction of the same statute-i.e., 46 U.S.C. § 3703a(e)(1). On March 29, 2004, the Agency denied Plaintiff's request to change ENERGY 8701's phase-out date, stating:
[W]e interpret the language of 46 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 16

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 8

<u>3703(a)(e)(1)</u> as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage. Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

Admin. R. at 26 ("Initial Response"). The Agency reiterated this reasoning in its September 15, 2004 denial of Plaintiff's appeal:<u>Section 3703a of title 46 United States Code</u> states that the "gross tonnage of a vehicle shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997." We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA 90 phase out. The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system used for regulatory purposes.

*11 *See* Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel G. Giberga) ("Final Action Letter").

The shift in the Agency's position, while subtle, is important. If correct, the original rationale set forth in the Agency Action would render the Agency's treatment of the two Bouchard barges-which also only had Regulatory tonnages assigned to them on July 1, 1997-unlawful. With respect to the two Bouchard barges, B. NO. 95 and B. NO. 105, Bouchard applied for a tonnage reduction of its barges on December 19, 1997, shortly after the passage of the Frelinghuysen Amendment on November 18, 1997 and prior to the statutory deadline of January 1, 1998 for submission of such applications. *See* Admin. R. at 88. Although Bouchard had requested the new admeasurements for these barges in March and June 1996, respectively, it did not physically obtain the new admeasurements from ABS until June 19, 1997 (for B. NO. 95) and November 3, 1998 (for B. NO. 105). *See id.* at 83, 88. Because (1) the new Convention measurements for the Bouchard barges fell under 5000 gross tons (ITC), and (2) Bouchard sought the new admeasurements 17 months before the Frelinghuysen Amendment was passed, the Agency granted Bouchard's application and extended the OPA 90 phase-out dates for its barges to January 1, 2015. *See id.* at 83; *see also* Defs.' Opp'n & Cross-Mot. at 28-29. However, it is true that on July 1, 1997, Bouchard had not obtained a new admeasurement for one of its

vessels (B. NO. 105) and it had not yet applied for a tonnage reduction. As such, under the Agency's reasoning as outlined to Plaintiff during its appeals process, it appears that one or both of the Bouchard vessels should have been denied a phase-out extension. The Agency's new construction is an attempt to save it from such an outcome, and to draw a new distinction between Bouchard and Plaintiff here.

Such an explanation by the Agency is clearly a *post hoc* rationalization. "Agency decisions must generally be affirmed on the grounds stated in them." *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,* 269 F.3d 1112, 1117 (D.C.Cir.2001) (citing *Fort Stewart Schs. v. Fed. Labor Relations Auth.,* 495 U.S. 641, 651-52, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) ("[I]t is elementary that if an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rationale set forth by the agency itself."); *Sec. & Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80, 93-95, 63 S.Ct. 454, 87 L.Ed.2d 626 (1943)). "Post-hoc rationalizations, developed for litigation[,] are insufficient." *Id.* (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action....")). As such, even assuming *arguendo* that the relevant statutes were ambiguous and the Court was required to proceed to *Chevron* step two, the Court could only give deference to and base its decision upon the Agency's initial construction of the statute as represented to Plaintiff. *See id.* The Agency's later construction, expressed in its Opposition and Cross-Motion for Summary Judgment, is a *post hoc* rationalization improperly before the Court and unworthy of deference.

### 3. Skidmore *Deference Would Be Inappropriate in this Situation*

*12 Also assuming *arguendo* that the relevant statutes were not plain on their face, the Agency's claim that its actions warrant *Skidmore* deference, i.e., "some deference whatever its form, given the specialized experience and broader investigations and information available to the [A]geny," Defs.' Opp'n & Cross-Mot. at 9 (quoting *Skidmore,* 323 U.S. at 139, 65 S.Ct. 161, 89 L.Ed. 124), is also without merit. Importantly, *Skidmore* deference, commonly referred to as "the power to persuade," ultimately hinges upon the ability of an agency to convince the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 17

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

court that its rationale merits respect. *See Mead*, 533 U.S. at 219, 121 S.Ct. 2164, 150 L.Ed.2d 292. As the Supreme Court has explained, "[t]he weight accorded to an administrative judgment 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." ' *Id.* (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161, 89 L.Ed. 124).

Assuming that the Court reached step two of a *Chevron* review, the Agency would not be owed *Skidmore* deference, as three important factors prevent its reasoning from being persuasive. First, as discussed *infra* Section III(B), the Agency's application runs counter to the relevant statutes' plain language. Second, there is nothing in the administrative record that shows that the Agency utilized any specialized knowledge or information. Indeed, the Agency itself neither required nor performed any risk analysis in this case; such a risk analysis might have implicated its specialized knowledge, but-in the absence of such analysis-there is little in the administrative record reflecting such knowledge and reasoning. Third, the inconsistency with respect to the Agency's "earlier and later" pronouncements-both between Plaintiff's request and the earlier Bouchard request, and between the Agency's pronouncements in the Agency Action and its rationale in this proceeding-defeats any claim to *Skidmore* deference. Accordingly, where the Agency's construction of the statute lacks both logic and consistency, no deference would be due.

### B. The Plain Language of the Relevant Statutes Contradicts the Agency's Interpretation

Two separate but interlocking statutory schemes are relevant to this dispute. First, the Frelinghuysen Amendment, codified as 46 U.S.C. § 3703a(e), is particularly important, given that the Agency exclusively relied upon this provision as the source of its authority to deny Plaintiff's phase-out date modification request. *See* Admin. R. at 26 ("Initial Response"); Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter"). Second, the laws pertaining to tonnage measurement systems are crucial as well, given that Plaintiff contends that these statutes allow it, as the owner of ENERGY 8701, to select the tonnage measurement system to be used in accord with the tonnage laws' optional provisions. The Court shall assess each of these schemes in turn.

Ultimately, such a review highlights the fact that the Agency's construction of the relevant statutes is contrary to their plain language and therefore is in violation of the APA.

### 1. The Agency Misreads 46 U.S.C. § 3703a(e)

#### a. Plain Language

*13 With respect to statutory construction, the Supreme Court has emphasized that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (citations omitted). The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 400. That is, the court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984). "Where [ ] the plain language of the statute is clear, the court generally will not inquire further into its meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C.Cir.1995).

The central statutory provision at the crux of this dispute is 46 U.S.C. § 3703a(e)(1), particularly this highlighted portion:
For the purposes of this section and except as otherwise provided in paragraphs (2) and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage *that would have been recognized* by the Secretary on July 1, 1997, as the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title.

*Id.* (emphasis added).

Under the Agency's construction of this provision, only a measurement that existed as of July 1, 1997 could be recognized by the Agency for the purposes of establishing an OPA 90 phase-out date; any remeasurement after that date could not be recognized. *See* Defs.' Opp'n & Cross-Mot. at 6 ("Coast Guard simply could not have recognized a Convention tonnage ... where none existed"); at 11 ("Coast Guard would not have recognized a gross

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 18

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

tonnage ... that did not exist"); at 19 ("Coast Guard could not have recognized a gross tonnage measurement that did not exist"). In support of this interpretation, the Agency inserts verbs and tenses not enacted into law by Congress in a way that shifts the plain meaning of the provision's language. *See Nat'l Pub. Radio, Inc. v. Fed. Commc'ns Corp., 254 F.3d 226, 230 (D.C.Cir.2001)* ("we must presume that Congress meant precisely what it said").

Here, the Agency reads the relevant portion as "the gross tonnage that *was recognized* by the Secretary on July 1, 1997." Such a reading would support its ultimate finding in an Agency Action with respect to Plaintiff's request: since ENERGY 8701's only gross tonnage measurement on July 1, 1997 was 5323 gross tons (GRT), and the later Convention tonnage measurement of 4660 gross tons (ITC) was not discovered until 2004, then the gross tonnage that "*was recognized*" by the Secretary on July 1, 1997 was 5323 tons, entailing a phase-out date of January 1, 2005. Unfortunately for the Agency, the statute reads *"would have been recognized"*-not "was recognized." This difference is key-by employing this plain language, Congress specifically incorporated the optional nature of the tonnage measurement statutes. *See 46 U.S.C. § 3703a(e); see also infra* Section III(B)(2) (for a discussion of the optional nature of the tonnage measurement statutes). The subpart fixes the determination of the tonnage on a hypothetical measurement of a particular vessel on the specified date-July 1, 1997-under the optional Regulatory or Convention measurement systems. Indeed, by employing the language "would have been recognized," Congress intended that either measurement system could be applied to ENERGY 8701 as it existed on July 1, 1997.

**\*14** The application of the plain language of the statute to the ENERGY 8701 shows the clear error in the Agency's Action. Here, it is uncontested that since its original construction in 1976, ENERGY 8701 has undergone no physical alterations to reduce its tonnage. *See* Admin. R. at 14. As such, the vessel as it existed on July 1, 1997 is essentially identical to the vessel as it exists today. *See* Defs.' Opp'n & Cross-Mot. at 19 ("ENERGY 8701 is more or less the same tank barge today as it was in 1976 when it was first constructed. The barge's physical dimensions have not changed materially-at least not in a manner that is legally significant for the purposes of the Court's analysis."). Because the statute plainly does not ask what the tonnage *was* under a specific system on July 1, 1997, but instead looks at what the tonnage *would have been* if measured under either

the system set forth in Section 14502 (the Regulatory measurement system) or in Section 14302 (the Convention measurement system), the fact that ENERGY 8701's tonnage on July 1, 1997 was 5323 gross tons (GRT) is not wholly determinative of its phase-out date. Rather, because the provision specifies "would have been recognized," the vessel's Convention measurement must be consulted as well. In this case, even though ENERGY 8701's Convention tonnage had not actually been recognized by the Secretary on July 1, 1997, if measured, that tonnage "would have been recognized" as 4660 gross tons (ITC). Under the phase-out provisions of 46 U.S.C. § 3703a, a vessel with a weight of 4660 gross tons that "would have been recognized" by the Secretary on July 1, 1997 has a phase-out date of January 1, 2015. *See* 46 U.S.C. § 3073a(c)(2). The Agency's failure to recognize the plain language and meaning of 46 U.S.C. § 3703a(e) ensured that it gave ENERGY 8701 an incorrect phase-out date of January 1, 2005. Such an action was arbitrary, capricious, and otherwise not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2)(A).

*b. Interaction Between the Statute's Provisions*

A review of the statutory provisions *in pari materia* with 46 U.S.C. § 3703a(e) supports this reading of the plain language of the statute and contradicts the Agency's construction. This Circuit follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia* normally are construed together to discern their meaning." *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n, 309 F.3d 796, 801 (D.C.Cir.2002)* (citing *Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)* (noting that the rule that statutes *in pari materia* should be construed together "is ... a logical extension of the principle that individual sections of a single statute should be construed together")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n, 799 F.2d 755, 766 (D.C.Cir.1986)* ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States, 768 F.2d 352, 363 (D.C.Cir.1985)* ("[T]hese two statutes are *in pari materia* and must be construed together."). The Agency, by confining its analysis to 46 U.S.C. § 3703a(e)(1), misreads both the meaning and purpose of the statute.

**\*15** Importantly, the Frelinghuysen Amendment to OPA 90 is codified as 46 U.S.C. § 3703a(e)(1)-(3). Upon a reading of the entirety of the amendment, it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 19

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

clear that the Agency is misapplying Section 3703a(e) to ENERGY 8701. In fact, reading the amendment as a whole, rather than in isolation as the Agency did, explains the provision's true purpose.

Section 3703a(e)(1) -the part relied upon by the Agency-sets out the rule establishing July 1, 1997 as the relevant reference point in time for a vessel's *physical* configuration, and provides for exceptions from that rule in paragraphs (2) and (3). *See* 46 U.S.C. § 3703a(e)(1). Paragraph (2) allows for waivers from the rule if the Agency finds, among other things, that "the owner of the tank vessel has entered into a binding agreement to *alter* the tank vessel in a shipyard ... to reduce the gross tonnage of the tank vessel." *Id.* § 3703a(e)(2) (emphasis added). Paragraph (3) excludes any vessel that "had undergone, or was the subject of a contract for, *alterations* that reduce the gross tonnage of the tank vessel" before the July 1997 deadline set in paragraph (1). *Id.* § 3703a(e)(3) (emphasis added).

Reading the provision enacted by Congress as a whole, as it was intended, it is clear that Congress plainly sought to restrict the physical alterations of vessels after July 1, 1997 to avoid an otherwise applicable OPA 90 phase-out schedule. Such an intention, while certainly admirable, is simply inapplicable to ENERGY 8701. It is uncontested that ENERGY 8701 has not undergone any substantial physical alterations since its construction, either before or after July 1, 1997. As such, the Agency's decision to apply a portion of a provision limiting the ability of vessel owners to escape an OPA 90 phase-out through a physical alteration to a situation where no physical alteration has occurred is simply illogical and contrary to the plain meaning of the statute. Indeed, the Agency's interpretation of Section 3703a(e)(1) ignores the plain language of the provision as a whole, which is plainly contradictory to its construction of the statute.

This misconstrual of Section 3703a(e) compels the Agency to make certain arguments that are unfounded, such as an accusation that Plaintiff's construction of the statute "renders the July 1, 1997 deadline mere surplusage and meaningless." *See* Defs.' Opp'n & Cross-Mot. at 20. Such a contention is without merit. Upon a reading of both the plain language of Section 3703a(e)(1) and its reading in conjunction with paragraphs (2) and (3), the July 1, 1997 date is not "mere surplusage" or "meaningless." Rather, July 1, 1997 is an important deadline that cuts off the date on which vessels may be physically altered to avoid an otherwise applicable OPA 90

phase-out date. However, July 1, 1997 is not a remeasurement application deadline, as the Agency suggests. No portion of the statute is rendered meaningless or converted to mere surplusage under this correct construction. *Cf. Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (courts should be reluctant to treat statutory terms as surplusage in any setting, and especially when a term occupies a pivotal place within the statutory scheme). Instead, each part of the 1997 Amendment plays a function: paragraph (1) states a general rule that a vessel's tonnage measurements must relate back to the vessel's physical configuration as of July 1, 1997; paragraph (2) establishes a mechanism to obtain a waiver for future conversion; and paragraph (3) grants an exemption for those that had undergone or were undergoing physical alterations at the time of enactment.

### c. Legislative History

*16 While the plain language of the statute in question and the reading of that provision in relation to its related subparts contradicts the Agency's construction, the Agency may establish the legitimacy of its construction by looking to the legislative history of the law at issue. However, the presumption in favor of the plain language of the provision is rebuttable only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotation omitted). The Agency's burden in rebutting the clear language is onerous: the Agency must "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. Envtl. Prot. Agency,* 88 F.3d 1075, 1089 (D.C.Cir.1996); *see also Griffin v. Oceanic Contractors,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (courts may ignore plain language in a narrow category of cases where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters"). Here, the Agency cannot meet this high standard, and a consultation of the legislative history behind the Frelinghuysen Amendment actually supports Plaintiff's position.

The Agency offers three types of "background" material to support its interpretation of Section 3703a(e): (1) a GAO Report, *see* U.S. Gen.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 20

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them (2000), *attached as Defs.' Cross-Mot. for Summ. J., Ex. B*; (2) a single sentence from the 1997 Amendment's legislative history, *see* H.R. Conf. Rep. 105-340 (1997), *attached as Defs.' Cross-Mot. for Summ. J., Ex. C*; and (3) a prior draft of the 1997 Amendment, *see* 143 Cong. Rec. H4169-01 (daily ed. June 23, 1997) (draft offered by Rep. Frelinghuysen), *attached as Defs.' Cross-Mot. for Summ. J., Ex. D.* A review of these materials indicates a lack of support for the Agency's position.

First, with respect to the Year 2000 GAO Report, two points are in order: (1) the GAO Report, drafted three years after the Frelinghuysen Amendment, is not legislative history and is not part of the administrative record; and (2) the Report does not stand for the broad proposition asserted by the Agency. As the GAO Report describes the 1997 Amendment: "Public Law 105-85 mandated that after July 1, 1997, a vessel's phase-out deadline would not change as a result of a *reduction in carrying capacity* unless the U.S. Department of Transportation (DOT) [the Coast Guard's parent agency] granted a waiver allowing it." *See* U.S. Gen. Accounting Office, Maritime Industry: As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them 12 (2000), *attached as Defs.' Cross-Mot. for Summ. J., Ex. B* (emphasis added). As such, neither the text nor the context of the GAO Report supports the application of the 1997 Amendment to anything more than physical alterations and associated waivers. Because no physical alteration took place with respect to ENERGY 8701, the GAO Report is consistent with the plain language of the statute indicating that Section 3703a(e) does not apply to the vessel.

*17 Second, with respect to the single line of the 1997 Amendment's legislative history highlighted by the Agency, the Conference Report-as quoted by the Agency-refers to the "industry practice of *reducing* the gross tonnage of single hull tank vessels." *See* H.R. Conf. Rep. 105-340, at 917, *reprinted in* 1997 U.S.C. C.A.N. at 2703 (emphasis added). By referring to the reduction of tonnage, the report is consistent with the plain language of the statute that refers to physical alterations and nothing more. Indeed, the Conference Report does not discuss the circumstances of this case, where Plaintiff has merely elected to use the Convention tonnage of the unaltered vessel.

Third, and finally, a comparison between the 1997 Amendment as enacted with the amendment as originally proposed reveals that Section 3703a(e) does not apply to the circumstances of ENERGY 8701's remeasurement. The Frelinghuysen Amendment, as originally proposed, read:

Section 3703 of title 46, United States Code, is amended by adding at the end the following:

"(e) For purposes of this section, the gross tonnage of a vessel for which a tonnage certificate was issued or accepted by the Secretary under this title before July 1, 1997, shall be the gross tonnage of the vessel stated on the most recent certificate."

143 Cong. Rec. H4202 (daily ed. June 23, 1997). As originally proposed, the Amendment would have used only the most recent tonnage certificate that existed for a subject vessel before July 1, 1997 as the determining measurement for the vessel's OPA 90 phase-out date. Indeed, if this amendment as drafted had become the law, Plaintiffs' APA claim would have ultimately failed; ENERGY 8701's most recent certificate as of July 1, 1997 stated that the vessel was 5323 gross tons (GRT), which would have ensured a phase-out date of January 1, 2005. *See* 46 U.S.C. § 3703a(c)(3)(A).

However, the conference committee specifically changed the proposed 1997 Amendment to "clarify the circumstances under which the House provision [i.e., the 1997 Amendment as proposed] would apply." H.R. Conf. Rep. 105-340, at 917, *reprinted in* 1997 U.S.C.C.A.N. at 2703. The committee removed the reference to the vessel's tonnage certificate as of July 1, 1997, and instead looked to "the gross tonnage of a vessel ... that would have been recognized by the Secretary on July 1, 1997." *See* 46 U.S.C. § 3703a(e)(1). By removing the reference to the vessel's tonnage certificate as of July 1, 1997 and replacing it with the detailed waiver and exclusion system, both of which deal exclusively with *physical* alterations to reduce tonnage, the conference committee revised the operation of the provision as originally proposed. As such, the history of the 1997 Amendment reaffirms the plain language of the statute and once again contradicts the Agency's construction. Had Congress intended to prevent a situation such as this one, where an owner is requesting remeasurement of an unaltered vessel after July 1, 1997, Congress could have kept the original wording of the proposed amendment. Congress declined this option, and instead redrafted the provision to focus on physical alterations alone-a material difference. The Agency's construction, which is in accordance with the proposed amendment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 21

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

but not the Amendment as actually enacted, is therefore flawed and without support. The Agency cannot opt to enforce the version of the 1997 Amendment that it wishes Congress had enacted; it is bound by the statute that Congress actually enacted.

### 2. The Laws Pertaining to Tonnage Measurement

**\*18** As noted above, the Agency's construction of 46 U.S.C. § 3703a(e) is contrary to its plain language, the meaning of the provision when read with an eye to its context, and its legislative history. A plain reading of Section 3703a(e) indicates that the owner of a subject vessel, such as Plaintiff, can look to what "would have been recognized" as the tonnage of the vessel as measured under 46 U.S.C. § 14502 (the Regulatory measurement) or under 46 U.S.C. § 14302 (the Convention measurement) to determine the proper OPA 90 phase-out date for the vessel. See 46 U.S.C. § 3703a(e)(1). However, before that reading of Section 3703a(e) can stand, the Court must determine whether anything within the other laws pertaining to tonnage measurement prevents this "reach back" on the part of Plaintiff to extend ENERGY 8701's phase-out date. A review of the relevant statutes indicates that nothing prevents this reading of Section 3703a(e) or impedes Plaintiff's requested "reach back."

### a. The Tonnage Measurement Systems Permit Plaintiff to Select the Convention Measurement System

Part J of Title 46 of the United States Code addresses the tonnage measurement of vessels. See 46 U.S.C. § § 14101-14522. Chapter 143 delineates the Convention measurement system and its applicability, see id. § § 14301-14307, whereas Chapter 145 does the same for the Regulatory measurement system, see id. § § 14501-14522. The Regulatory measurement system applies only if (1) the vessel is not measured with the Convention measurement system, or (2) the vessel is measured under the Convention system, but the owner requests that the Regulatory measurement be used for certain U.S. laws. See id. § 14501; see also 46 C.F.R. § 69.11(b) ("This system [the Regulatory measurement system] applies to a vessel not required to be measured under the Convention Measurement System."). In this case, to determine which system applies, the applicability of the Convention system must be determined.

Under this scheme, the Convention system applies to vessels if (1) the vessel is engaged on a foreign voyage, see 46 U.S.C. § 14101(4), or (2) the owner requests its application, id. § 14301(b)(6). If an owner exercises the option to measure the vessel under the Convention system, that decision is binding. See 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter [the Convention measurement system] at the request of the owner may be remeasured only as provided by this chapter."); see also 46 C.F.R. § 69.11(a)(3). In this case, Plaintiff's barge, ENERGY 8701, was to be engaged on a foreign voyage to Canada, and in anticipation of that voyage Plaintiff applied for and received remeasurement under the Convention system. See Admin. R. at 32-63. As such, in this case, Plaintiff was within its rights under 46 U.S.C. § 14301(b)(6) to select the Convention measurement system for ENERGY 8701, and that selection became binding absent another remeasurement request by Plaintiff. Indeed, the Agency correctly recognized this change in its Initial Response, stating:

**\*19** The new tonnage assignment [i.e., Convention tonnage] by the American Bureau of Shipping (ABS) on February 24, 2004, is 4660 GT ITC. The tonnage originally assigned to the vessel [i.e., the Regulatory tonnage] by the Coast Guard on August 25, 1976, was 5323 GRT, and is no longer assigned to the vessel.

Admin. R. at 26 ("Initial Response"). While properly recognizing and assigning ENERGY 8701's Convention tonnage on a "going-forward" basis, the Agency rejected Plaintiff's request to recognize the Convention tonnage for the purposes of OPA 90. Id. The Court must now look to whether such a decision was proper under applicable tonnage measurement law.

### b. OPA 90 Allows Hornbeck to Select the Tonnage Measurement System Used in Accordance With the Tonnage Laws' Optional Provisions

As noted previously, according to the phase-out provision in OPA 90, a single-hull barge, built in 1976, of less than 5000 gross tons may operate in the navigable waters of the United States until January 1, 2015. See 46 U.S.C. § 3703a(c)(2). For the purposes of OPA 90, "gross ton" has the meaning given that term by the Secretary under part J of Title 46. See OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12). As set forth above, Congress allows the owner-not the Agency-to determine whether or not to use the Convention measurement system. See, e.g.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 22

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

46 U.S.C. § 14301(b)(6); id. § 14301(c); 46 C.F.R. § 69.11(a)(2)(v); 46 C.F.R. § 69.11(a)(3). As noted, that option-having been exercised by Plaintiff in this case-becomes the exclusive tonnage assignment on the vessel for the purposes of all U.S. laws. See 46 U.S.C. § 14301(c); 46 C.F.R. § 69.11(a)(3).

OPA 90 allows the gross tonnage of vessels to be measured in accordance with either the Regulatory or the Convention systems. See OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12). Indeed, OPA 90's phase-out schedule incorporates the optional nature of a vessel's tonnage by providing: "A vessel of less than 5,000 gross tons as measured under section 14502 of this title [Regulatory tonnage], or an alternate tonnage measured under section 14302 of this title [Convention tonnage], as prescribed by the Secretary under section 14104 of this title...." 46 U.S.C. § 3703a(c)(2). This optional tonnage measurement language was added to many other maritime-related statutes in the Coast Guard Authorization Act of 1996, Pub.L. No. 104-324, § 715, 110 Stat. 3901, 3937 (1996), as well as to OPA 90.

Importantly, legislative history confirms this reading. For instance, the conference committee noted:
Under the amendments made by these actions, vessel owners have the option to measure their vessels under the new ITC tonnage system [Convention measurement system] or the regulatory system. The Committee expect ... [the provisions will] lead [ ] ultimately to the demise of the antiquated regulatory measurement system.

Conf. Rep. No. 104-854, at 116 (1996); see also S.Rep. No. 104-160, at 36 (1995) ("Under the amendments made by these sections, vessel owners retain their option to choose either the ITC system [Convention measurement system] or the regulatory system for the purposes of domestic requirements established prior to July 18, 1994").

*20 As such, it is clear that the tonnage measurement statutes do not permit the Agency to pick and choose which tonnage to assign a vessel. Nor do the tonnage measurement statutes permit the Agency to unilaterally recognize one tonnage for some purposes and other tonnages for other purposes. The OPA 90 itself contemplates the use of both the Convention system and the Regulatory system. Accordingly, once an owner opts to employ the Convention measurement system, that system applies to OPA 90 and other applicable laws, and no other system governs. See 46 U.S.C. § 14301(c); 46 C.F.R. §

69.11(a)(3).

**c. No Statute Permits the Agency to Apply the Remeasurement Only on a "Going-Forward" Basis or to Exclude the Remeasurement from the OPA 90 Analysis**

As described, the Agency in its Initial Response to Plaintiff-without citing to any authority-reassigned ENERGY 8701 a tonnage of 4660 gross tons (ITC), but refused to apply that tonnage for the purposes of the OPA 90 phase-out analysis. See Admin. R. at 26 ("Initial Response"). According to the Agency, it limited the use of ENERGY 8701's Convention tonnage of 4660 gross tons (ITC) to "a going forward basis" only. See Defs.' Opp'n & Cross-Mot. at 16.

A review of the relevant statutes indicates that no authority exists to support the Agency's position. Once an owner, such as Plaintiff, exercises the option to measure a vessel under the Convention system, that decision is binding. See 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter at the request of the owner may be remeasured only as provided by this chapter."); see also 46 C.F.R. § 69.11(a)(3) (same). OPA 90 contemplates the use of the Convention system. See OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12); 46 U.S.C. § 3703a(c)(2). Following the issuance of an International Tonnage Certificate by the ABS for ENERGY 8701 on February 24, 2004, and the Agency's March 22, 2004 Initial Response, the official tonnage of ENERGY 8701 became 4660 gross tons (ITC). A single hull vessel of ENERGY 8701's age and tonnage has a OPA 90 phase-out date of January 1, 2015. See 46 U.S.C. § 3703a(c)(2). Section 3703a(e) does not restrict the application of ENERGY 8701's Convention tonnage to the OPA 90 phase-out determination because (1) it applies only to the physical modification of vessels, and it is uncontested that ENERGY 8701 underwent no physical modifications; and (2) even assuming arguendo that it did apply, the plain language of Section 3703a(e)(1) looks to "the gross tonnage of a vessel ... that would have been recognized by the Secretary on July 1, 1997." Had ENERGY 8701 been measured according to the Convention system on July 1, 1997, it would have a Convention tonnage of 4660 gross tons (ITC).

As such, all relevant statutes indicate that the Convention tonnage for ENERGY 8701 assigned in early 2004 is the proper tonnage for the OPA 90 analysis. While the Convention tonnage had not yet

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 23

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

been measured as of July 1, 1997, such a fact is either (1) irrelevant to the OPA 90 analysis where no physical modification occurred, or (2) rendered irrelevant by Section 3703a(e)(1)'s "relation back" language. The Agency presents no persuasive authority to undercut this analysis, and presents no authority suggesting that it can limit the Convention tonnage afforded to ENERGY 8701 to a "going forward basis" only. Accordingly, the Court finds that the Agency's refusal to apply the plain language of Section 3703a(e), the entire OPA 90 scheme, and the tonnage measurement laws to Plaintiff's vessel was arbitrary, capricious, and otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706(2)(A).

IV: CONCLUSION

*21 For the reasons set forth above, the Court grants Plaintiff's Motion for Summary Judgment as to Counts I of Plaintiff's First Amended Complaint, and denies Defendants' Cross-Motion for Summary Judgment. As this Court recently noted, "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." Accordingly, it is up to the agency to determine how to proceed next-not for the Court to decide or monitor.

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F.Supp.2d 1, 38 (D.D.C.2003) (quoting County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C.Cir.1999)) (internal citation omitted). Consequently, the Court shall remand the case to the Agency for further action consistent with this opinion. An appropriate Order accompanies this Memorandum Opinion.

FN1. This Court, on March 20, 2006, issued a Memorandum Opinion and Order that granted-in-part and denied-in-part Defendants' Motion for Summary Judgment as to Counts III and IV of Plaintiff's First Amended Complaint, and denied Plaintiff's Cross-Motion for Summary Judgment on Counts III and IV (FOIA Claims). Specifically, the Court granted Defendants' Motion for Summary Judgment with respect to the adequacy of its search, and its withholdings/productions pursuant to FOIA

Exemptions 4 and 6. However, due to the identified problems with the Agency's *Vaughn* Index and accompanying affidavits with respect to the documents withheld pursuant to FOIA Exemption 5, the Court denied Defendants' Motion for Summary Judgment with respect to its Exemption 5 withholdings. As such, the Court ordered Defendants to submit a new *Vaughn* Index as to the documents withheld pursuant to FOIA Exemption 5 with proper detailed document descriptions and reasons for withholding that illuminate the contents of the documents and the reasons for nondisclosure by Monday, May 8, 2006, with supplemental briefing to follow. *See Hornbeck Offshore Transp., LLC v. U.S. Coast Guard,* Civ. No. 04-1724, 2006 WL 696053 (D.D.C. Mar.20, 2006).

FN2. ABS is the American classification society. Classification societies are officially recognized organizations that develop and apply technical requirements for the design, construction, and maintenance of ships. With respect to tonnage measurement, ABS is qualified to perform the Convention measurement and authorized by the Coast Guard to issue a certificate for the vessel. *See* 46 C.F.R. § § 69.27, 69.15; 46 U.S.C. § 3316(a) & (b)(1).

FN3. Plaintiff learned of these other barges after the Agency provided the initial response to its contemporaneous FOIA request. *See* Pl.'s Mot. for Summ. J. at 5 n. 28.

FN4. Moreover, "[i]nartful drafting is not the same as ambiguity." *Nat'l Pub. Radio,* 254 F.3d at 229; *see also Meredith v. Fed. Mine Safety & Health Review Comm.,* 177 F.3d 1042, 1053 (D.C.Cir.1999) ("[T]hre presence of a difficult question of statutory construction does not necessarily render that provision ambiguous for purposes of *Chevron.* ").

FN5. Ordinarily, the Convention measurement system applies to all documented vessels and vessels engaged on a foreign voyage unless exempted by Section 14301(b). *See* 46 U.S.C. § 14301(a). However, because ENERGY 8701 is a barge, Section 14301(b) applies. Section

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 24

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 16

14301(b)(6) reads: "This chapter [the Convention measurement system] does not apply to a barge (except a barge engaged on a foreign voyage) unless the owner requests."

D.D.C.,2006.
Hornbeck Offshore Transp., LLC v. U.S. Coast Guard
--- F.Supp.2d ----, 2006 WL 785432 (D.D.C.)

Briefs and Other Related Documents (Back to top)

- 2005 WL 3557477 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition and Reply Brief with Regard to Plaintiff's Foia Claims (Apr. 1, 2005)
- 2005 WL 3557475 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment on Counts I and Ii (Apa Claims) (Mar. 17, 2005)
- 2005 WL 3557476 (Trial Motion, Memorandum and Affidavit) Plaintiff's Cross-Motion for Summary Judgment on Counts Iii and Iv (Foia Claims) (Mar. 17, 2005)
- 2005 WL 3556284 (Trial Motion, Memorandum and Affidavit) Defendant's Cross Motion for Summary Judgment on Counts I and Ii (Feb. 17, 2005)
- 2005 WL 3556283 (Trial Pleading) First Amended Complaint (Jan. 25, 2005)
- 2005 WL 3556282 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for Summary Judgment (Jan. 19, 2005)
- 2004 WL 3633811 (Trial Pleading) Answer (Dec. 17, 2004)
- 2004 WL 3633810 (Trial Pleading) Complaint (Oct. 08, 2004)
- 1:04cv01724 (Docket) (Oct. 08, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7
No.1:07-1030 (RCL)
Page 25

# ENCLOSURE 3

Exhibit 7
No.1:07-1030 (RCL)
Page 26

Hornbeck-Crowley. File

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-LMI
Phone: (202) 267-0069
Fax: (202) 267-4496

16711

APR 1 4 2006

Mr. Lawrence I. Kiern
Winston & Strawn LLP
1700 K St N.W.
Washington, D.C. 20008-3817

Re:    Hornbeck Offshore Transportation LLC, v. U.S. Coast Guard, et al.
       Docket No. 04-cv-1724 (CKK)

Dear Mr. Kiern:

This is in response to your letter to Rear Admiral Crowley of April 3, 2006. The Coast Guard's

Office of Vessel Compliance has initiated steps with Sector New York, which currently holds the

records for the barge 8701's Certificate of Inspection, to provide for an OPA-90 phase-out date

of January 1,  2015, in accordance with the district court's opinion.

Sincerely,

W. D. BAUMGARTNER
Rear Admiral, U. S. Coast Guard
Judge Advocate General

Copy:    G-PCV
         G-LCL

Exhibit 7
No.1:07-1030 (RCL)
Page 27

# ENCLOSURE 4

Exhibit 7
No.1:07-1030 (RCL)
Page 28

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See Instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| United States Coast Guard | Representative: Lawrence I. Kiern<br>Winston & Strawn LLP<br>see attached |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH<br>N/A | 5. MARITAL STATUS<br>N/A | 6. DATE AND DAY OF ACCIDENT<br>12/29/04 | 7. TIME (A.M. OR P.M.)<br>N/A |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof.) (Use additional pages if necessary.)

See Letter of September 13, 2006 and enclosures from Winston & Strawn LLP, legal representative of claimant

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)
Hornbeck Offshore Transportation, LLC 103 Northpark Blvd., Ste 300 Covington, LA 70433

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See Instructions on reverse side.)
See Attached

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

N/A

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
| See Attached | |

| 12. (See instructions on reverse.) | AMOUNT OF CLAIM (In dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE<br>$6,578,798.65 | 12b. PERSONAL INJURY<br>N/A | 12c. WRONGFUL DEATH<br>N/A | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.)<br>$6,578,798.65 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)<br>Lawrence I. Kiern, Winston & Strawn LLP | 13b. Phone number of signatory<br>(202) 282-5811 | 14. DATE OF CLAIM<br>9/12/06 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109          NSN 7540-00-634-4046          STANDARD FORM 95 (Rev. 7-85)
Previous editions not usable.                    PRESCRIBED BY DEPT. OF JUSTICE
This form was electronically produced by National Production Services Staff          28 CFR 14.2

Exhibit 7
No.1:07-1030 (RCL)
Page 29

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

### INSTRUCTIONS

Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY
RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE
AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT,
ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN
FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH
ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT.
THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY
WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:
(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.

### INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes. If yes, give name and address of insurance company *(Number, street, city, State, and Zip Code)* and policy number.   ☐ No

N/A

| 16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |
|---|---|
| No | N/A |

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? *(It is necessary that you ascertain these facts)*

N/A

19. Do you carry public liability and property damage insurance? ☐ Yes. If yes, give name and address of insurance carrier *(Number, street, city, State, and Zip Code)*   ☐ No

N/A

SF 95 (Rev. 7-85) BACK
USAPPC V1.00

Exhibit 7
No.1:07-1030 (RCL)
Page 30

## Attachment to Claim for Damage Injury or Death

2. Claimant: Hornbeck Offshore Transportation, 103 Northpark Blvd., Suite 300, Covington, LA 70433

9. The ENERGY 8701 is an 85,000-barrel U.S. flag-tank barge that is 64 feet wide and 27 feet deep. It is designed to carry oil or other liquid cargo.

11. **WITNESSES**

Carl Annessa, 103 Northpark Blvd., Suite 300, Covington LA 70433

Sam Giberga, 103 Northpark Blvd., Suite 300, Covington LA 70433

Mike Molloy, 103 Northpark Blvd., Suite 300, Covington LA 70433

Troy Geautreaux, 103 Northpark Blvd., Suite 300, Covington LA 70433

Dan Gaiennie, 103 Northpark Blvd., Suite 300, Covington LA 70433

Brian Bickford, 103 Northpark Blvd., Suite 300, Covington LA 70433

Captain R.A. Nash, United States Coast Guard, Commanding Officer USCG Marine Safety Center, 400 7th Street, S.W., Washington DC 20590

LCDR L.J. Slein, Chief, Cargo Division, USCG Marine Safety Center, 400 7th Street, S.W., Washington DC 20590

Joseph Angelo, Former Director of Standards, U.S. Coast Guard

Jeffrey G. Lantz, Current Director of Standards, U.S. Coast Guard

Rear Admiral John Crowley, Former Judge Advocate General, U.S. Coast Guard

# ENCLOSURE 5

Exhibit 7
No.1:07-1030 (RCL)
Page 32

| Market Day Rate | Lost Hire Claim 2005 | ENERGY 8701 2006 (thru 9/30) | Total |
|---|---|---|---|
| $7429.00 per day | $2,711,429 | $2,066,611 | $4,778,040 |

DC:482772.1

Exhibit 7
No.1:07-1030 (RCL)
Page 33

# ENCLOSURE 6

Exhibit 7
No.1:07-1030 (RCL)
Page 34

PO Number: SP00005382
Page: 1

GMD-04-1133
10/27/04

PO Date: 11/3/2004
Date Printed By: 11/16/2004
Printed By: hprima

HOT - Transportation

Vendor: G.M.D. SHIPYARD

Shipping Method:
Delivery Date: 11/16/2004

Address: 111 LIVINGSTON ST.
         SUITE 1110
         BROOKLYN NY    11201

^ Changed Since the Previous Revision                    RECERTIFICATION

| /N | Project Number | Cost Category ID | Item Number | Qty Ordered | Unit Cost | Tax Amount | Extended Cost |
|----|----------------|------------------|-------------|-------------|-----------|------------|---------------|
| oject Name | | Cost Category Name | Vendor Item Number | | Ship To | | |
| lling Note | | | | U of M | | | |
| | 744-04-R | 001.0000.000 | DRYDOCKING, LABOR, MATERIAL | 231,869.00 | $1.00 | $0.00 | $231,869.00 |
| | Energy 8701 RECERT | | Vessel Regulatory Requireme  DRYDOCKING, LABOR, MATERIAL Each | | | | |

ENT'D NOV 1 6 2004

*needs to be completed*
*has been closed out*
*in Sagunet – per Daryl B.*
*12/9/04*

REVIEWED - BTK  11/16/04

O: Nick Pospula
A: Todd Hornbeck & Brian Bickford

| | |
|---|---|
| Subtotal | $231,869.00 |
| Trade Discount | $0.00 |
| Freight | $0.00 |
| Miscellaneous | $0.00 |
| Tax | $0.00 |
| Order Total | $231,869.00 |

_____
Authorized Signature

Exhibit 7
No.1:07-1030 (RCL)
Page 35

```
HORNBECK OFFSHORE TRANSPORTATION    SERVICE PURCHASE ORDER # 0005382        1
671 Court Street                    Fax #: 718-625-4072
Brooklyn, NY  11231                 Tel #:
                                    Contact: Nicholas Pospula
```

```
Contractor:                         Ship: ENERGY 8701
                                    Ship #: 001  Voyage #:
GMD SHIPYARD                        Meet Ship At:
BROOKLYN NAVY YARD #595
63 FLUSHING AVENUE
BROOKLYN, NY 11205

Tel: 718-260-9200
Fax: 718-260-9284
```

```
SPO #: 0005382              SPO Type: _X_Service Order  ___Contract Release
Issued:           Sched.: 11/03/2004 Apprv:          Completed:
Contract:
Project #:                  Invoice To: HORNBECK OFFSHORE TRANSPORTATION
Terms:                      (Triplicate) 671 Court Street
FOB:                                     Brooklyn, NY  11231
Tax: _Exempt _Subject _Not Subject
```

| Item | Job Category, Job Title, Account Code Item Description | Price |
|---|---|---|
| -00 | Job: 7744 - Energy 8701 - Dry Docking<br>SR#: 0006425<br>Account: 7329020 GENERAL OUTFITTING & FIXTURES<br>7744 - Energy 8701 - Dry Docking<br><br>Furnish Labor, material, dry-docking, and services for the completion of all work assigned by the port engineer and all concerned regulatory and class bodies.<br><br>***NOTE: OF TOTAL BILL FOR DRY-DOCKING, $148,643.00 WAS FOR SHIPYARD WORK AS PER REGULATORY AND CLASS BODIES, AND $83,226.00 WAS FOR CLEANING OF BARGE*** | 744-04-R |

```
                                    Item Subtotal ->
                                    Discount (0.00%) ->
                                    Total Cost -> $231,869.00

     Currency(US Dollar)
     Confirming:
TO BE ISSUED - DO NOT SEND




     Purchasing Authority: O/C Tunk
```

Exhibit 7
No.1:07-1030 (RCL)
Page 36

```
[1] SPO <0005382-00>
                                                        Date: 11/09/04
ITM     STATUS      TITLE
                                       ESTIMATED (USD)CONTRACTED (USD)
-001 _ S11/03/04  7744 - Energy 8701 - Dry     231,869.00        N/A




















SafeNet - PARTS.DB - MAINTENANCE & REPAIR - Fleet Level          Page: 1
```

Exhibit 7
No.1:07-1030 (RCL)
Page 37



# GMD Shipyard Corp.

**111 LIVINGSTON ST.**
**SUITE 1110**
**BROOKLYN, N.Y. 11201**
**TEL: (718) 210-4739**
**FAX: (718) 210-4751**

SOLD TO:
*Hornbeck Offshore LLC*
671 Court Street
Brooklyn, NY 11231

DATE: October 27, 2004
INVOICE NO: GMD-04-1133
CUST. ORDER NO: 0005382
OUR ORDER NO.: E-8701

## FINAL INVOICE

## BARGE ENERGY 8701

Furnished labor, material, dry-docking and services on the above referenced vessel. All work accomplished to the satisfaction of the attending Port Engineer and all concerned parties.

| Item | Description | Unit | Qty | Total |
|------|-------------|------|-----|-------|
| 1A | Shore Power Connect/ Disconnect | 200.00 | 1 | 200.00 |
| 1B | Shore Power Usage | 50.00 | 15 | 750.00 |
| 2 | Ventilation | 4800.00 | 1 | 4800.00 |
| 3 | Haul Day | 13000.00 | 1 | 13000.00 |
| 3A | Lay Days | 1200.00 | 10 | 12000.00 |
| 4 | Competent Person | 100 | 15 | 1500.00 |
| 5 | Tank Cleaning, Mucking, Disposal | 83,226.00 | 1 | 83226.00 |
| 6 | USCG/ABS Worklist | 111,670.00 | 1 | 111671.00 |
| 7 | Scrape Vessel bottom | 4722.00 | 1 | 4722.00 |

GMD not responsible for Marine Chemist bills.

TOTAL AMOUNT DUE  . . . . . .  $231,869.00

11-2-04

Exhibit 7
No.1:07-1030 (RCL)
Page 38

2

***Please Remit:*** *Two Hundred and Forty Nine Thousand, One Hundred and Frorty Seven Dollars and no cents***

**Wire Transfer Information**

Chase Manhattan Bank
210 Flushing Avenue
Brooklyn, NY 11205

Account Number:    053071240765
Route Number:      021 000 021

_per Brian B._
_Re-Negiotated_

_Brian Bicford_
_11 2-04_

_____
GMD SHIPYARD

Exhibit 7
No.1:07-1030 (RCL)
Page 39

# ENCLOSURE 7

Exhibit 7
No.1:07-1030 (RCL)
Page 40



# G.M.D.  Shipyard
BROOKLYN NAVY YARD
BLDG. #595
BROOKLYN, N.Y. 11205
TEL: (718) 260-9200
FAX: (718) 260-9264

'05 FEB -5 P1 :10

**SOLD TO:**
*HORNBECK OFFSHORE TRANSPORTATION*
671 Court Street
Brooklyn, New York 11231

**DATE:** February 3, 2005
**INVOICE NO:** GMD-05-1009
**OUR ORDER NO.:**
**CUSTOMER P.O. NO.:** 0005633

## ENERGY 8701
## FINAL INVOICE

Provided labor, material, Wharfage and services to clean and gas-free Barge ENERGY 8701 "Safe For Men" and "Safe For Hot Work". Chemist certificate was issued to Hornbeck Offshore Transportation LLC representative.

**TOTAL AGREED PRICE    $ 60,000.00**

***PLEASE REMIT:*** *Sixty Thousand Dollars*

### Wire Transfer Information

Chase Manhattan Bank
210 Flushing Avenue
Brooklyn, NY 11205

Account Number:    053071240765
Route Number:    021 000 021

____ PO #            ____ Add or Adjust Frt.
____ Approve        ____ Proj - Sec - Claim #
____ Issue           ____ Price Difference
____ Complete     ____ Quantity Difference
____ Signature    ____ Received?

_____         _____
HORNBECK OFFSHORE TRANSPORTATION              GMD SHIPYARD

Exhibit 7
No.1:07-1030 (RCL)
Page 41

SERIAL NO. M 1199

Page _1_ of _1_

| | | |
|---|---|---|
| Survey Requested by: _GMO_ | Vessel Owner or Agent: _HORNBECK_ | Date: _1-7-05_ |
| Vessel: _BARGE E8701_ | Type of Vessel: _TANK BARGE_ | Specific Location of Vessel: _PIER GMO BNY_ |
| Last Three (3) Loadings: _2 oil KEROSENE_ | Tests Performed: _O2, LEL H2S, CO, THC, VIS_ | Time Survey Complete: _1:00_ |

N° 1, 2 & 5 P/S Cargo Tanks

O₂% LEL-% H₂S, CO          ENTER WITH RESTRICTIONS
20.8    0    NON DETECTED –
                                 NOT SAFE FOR HOT WORK
Hydrocarbons  30-60 ppm

Entry Restrictions: Ventilation & Half mask organic cartri.
Respiratory Protection Req'd

N° 3 & 4 P/S Cargo Tanks     Atmosphere Safe for Workers
                                 = With Ventilation =
O₂% LEL-% Hydrocarbons      Not Safe for Hot Work
20.8    0    <15 ppm

In the event of physical or atmospheric changes affecting the STANDARD SAFETY DESIGNATIONS assigned to any of the above spaces, this Certificate is voided; spaces not listed on the Certificate are not to be entered unless authorized on another Certificate and/or maintained in accordance with OSHA 29 CFR 1915, or in any event, reinspected. Flap all vents and contact the undersigned Marine Chemist. Unless otherwise stated on the Certificate, spaces and affected adjacent spaces are to be reinspected as may be necessary by the competent person or the authority having jurisdiction as applicable in support of work prior to entry or recommencement of work.

QUALIFICATIONS: Transfer of ballast, cargo, fuel, or manipulation of valves or closure equipment tending to alter conditions in pipelines, tanks, or compartments subject to gas accumulation, unless specifically approved on this Certificate, requires inspection and a new Certificate for spaces so affected. All lines, vents, heating coils, valves, and similar enclosed appurtenances shall be considered "not safe" unless otherwise specifically designated. Movement of the vessel from its specific location voids this Certificate unless shifting of the vessel within the facility has been specifically authorized on this Certificate.

STANDARD SAFETY DESIGNATIONS: (partial list, paraphrased from NFPA 306, Subsections 4.3.1 through 4.3.6).

ATMOSPHERE SAFE FOR WORKERS: In the compartment or space so designated (a) the oxygen content of the atmosphere is at least 19.5 percent and not greater than 22 percent by volume; (b) the concentration of flammable materials is below 10 percent of the lower explosive limit; (c) any toxic materials in the atmosphere associated with cargo, fuel, tank coatings, inerting mediums, or fumigants are within permissible concentrations at the time of the inspection.

NOT SAFE FOR WORKERS: In the compartment or space so designated, ...

Exhibit 7
No.1:07-1030 (RCL)
Page 42

SERIAL NO. **M** 12000

Page ___ of ___

Survey Requested by: *Hancock /Gmd*     Vessel Owner or Agent: *Hancock*     Date: *4-12-05*

Vessel: *Barge 58701*     Type of Vessel: *Tank Barge*     Specific Location of Ve...: *Gmd ...*

Last Three (3) Loadings: *2 oil*     Tests Performed: *$O_2$, LEL $H_2S$ CO, THC, ...*     Time Survey Complet...: *0915*

*Nº 1, 2, 3, 4, 45 P/S Cargo Tanks*     *Enter with Restrictions*
                                        *w/ventilation*

*All: $O_2$, 7LEL $O$   $H_2S$  CO*     *Safe for Hotwork*
*20.8      0        none*              *w/ Fresh air*
                    *detected*

*Hydrocarbons - ~ 50 - 100 ppm*

*Entry Restrictions: O Half - mask, organic cartridge Respiratory*
                     *Protection Req'd for Entry*

*NOTE: Cargo Lines Have Been Flushed and must Be Blown w/air*
       *Before containing Hotwork*

*F/S Fwd Rake, After Rake*     *Atmosphere Safe for Workers*

*Oil $O$  15C 7o*             *Safe For Hotwork*
*20.8*                        *w/ Fresh air*

In the event of physical or atmospheric changes affecting the STANDARD SAFETY DESIGNATIONS assumed to any of the above spaces, this certif...
vorked. spaces not listed on the Certificate are not to be entered unless authorized on another Certificate and/or maintained in accordan...
OSHA 29 CFR 1915, or if in any doubt, immediately cease all work and contact the undersigned Marine Chemist. Unless otherwise stated on the Certifica...
spaces and affected adjacent spaces are to be reinspected daily or more often as necessary by the competent person or the authority having juri...
applicable support of work prior to entry or reommencement of work.
   QUALIFICATIONS: Transfer of ballast, cargo, fuel, or manipulation of valves or closure equipment tending to alter conditions in pipelines, tanks, or compartments subject
to gas accumulation, unless specifically approved on this Certificate, requires inspection and a new Certificate for spaces so affected. All lines, vents, heating coils, valves,
and similar enclosed appurtenances shall be considered "not safe" unless otherwise specifically designated. Movement of the vessel from its specific locat... voids the
Certificate unless shifting of the vessel within the facility has been specifically authorized on the Certificate.
STANDARD SAFETY DESIGNATIONS: (partial list, paraphrased from NPPA 306, Subsections 4.3.1 through 4.3.6).
ATMOSPHERE SAFE FOR WORKERS: In the compartment or space so designated (a) the oxygen content of the atmosphere is at least 19.5 percent and not greater than
22 percent by volume; (b) the concentration of flammable materials is below 10 percent of the lower explosive limit; (c) any toxic materials in the atmosphere associated
cargo, fuel, tank coatings, inerting mediums, or fumigants are within permissible concentrations at the time of the inspection.
NOT SAFE FOR WORKERS: In the compartment or space so designated, entry is not permitted.

Exhibit 7
No.1:07-1030 (RCL)
Page 43



SHANNON HARDWARE
PO BOX 631
MORGAN CITY    LA   70381



**COUNTER SALES**

HOROFF

INVOICE NUMBER
1145179-0001-01

*No Pain OP*
*K8*

INVOICE NUMBER
1145175-0001-01

BILL
TO:  HORNBECK OFFSHORE SERVICES, IN
103 NORTHPARK BLVD.
SUITE 300
COVINGTON    LA   70433
CUSTOMER P.O. NO.    134889

SHIP
TO:  HORNBECK OFFSHORE SERVICES, IN
103 NORTHPARK BLVD.
SUITE 300
COVINGTON    LA   70433
CUSTOMER P.O. NO.    134889



| INVOICE NUMBER | SLSMN | ORDER DATE | TAKER | CUSTOMER P.O. NUMBER | DATE |
|---|---|---|---|---|---|
| 1145179-0001-01 | 100 | 01/29/05 | 156 | 134889 | 01/29/05 |

| | | | INSTRUCTIONS | | PER | PAGE NO. |
|---|---|---|---|---|---|---|
| | | | | | B | 1 |

| ORDERED | B.O./RET | SHIPPED | | ITEM CODE AND DESCRIPTION | U/M | MULT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 15 | | 15 | | MAS 1KALF 2001<br>1LF-KA #1 KEYED ALIKE LOCK<br>2001 | EA | .9000 | 12.1200 | 163.62 |

*Locks + Liquids fer De.MOB/*
*Cold Storage of Vessel*

*#1248.62*

CODE EXPLANATION

\* STATE TAX APPLICABLE
\* FED. OTHER TAX APPLICABLE
\* STATE & FEDERAL TAX APPL.
B - BALANCE BACK ORDERED

C - CONSIDER COMPLETE
D - DIRECT SHIPMENT
F - FACTORY MINIMUM
\* - RETURNED CYL.

**\*\* THIS IS YOUR INVOICE \*\***

| FREIGHT IN | FREIGHT OUT |
|---|---|
| | |

NET TERMS:  INV   30      DUE:  02/28/05

ORIGINAL

| SUB TOTAL | 163.62 |
|---|---|
| MISC. CHARGE | |
| TELE. CHARGE | |
| FREIGHT TOTAL | |
| FED./OTHER TAX | |
| STATE TAX | |
| PAYMENT REC'D. | 0.00 |

| TOTAL AMT DUE | |
|---|---|
| | 163.62 |

XLOPTD 8/88

Exhibit 7
No.1:07-1030 (RCL)
Page 44



**MANNING**
E L E C T R I C

# Invoice

**Sold To:**
Hornbeck Offshore Operators LLC

671 Court Street

Brooklyn NY 11231

**Shipped To:**    Energy 8701
Hornbeck Offshore Operators LLC

671 Court Street

Brooklyn NY 11231

'05 JAN 18 P1 :51

Received-Acct

JAN 2 7 2005

| Invoice Date | Invoice No. | Your Order No. | VIA | Terms |
|---|---|---|---|---|
| 1/12/05 | D4360 | 0510633 | | Net 30 Days |

| Quantity Shipped | Description | Unit Price | Disc % | Amount |
|---|---|---|---|---|
| 1 | Barge Light BGLED-888-KIT-STERN | 995.00 | | 995.00 |
| 12 | Energizer EN529 Battery | 7.50 | | 90.00 |
| | | Total | | 1,085.00 |

Manning Electric, Inc.  –  154 27th Street,  Brooklyn, New York  11232  –  Tel: (718) 832-2488  –  Fax: (718) 832-2493

Exhibit 7
No.1:07-1030 (RCL)
Page 45

**VACCO MARINE, INC.**
P.O. BOX 8032
HOUMA, LA 70361

*expense
cleaning + stripping*

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
\*  I N V O I C E  \*
\*
\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Invoice Number: 003173

Invoice Date: 02/23/05

Page:  1

| Sold To: | HORNBECK OFFSHORE<br>103 NORTHPARK BLVD.<br>SUITE 300<br>COVINGTON, LA.<br>70433 | Ship To: | HORNBECK OFFSHORE<br>103 NORTHPARK BLVD.<br>SUITE 300<br>COVINGTON, LA.<br>70433 |
|---|---|---|---|

Ship Via.: BARGE 8701

Cust I.D.....: HORBEC
P.O. Number..: 134519
P.O. Date....: 01/25/05
Job/Order No.:
Salesperson..: MOE

|  | Net | TX |
|---|---|---|
| PLEASE SEE ATTACHED TICKET FOR<br>SCOPE OF WORK AS DIRECTED. | 18506.79 | E |

*10/31/05
To be reclassed to
claim.
See Oct 05 Jeb.
JP*

ENT'D MAR 0 2 2005

IF PAID WITHIN (10) DAYS
DEDUCT 2% FROM TOTAL

*370.14*

| Subtotal: | 18506.79 |
|---|---|
| Tax.....: | 0.00 |
| Payments: | 0.00 |
| Total...: | 18506.79 |

*19,136.65*

Exhibit 7
No.1:07-1030 (RCL)
Page 46

TOWING, INC.                                    **INVOICE**                    Page: 1

EVERGLADES TOWING
X 13038
UDERDALE, FL-33316
954-523-2200 FAX 954-522-5651

                                    '05 FEB 28 P2:12

Tug LIBERTY SERVICE AND/OR OWNER/OPERATOR                    DATE: 2/24/2005

HORNBECK OFFSHORE OPERATORS
ATTN: JOHN BOWIE                                    INVOICE NO: 224786
671 COURT STREET
BROOKLYN, NY 11231
                                                    GROSS TONNAGE: 198

                                                    P.O. # 30981

| ATE | DESCRIPTION | AMOUNT |
|---|---|---|
| '19/2005 | Assisted Vessel OFFSHORE<br>13:00-14:00 Tug BROWARD @ $450.00 Flat Rate | 450.00 |
| | * Take 5 Crew Members to Tug and Bring 5 Back to Dock * | |
| '20/2005 | Assisted Vessel OFFSHORE<br>12:55-13:55 Tug BROWARD @ $450.00 Flat Rate | 450.00 |
| | * Deliver Packages * | |
| | Invoice Total: | 900.00 |

Replaces i    224455
Billed witho

**PORT EVERGLADES TOWING**
A Division of Seabulk International
P.O. BOX 13038 • Fort Lauderdale Florida 33316 • (954) 523-2200

VESSEL _Tug Liberty Service_

GROSS TONS _____

    Docking    ( )
    Undocking    ( )
    Shift    ( )
    T/T BROWARD
    TUG FORT LAUDERDALE    ( )
    TUG/SDM NEW RIVER    ( )
    TUG/SDM ST. JOHNS    ( )
    TUG _____    ( )
    DATE 19,20 Jan 05 TIME 300, 1255

_Acknowledged as to services rendered. To be invoiced at contract rate._

MASTER SIGNATURE _____

OP-8 Revised 7/04

PLEAS
SEAB
PORT
-or- P
P O B
ATLA

INVOICE COPY - WHITE • OFFICE COPY - CANARY • MASTER'S COPY - PINK

8 2005

ENi MAR

Exhibit 7
No.1:07-1030 (RCL)
Page 47

 **Stagg Marine, Inc.**
P.O. Box 1839
Morgan City, LA  70381

# INVOICE

| Date | Invoice # |
|------|-----------|
| 3/8/2005 | 10575 |

'05  MAR 14  A8 :12

| Bill To |
|---------|
| Hornbeck Offshore, Inc.<br>Attn:  Accounts Payable<br>671 Court St.<br>Brooklyn, NY  11231 |

| P.O. # | Terms | Ordered By |
|--------|-------|------------|
| 30981 | Net 30 | Mr. Dick Dill |

| Vessel | Description | Hourly | Rate | Amount |
|--------|-------------|--------|------|--------|
| Escort Charges Energy-8701 | Port Patrol Vessel #17 escort services at Port Fourchon for barge Energy-8701.<br><br>Start Date:  01/26/05<br>Stop Date:  01/26/05 | | 195.56 | 195.56 |

Received-Acct
MAR 3 0 2005

ADD  30981 C

| | Total | $195.56 |

*Stagg Marine Appreciates Your Business!*

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| 985-385-5816 | 985-385-5657 | tugboats@petronet.net |

Exhibit 7
No.1:07-1030 (RCL)
Page 48



# Stagg Marine, Inc.
P.O. Box 1839
Morgan City, LA 70381

# INVOICE

| Date | Invoice # |
|------|-----------|
| 2/24/2005 | 10561 |

'05  FEB 28  P2:12

**Bill To**

Hornbeck Offshore, Inc.
Attn:  Accounts Payable
671 Court St.
Brooklyn, NY 11231

| P.O. # | Terms | Ordered By |
|--------|-------|------------|
| 30981 | Net 30 | Mr. Dick Dill |

| Vessel | Description | Hourly | Rate | Amount |
|--------|-------------|--------|------|--------|
| Sidney V. & Susan G. | Transport Energy 8701 from Fourchon to Larose, as per attached logs. | | | |
| | Start Time and Date:  20:00  01/25/05<br>Stop Time and Date:  10:00  01/27/05 | 38 | 350.00 | 13,300.00 |
| | Stop Time and Date:  22:00  01/25/05<br>Stop Time and Date:  04:30  01/27/05 | 30.5 | 210.00 | 6,405.00 |

| | Total | $19,705.00 |
|--|-------|------------|

*Stagg Marine Appreciates Your Business!*

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| 985-385-5816 | 985-385-5657 | tugboats@petronet.net |

Exhibit 7
No.1:07-1030 (RCL)
Page 49

TOWING FOR: _____          DATE 1-25-05
NAME OF TUG ___Sidney V_____

| DEPT. | ARRIVED | |
|-------|---------|---|
| 2000 | | departed Amelia Base Lightboat |
| 2300 | | Turn Southbound Houma NAV. |
| 2400 | | Southbound Houma NAV. |
| | | |
| | | 1-26-04 |
| 0001 | | Southbound Houma NAV., Lightboat |
| 0315 | | Turn Eastbound Cot Isle. Seabouy |
| 0515 | | Turn Northbound Bouys 1&2 Belle Poss |
| | 0630 | Arrived Bollingers penrchow |
| 0930 | | departed with Energy 8701, m/v Susan G. Asst. |
| 1000 | | Cloored Belle Poss Jettys, Susan G. off |
| 1200 | | Bck. 64 Ship Shoal |
| 1315 | | Turn Inbound Cot Isle Seabouy |
| 1415 | | m/v Susan G. Put on Headline at Bouy 56 Cot Isle Channel |
| 1800 | | Northbound Houma NAV. |
| 1900 | | Turn Eastbound mi. 59.5 ICW |
| 2220 | | Arrived Bollinger Safe Harbor Larose |
| 2400 | | Secured Energy 8701, departed Lightboat |
| | | |
| | | 1-22-05 |
| | 0130 | fog Bound mi. 49 ICW |
| 0415 | | departed mi 49 ICW |
| | 1000 | Arrived Amelia Base |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

MASTER _____

Exhibit 7
No.1:07-1030 (RCL)
Page 50

TOWING FOR: _____    DATE 1-25-05

NAME OF TUG _____ Susan G.

| DEPT. | ARRIVED | |
|-------|---------|---|
| 22:00 | | Houma Base light boat ICW mile 54 W/B |
| 23:00 | | Turned out ICW mile 60 S/B |
| 24:00 | | S/B Houma Nav light boat |
| | | |
| | | 1-26-05 |
| 00:01 | | S/B Houma Nav light boat |
| 09:30 | 06:30 | Bollinger Fourchon |
| 12:00 | | Bollinger Taking Engera 8701 |
| 18:00 | | In rough To Bollinger Larose |
| 19:00 | | N/B Houma Nav |
| | | Turned E/B ICW mile 60 Taking Engera 8701 |
| | 22:20 | Bollinger Larose |
| 24:00 | 24:00 | Engera 8701 Sec Secured |
| | | Bollinger W/B ICW mile 36 light boat |
| | | |
| | | 1-27-05 |
| 00:01 | | Bollinger Larose W/B ICW mile 36 light boat |
| | 02:00 | Fog bound ICW mile 49 |
| 04:00 | | W/B ICW mile 49 light boat |
| | 05:00 | Houma Base ICW mile 54 |

MASTER Bert Hebert

Exhibit 7
No.1:07-1030 (RCL)
Page 51



**HORNBECK OFFSHORE TRANSPORTATION, LLC**
*Service with Energy*

## Request for Reimbursement

Invoice Date:  6/15/06
Job No.        30981
Barge:         8701

1. 8701/GMD Yard to Hornbeck Court Street Dock:  Spartan Service & Stapleton Service:
   1/12/05, 1145 to 1300.  $1276.05

2. 8701/Court Street Brooklyn to Sea Buoy:  Liberty Service 1/15/05; 0705 to 1/24/05 1815,
   8 days-2 hours.  $99,020.84

*Tug Rate  $5,000.00/day plus $7,250.00/day fuel ($510.42/hour)

**From 0700 on 1/19/05 to 1450 on1/20/05 Tug laid off Ft Lauderdale awaiting fuel pump parts
for vessel repair deduction of 1 day and 9 hours 50 minutes.

**Total Requested Amount:**                    **$100,296.89**

Payment by wire transfer to:  HIBERNIA NATIONAL BANK ABA No. 065-000-090
For the Account of HORNBECK OFFSHORE SERVICES, LLC – Account No. 812-519-034
Please call (985) 727-6811 upon completion of wire transfer.

REMITTANCE ADDRESS:  P.O. Box 54863 – New Orleans, LA  70154-4863
Any questions regarding this invoice should be directed to (985) 727-6927

103 Northpark Blvd., Suite 300
Covington, Louisiana 70433

Phone:  (985) 727-2000
Fax:    (985) 727-3606
Exhibit 7
No.1:07-1030 (RCL)
Page 52





**SHIPYARDS**

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Received-Acct

APR 17 2006

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

| INVOICE | |
|---|---|
| NUMBER | 230804002 |
| DATE | PAGE |
| 03-APR-06 | 1 of 1 |
| PURCHASE ORDER NUMBER | |
| | 21542 |
| OUR REFERENCE | |
| | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| | |
| CUSTOMER NUMBER | LOCATION |
| 2300 | Bill |

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 03-MAY-06 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 3/1/06 THRU 3/31/06 | 1 | 1 | 500.00 | 500.00 |

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
Wire To:                    Credit To:
  JP Morgan Chase            Bollinger Shipyards Lockport, L.L.C.
  Baton Rouge, LA            Operating Account
  ABA# 021000021            Account# 8002104075

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

Version 3.0.3 01.01.02.Invoic11.seg

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed.*

Exhibit 7
No.1:07-1030 (RCL)
Page 53



**SHIPYARDS**



**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Received-Acct

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

| INVOICE | |
|---|---|
| NUMBER | 230605002 |
| DATE | 27-MAY-06 | PAGE 1 of 1 |
| PURCHASE ORDER NUMBER | 21542 |
| OUR REFERENCE | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| CUSTOMER NUMBER | 2300 | LOCATION Bill |

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 31-MAY-08 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 4/1/06 THRU 4/30/06 | | 1 | 1 | 500.00 | 500.00 |

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
Wire To:                          Credit To:
  *JP Morgan Chase*                 *Bollinger Shipyards Lockport, L.L.C.*
  *Baton Rouge, LA*                 *Operating Account*
  *ABA# 021000021*                  *Account# 8002104075*
Version 3.0.3.01.01.02.Invoic11.seg

| SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|
| 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed.*

Exhibit 7
No.1:07-1030 (RCL)
Page 54



**SHIPYARDS**

**INVOICE**

| NUMBER | | |
|---|---|---|
| | 230603002 | |
| DATE | | PAGE |
| 01-MAR-06 | | 1 OF 1 |
| PURCHASE ORDER NUMBER | | |
| | 21542 | |
| OUR REFRENCE | | |
| | SAFE HARBOR STORAGE | |
| SALES ORDER NUMBER | | |
| | | |
| CUSTOMER NUMBER | LOCATION | |
| 2300 | Bill | |

LOCATION WHERE WORK PERFORMED
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Received-Acc:

MAR 07 2006

Attn: Accounts Payable
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 31-MAR-06 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 2/1/06 THRU 2/28/06 | 1 | 1 | 500.00 | 500.00 |

Molloy — Vouchea

2000-04-174 — 500 030

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| Tax Registration Number: 72-0449902 | | | | |
| *Electronic Funds Transfer Instructions:* | | | | |
| Wire To:              Credit To: | 500.00 | 0.00 | 0.00 | 500.00 |
| *JP Morgan Chase     Bollinger Shipyards Lockport, L.L.C.* | | | | |
| *Baton Rouge, LA     Operating Account* | | | | |
| *ABA# 021000021      Account# 8002104075* | | | | |

Version 3.0.3.01.01.02.Invoic11.seq

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7
No.1:07-1030 (RCL)
Page 55



**SHIPYARDS**

ORIGINAL INVOICE



INVOICE

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

V#893

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

*Send Payments To:*

**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | | DUE DATE 01-DEC-05 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - BARGE LAYUP STORAGE - PERIOD THRU 10/31/05 | | | 1 | 1 | 500.00 | 500.00 |

*(handwritten notes across body of invoice)*

| Tax Registration Number: 72-0449902 | | | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|---|---|
| *Electronic Funds Transfer Instructions:* | | | 500.00 | 0.00 | 0.00 | 500.00 |
| *Wire To:* JP Morgan Chase Baton Rouge, LA ABA# 021000021 | *Credit To:* Bollinger Shipyards Lockport, L.L.C. Operating Account Account# 8002104075 | | | | | |

Version 3.0.3.01.01.02.invoic1l.seg

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed*

Exhibit 7
No.1:07-1030 (RCL)
Page 56



2006
x

(DIRTY!)

HCT

**INVOICE**

NUMBER
230602002

DATE                    PAGE
01-FEB-06           1 OF 1

PURCHASE ORDER NUMBER
21342            DAVID

OUR REFERENCE
SAFE HARBOR STORAGE

SALES ORDER NUMBER

CUSTOMER NUMBER      LOCATION
2300                    Bill

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Received-Acct

FEB 0 6 2006

Attn: Accounts Payable
HORNBECK OFFSHORE SERVICES
SUITE 300
103 NORTHPARK BLVD
COVINGTON LA 70433

*Send Payments To:*

**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
PO BOX 62600
DEPT 1102
NEW ORLEANS, LA 70162-2600

| TERMS 30 NET | DUE DATE 03-MAR-06 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 1/1/06 THRU 1/31/06 | | 1 | 1 | 500.00 | 500.00 |

PO was written later than invoice date.
Invoice amount was known by originator
and goods or services were received.
PO/E-req only an approval mechanism.

ENT'D FEB 2 7 2006

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
Wire To:                          Credit To:
  JP Morgan Chase                    Bollinger Shipyards Lockport, L.L.C.
  Baton Rouge, LA                    Operating Account
  ABA# 021000021                     Account# 8002104075
Version 3.0.3.01.01.02.Invoic11.seg

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed*

Exhibit 7
No.1:07-1030 (RCL)
Page 57



**Bollinger**
SHIPYARDS

LOCATION WHERE WORK PERFORMED
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

| INVOICE | |
|---|---|
| NUMBER | 230503004 |
| DATE | 03-MARCH | PAGE 1 |
| PURCHASE ORDER NUMBER | 115549 |
| OUR REFERENCE | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| CUSTOMER NUMBER 2300 | LOCATION BIB |

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS<br>30 NET | DUE DATE<br>31-MAR-05 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM<br>NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE -<br>PERIOD 2/1/05 THRU 2/28/05. | 1 | 1 | 500.00 | 500.00 |

*Billed on Bollinger*
*Invoice #230503007.*
*N/a pmof*

| Tax Registration Number: 72-0449902<br>*Electronic Funds Transfer Instructions:*<br>*Wire To:*    *Credit To:*<br>*Bank One, Louisiana N.A.*   *Bollinger Shipyards Lockport, L.L.C.*<br>*Baton Rouge, LA*    *Operating Account*<br>*ABA# 065400137*    *Account# 8002104075* | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

Version 3.0.3.01.01.01.Invoic11.seg

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7
No.1:07-1030 (RCL)
Page 58



**SHIPYARDS**

LOCATION WHERE WORK PERFORMED
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

| INVOICE | |
|---|---|
| NUMBER | 230504004 |
| DATE | 01-APR-05 |
| PURCHASE ORDER NUMBER | 116549 |
| JOB REFERENCE | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| CUSTOMER NUMBER | 2500 |
| LOCATION | BH |

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 01-MAY-05 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 3/1/05 THRU 3/31/05 | | 1 | 1 | 500.00 | 500.00 |

Received-Acct
APR 0 5 2005

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
*Wire To:                         Credit To:*
*Bank One, Louisiana N.A.        Bollinger Shipyards Lockport, L.L.C.*
*Baton Rouge, LA                 Operating Account*
*ABA# 065400137                  Account# 8002104075*
Version 3.0.3.01.01.01.Invoic11.seg

| SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|
| 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed.*

Exhibit 7
No.1:07-1030 (RCL)
Page 59



**SHIPYARDS**

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

| INVOICE | | |
|---|---|---|
| Number | 230505006 | |
| DATE | 02-MAY-05 | PAGE 1 OF 1 |
| PURCHASE ORDER NUMBER | | |
| OUR REFERENCE | SAFE HARBOR STORAGE | |
| SALES ORDER NUMBER | | |
| CUSTOMER NUMBER 2300 | LOCATION Bill | |

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 01-JUN-05 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 4/1/05 THRU 4/30/05 | 1 | 1 | 500.00 | 500.00 |

Received-Acct

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
*Wire To:*                          Credit To:
*Bank One, Louisiana N.A.*          *Bollinger Shipyards Lockport, L.L.C.*
*Baton Rouge, LA*                   *Operating Account*
*ABA# 065400137*                    *Account# 8002104075*

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

Version 3.0.3.01.01.01.Invoic11.seg

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed.*

Exhibit 7
No.1:07-1030 (RCL)
Page 60

S|K 6|4|05



**BOLLINGER**
SHIPYARDS

LOCATION WHERE WORK PERFORMED
**BOLLINGER LAROSE, LLC**
**985-693-7002**
**1515 HWY 24**
**LAROSE LA 70373**



INVOICE

Received-Acct

JUN 03 2005

Attn: Accounts Payable
HORNBECK OFFSHORE SERVICES
SUITE 300
103 NORTHPARK BLVD
COVINGTON LA 70433

*Send Payments To:*
BOLLINGER SHIPYARDS LOCKPORT, L.L.C.
PO BOX 62600
DEPT 1102
NEW ORLEANS, LA 70162-2600

| TERMS 30 NET | DUE DATE 01-JUL-05 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 5/1/05 THRU 5/31/05 | 1 | 1 | 500.00 | 500.00 |

Need new PO#

√ PO #            ___Add or Adjust Frt.
√ Approve        ___Proj - Sec - Claim #
√ Issue          ___Price Difference
√ Complete       ___Quantity Difference
√ Signature      ___Received?

04744-500030- Lawson

ENTD JUL 05 2005

Tax Registration Number: 72-0449902
Electronic Funds Transfer Instructions:
Wire To:              Credit To:
  JP Morgan Chase      Bollinger Shipyards Lockport, L.L.C.
  Baton Rouge, LA      Operating Account
  ABA# 021000021       Account# 8002104075
Version 3.0.3.01.01.02.Invoic1l.seg

| SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|
| 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7
No.1:07-1030 (RCL)
Page 61

K|5|7|7|05



**Bollinger**
SHIPYARDS

ORIGINAL
INVOICE

**INVOICE**
230B07/006

01-JUL-05

SAFE HARBOR STORAGE

CUSTOMER NUMBER 2500    LOCATION BILL

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Attn: Accounts Payable
HORNBECK OFFSHORE SERVICES
SUITE 300
103 NORTHPARK BLVD
COVINGTON LA 70433

JUL 19 2005

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 31-JUL-05 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 6/1/05 THRU 6/30/05. | 1 | 1 | 500.00 | 500.00 |

203066

ENTD JUL 19 2005

| Tax Registration Number: 72-0449902 *Electronic Funds Transfer Instructions:* Wire To:      Credit To: JP Morgan Chase      Bollinger Shipyards Lockport, L.L.C. Baton Rouge, LA      Operating Account ABA# 021000021      Account# 8002104075 | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

Version 3.0.3.01.01.02.invoic11.seg

***After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .***

Exhibit 7
No.1:07-1030 (RCL)
Page 62



**BOLLINGER**
SHIPYARDS

*ORIGINAL INVOICE*
*2005*

LOCATION WHERE WORK PERFORMED
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

| INVOICE | |
|---|---|
| NUMBER | 280508003 |
| DATE | 01-AUG-05 | PAGE 1 |
| PURCHASE ORDER NUMBER | |
| JOB & LOCATION | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| CUSTOMER NUMBER | 2800 | LOCATION BH |

Received-Acct
AUG 0 3 2005

Attn: Accounts Payable
HORNBECK OFFSHORE SERVICES
SUITE 300
103 NORTHPARK BLVD
COVINGTON LA 70433

ENT'D NOV 0 7 2005

*Send Payments To:*

**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
PO BOX 62600
DEPT 1102
NEW ORLEANS, LA 70162-2600

| TERMS 30 NET | DUE DATE 31-AUG-05 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE PERIOD 7/1/05 THRU 7/31/05 | | 1 | 1 | 500.00 | 500.00 |

PO 21542

_X_PO #        ___Add or Adjust Frt.
___Approve    ___Proj - Sec - Claim #
___Issue       ___Price Difference
___Complete  ___Quantity Difference
___Signature  ___Received?

See Attached for Approval

Tax Registration Number: 72-0449902
Electronic Funds Transfer Instructions:
Wire To:                        Credit To:
  JP Morgan Chase             Bollinger Shipyards Lockport, L.L.C.
  Baton Rouge, LA              Operating Account
  ABA# 021000021             Account# 8002104075

Version 3.0.3.01.01.02.Invoic1L.seg

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed.*

Exhibit 7
No.1:07-1030 (RCL)
Page 63



**INVOICE**

| NUMBER | | |
| --- | --- | --- |
| 230509002 | | |

| DATE | | PAGE |
| --- | --- | --- |
| 06 SEP 05 | | 1 of 1 |

| PURCHASE ORDER NUMBER |
| --- |
| 115549 |

| OUR REFERENCE |
| --- |
| SAFE HARBOR STORAGE |

| SALES ORDER NUMBER |
| --- |

| CUSTOMER NUMBER | LOCATION |
| --- | --- |
| 2300 | Bill |

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*986-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**



Send Payments To:
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 06-OCT-05 | | QUANTITY | | CUSTOMER CONTACT | |
| --- | --- | --- | --- | --- | --- | --- |
| ITEM NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 8/1/05 THRU 8/31/05 | | 1 | 1 | 500.00 | 500.00 |

ENT'D NOV 0 7 2005

... Attached for Approval

Tax Registration Number: 72-0449902
Electronic Funds Transfer Instructions:
Wire To:
  JP Morgan Chase
  Baton Rouge, LA
  ABA# 021000021
Credit To:
  Bollinger Shipyards Lockport, L.L.C.
  Operating Account
  Account# 8002104075

Version 3.0.3.01.01.02.Invoic1I.seg

| SUBTOTAL | TAX | FREIGHT | TOTAL |
| --- | --- | --- | --- |
| 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7
No.1:07-1030 (RCL)
Page 64







**INVOICE**

| NUMBER | 230510002 | |
|---|---|---|
| DATE | 03-OCT-05 | PAGE 1 of 1 |
| PURCHASE ORDER NUMBER | 115549 | |
| OUR REFERENCE | SAFE HARBOR STORAGE | |
| SALES ORDER NUMBER | | |
| CUSTOMER NUMBER | 2300 | LOCATION Bill |

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

PO
71542

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS 30 NET | DUE DATE 02-NOV-05 | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|
| ITEM NO. | PART NUMBER/DESCRIPTION | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE - PERIOD 9/1/05 THRU 9/30/05 | 1 | 1 | 500.00 | 500.00 |

ENT'D NOV 0 7 2005                    ...... for **Approval**

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
*Wire To:*     Credit To:
*JP Morgan Chase*     *Bollinger Shipyards Lockport, L.L.C.*
*Baton Rouge, LA*     *Operating Account*
*ABA# 021000021*     *Account# 8002104076*
Version 3.0.3.01.01.02.Invoic11.seg

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7
No.1:07-1030 (RCL)
Page 65


SHIPYARDS

ORIGINAL
INVOICE

**LOCATION WHERE WORK PERFORMED**
*BOLLINGER LAROSE, LLC*
*985-693-7002*
*1515 HWY 24*
*LAROSE LA 70373*

Received-Acct

| INVOICE | |
|---|---|
| NUMBER | 230512002 |
| DATE | 01-DEC-05 | PAGE | 1 of 3 |
| PURCHASE ORDER NUMBER | |
| OUR REFERENCE | SAFE HARBOR STORAGE |
| SALES ORDER NUMBER | |
| CUSTOMER NUMBER | 2300 | LOCATION | Bill |

**Attn: Accounts Payable**
**HORNBECK OFFSHORE SERVICES**
**SUITE 300**
**103 NORTHPARK BLVD**
**COVINGTON LA 70433**

PO
21542

*Send Payments To:*
**BOLLINGER SHIPYARDS LOCKPORT, L.L.C.**
**PO BOX 62600**
**DEPT 1102**
**NEW ORLEANS, LA 70162-2600**

| TERMS<br>30 NET | DUE DATE<br>31-DEC-05 | | QUANTITY | | CUSTOMER CONTACT | |
|---|---|---|---|---|---|---|
| ITEM<br>NO. | PART NUMBER/DESCRIPTION | | ORDERED | SHIPPED | UNIT PRICE | EXTENSION |
| 1 | BARGE ENERGY 8701 - SAFE HARBOR STORAGE -<br>PERIOD 11/1/05 THRU 11/30/05 | | 1 | 1 | 500.00 | 500.00 |

ENTD DEC 07 2005

See Attached for Approval

Tax Registration Number: 72-0449902
*Electronic Funds Transfer Instructions:*
*Wire To:*     *Credit To:*
  *JP Morgan Chase*      *Bollinger Shipyards Lockport, L.L.C.*
  *Baton Rouge, LA*      *Operating Account*
  *ABA# 021000021*      *Account# 8002104075*

| | SUBTOTAL | TAX | FREIGHT | TOTAL |
|---|---|---|---|---|
| | 500.00 | 0.00 | 0.00 | 500.00 |

Version 3.0.3.01.01.02.invoic11.seg

*After 30 days past the invoice date, interest at the rate of 1-1/2% per month (18% annual rate) will be assessed .*

Exhibit 7<br>No.1:07-1030 (RCL)<br>Page 66

# ENCLOSURE 8

Exhibit 7
No.1:07-1030 (RCL)
Page 67

# WINSTON & STRAWN LLP

1400 L Street, N.W.
Washington, DC 20005-3502
TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1840916 |
| Invoice Date | 10/25/04 |
| Client Matter No. | 104952.00001 |

### Remittance Advice
Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $13,933.75 |
| Total Disbursements | 0.00 |
| **Total Due This Invoice** | **$13,933.75** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank – Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 68

# WINSTON & STRAWN LLP

1400 L Street, N.W.
Washington, DC 20005-3502
TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1845784 |
| Invoice Date | 11/19/04 |
| Client Matter No. | 104952.00001 |

### Remittance Advice
Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $26,417.50 |
| Total Disbursements | 1,182.16 |
| **Total Due This Invoice** | **$27,599.66** |
| Prior Balance Due | 13,933.75 |
| **Total Now Due and Owing** | **$41,533.41** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | Harris Bank - Chicago, Illinois<br>ABA/Routing Number: 071 000 288<br>Account Number: 449-675-8<br>Account Name: Winston & Strawn LLP<br>SWIFT Code: HATRUS44 (International Wires)<br>Please reference invoice/client matter number. |

Exhibit 7
No.1:07-1030 (RCL)
Page 69

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817
TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1851012 |
| Invoice Date | 11/30/04 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
Please include this remittance page with your payment

| | |
|---|---:|
| Total Fees | $1,311.25 |
| Total Disbursements | 21.79 |
| **Total Due This Invoice** | **$1,333.04** |
| Prior Balance Due | 41,533.41 |
| **Total Now Due and Owing** | **$42,866.45** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 70

# WINSTON & STRAWN LLP

1400 L Street, N.W.
Washington, DC 20005-3502
TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1856137 |
| Invoice Date | 01/18/05 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
### Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $4,913.75 |
| Total Disbursements | 117.79 |
| **Total Due This Invoice** | **$5,031.54** |
| Prior Balance Due | 28,932.70 |
| **Total Now Due and Owing** | **$33,964.24** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 71

# WINSTON & STRAWN LLP

1400 L Street, N.W.
Washington, DC 20005-3502
TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1860896 |
| Invoice Date | 02/23/05 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $22,225.00 |
| Total Disbursements | 357.84 |
| **Total Due This Invoice** | **$22,582.84** |
| Prior Balance Due | 5,031.54 |
| **Total Now Due and Owing** | **$27,614.38** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>**Winston & Strawn LLP**<br>**36235 Treasury Center**<br>**Chicago, IL 60694-6200** | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 72

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1891317 |
| Invoice Date | 09/21/05 |
| Client Matter No. | 104952.00001 |

**Remittance Advice**
Please include this remittance page with your payment

| | |
|---|---:|
| Total Fees | $69,305.00 |
| Total Disbursements | 1,111.29 |
| Credit Applied | (11,237.68) |
| **Total Due This Invoice** | **$59,178.61** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank – Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 73

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1895469 |
| Invoice Date | 10/20/05 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $5,642.50 |
| Total Disbursements | 2.93 |
| **Total Due This Invoice** | **$5,645.43** |
| Prior Balance Due | 59,178.61 |
| **Total Now Due and Owing** | **$64,824.04** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 74

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1902531 |
| Invoice Date | 11/30/05 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $1,053.75 |
| Total Disbursements | 1.76 |
| **Total Due This Invoice** | **$1,055.51** |
| Prior Balance Due | 64,824.04 |
| **Total Now Due and Owing** | **$65,879.55** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>Please reference invoice/client matter number. |

Exhibit 7
No.1:07-1030 (RCL)
Page 75

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1916397 |
| Invoice Date | 02/22/06 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
### Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $295.00 |
| Total Disbursements | 1.21 |
| **Total Due This Invoice** | **$296.21** |
| Prior Balance Due | 59,178.61 |
| **Total Now Due and Owing** | **$59,474.82** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>Winston & Strawn LLP<br>36235 Treasury Center<br>Chicago, IL 60694-6200 | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>Winston & Strawn LLP<br>311 W. Monroe<br>7th Floor, Lockbox #36235<br>Chicago, IL 60606 | Harris Bank - Chicago, Illinois<br>ABA/Routing Number: 071 000 288<br>Account Number: 449-675-8<br>Account Name: Winston & Strawn LLP<br>SWIFT Code: HATRUS44 (International Wires)<br>Please reference invoice/client matter number. |

Exhibit 7
No.1:07-1030 (RCL)
Page 76

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1925808 |
| Invoice Date | 04/25/06 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
### Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $5,675.00 |
| Total Disbursements | 14.14 |
| **Total Due This Invoice** | **$5,689.14** |
| Prior Balance Due | 59,178.61 |
| **Total Now Due and Owing** | **$64,867.75** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:**<br>**Winston & Strawn LLP**<br>**36235 Treasury Center**<br>**Chicago, IL 60694-6200** | **Via Delivery Service:**<br>c/o Harris Bank Remittance<br>**Winston & Strawn LLP**<br>**311 W. Monroe**<br>**7th Floor, Lockbox #36235**<br>**Chicago, IL 60606** | **Harris Bank - Chicago, Illinois**<br>**ABA/Routing Number: 071 000 288**<br>**Account Number: 449-675-8**<br>**Account Name: Winston & Strawn LLP**<br>**SWIFT Code: HATRUS44 (International Wires)**<br>**Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 77

# WINSTON & STRAWN LLP

1700 K Street, N.W.
Washington, D.C. 20006-3817

TAX ID NO. 36-1975990

Hornbeck Offshore Transportation LLC
103 Northpark Boulevard, Suite 300
Attn: Samuel A. Giberga, Esquire
General Counsel
Covington, LA 70433

| | |
|---|---|
| Invoice # | 1930898 |
| Invoice Date | 05/31/06 |
| Client Matter No. | 104952.00001 |

## Remittance Advice
### Please include this remittance page with your payment

| | |
|---|---|
| Total Fees | $12,520.00 |
| Total Disbursements | 632.76 |
| **Total Due This Invoice** | **$13,152.76** |
| Prior Balance Due | 64,867.75 |
| **Total Now Due and Owing** | **$78,020.51** |

| Remittance Address | | For Wire Transfers/ACH Payments |
|---|---|---|
| **Via Mail:** | **Via Delivery Service:** | **Harris Bank - Chicago, Illinois** |
| **Winston & Strawn LLP** | c/o Harris Bank Remittance | **ABA/Routing Number: 071 000 288** |
| **36235 Treasury Center** | **Winston & Strawn LLP** | **Account Number: 449-675-8** |
| **Chicago, IL 60694-6200** | **311 W. Monroe** | **Account Name: Winston & Strawn LLP** |
| | **7th Floor, Lockbox #36235** | **SWIFT Code: HATRUS44 (International Wires)** |
| | **Chicago, IL 60606** | **Please reference invoice/client matter number.** |

Exhibit 7
No.1:07-1030 (RCL)
Page 78

| VENDOR COST CLAIM | | | |
|---|---|---|---|
| VESSEL: ENERGY 8701 | | | |
| | | | AMOUNT |
| 1. SHIPYARD | INTERNATIONAL SHIP REPAIR | | |
| 2. BID PACKAGE | FED-EX | 0007613 | $500 |
| 3. PAINT | INTERNATIONAL PAINT | 0007953 | $30,000 |
| 4. SPECIAL SURVEY GAUGING | Q-SEA | 0007813 | $15,000 |
| 5. SPECIAL SURVEY AND REPAIRS (Tampa | ABS | 0007954 | $15,000 |
| 6. BERGAN SYSTEM REVIEW | ABS | 0008042 | $1,500 |
| 8. MISCELLANEOUS SERVICES | BOLLINGER LAROSE | 0007747 | $14,000 |
| 9. MISCELLANEOUS SERVICES | BOLLINGER AMELIA | 0007956 | $35,000 |
| 13. P/S CRANE O/H, Seal removal | SOUTHERN CRANE | 0007937 | $40,000 |
| 14. ANCHOR WINDLASS O/H | SOUTHERN CRANE | 0007939 | $16,000 |
| 15. CAPSTAN O/H | SOUTHERN CRANE | 0007941 | $11,500 |
| 16. REMOVALS/REINSTALLATION | SOUTHERN CRANE | 0007962 | $7,500 |
| 17. OVERHAUL (8) D6U WINCHES | SOUTHERN CRANE | 0007963 | $17,500 |
| 18. CARGO PUMP OVERHAULS | DUVICS | 0007942 | $30,000 |
| 19. MOVE BARGE TO BOLLINGER AMELIA | GER TOWING/STAGG MARI | 0007943 | $23,550 |
| 20. TRANSPORT PUMPS & ENGINES TO SHO | ACE TRANSPORTATION | 0007912 | $968 |
| 21. RUNNING LIGHTS/to make tranist | TBN | 27690 | $2,000 |
| 22. TRUCKING TO TAMPA (ENGINES,PUMP | TBN | | $5,000 |
| 23. MISCELLANEOUS SERVICES | RINE FABRICATORS & REP | 0007812 | $25,000 |
| 24. MMC VALVES AND TAPES, Gauging | MMC | 0007940 | $15,000 |
| 26. VALVES | W & 0 SUPPLY | 0007979 | $19,800 |
| 27. GAUGING SYSTEM | IAN CONRAD BERGAN | 0007667 | $100,000 |
| 29. REMOVE EMS SYSTEM AND INSTALL | GARBA INDUSTRIAL | 0007964 | $20,000 |
| 30. AC UNIT/Motor Frozen | GRIFFIN SERVICE A/C | | $8,000 |
| 33. TOW PENDANT/Tow to yard-old one dried | GATOR SUPPLY | 0007867 | $777 |
| 34. HAWSER, ANCHOR CABLE, SHACKLES, | GATOR SUPPLY | 0007908 | $15,892 |
| 41. MICROPHOR TANK | CL ASSOCIATES | 0008065 | $3,100 |
| 42. PV VALVES | TIMCO INDUSTRIES | 0008000 | $11,500 |
| 45. 8" BUTTERFLY VALVES | FREEDOM CONTROLS | 0007975 | $7,350 |
| 52. INSTALL CRANES, CAPTAIN & | SOUTHERN CRANE | | $7,500 |
| 54. (2) JD 50 KW GEN SETS | FLAG SERVICES | 0008129 | $48,000 |
| 69. SUPERVISION EXPENSES | SUPERVISON EXPENSES | | $30,000 |
| 70. MOB/DEMOB | SMITH MARITIME | 0008077 | $149,909 |
| 71. MOB/DEMOB | GER TOWING/STAGG MARINE | | $7,500 |
| | | | |
| | | | TOTAL: |
| | | | $ 734,346.00 |

Document Number: 482764.1

Exhibit 7
No.1:07-1030 (RCL)
Page 79

## SHIPYARD COST RECAP
### VESSEL: ENERGY 8701

| WORK ITEM | | COST AMOUNT |
|---|---|---|
| **Section 1** | **GENERAL / STANDARD** | |
| 1,210 | DRY-DOCKING | $ 71,500.00 |
| 1,220 | SERVICES | $ 8,150.00 |
| 1,230 | CHEMIST CERTIFICATE | $ 6,930.00 |
| | | |
| **Section 3** | **HULL PROTECTING** | |
| 3,600 | HULL FENDERING SYSTEM | $ 34,614.00 |
| | | |
| **Section 4** | **GENERAL OUTFITTING FIXTURES** | |
| 4,210 | MANHOLES | |
| Claim 4.210 | Labor and o-rings to replace/renue 20 butterworth covers | $ 3,500.00 |
| 4,220 | WEATHER TIGHT & WATER TIGHT DOORS BUTTERWORTH COVERS | $ 3,500.00 |
| 4,230 | WEATHER TIGHT & WATER TIGHT HATCHES BUTTERWORTH COVERS | $ 3,500.00 |
| 4,240 | CARGO OIL TANK EXPANSION DOMES BUTTERWORTH COVERS | $ 5,000.00 |
| Claim 4.240 | Gaskets cost $5000.00 | |
| 4,550 | EMERGENGY HAWSER | $ 1,755.00 |
| | | |
| **Section 7** | **SHIP SERVICE PUMPS, PIPING & PLUMBING** | |
| 7,150 | TANK GAUGING AND OVERFILL PROTECTION | $ 26,736.00 |
| 7,490 | SANITARY SYSTEM | $ 2,310.00 |
| **Section 8** | **CARGO PUMPS & PIPING** | |
| 8,100 | 1. CARGO VALVES 6" | $ 6,760.00 |
| | 2. CARGO VALVE 3" | $ 2,535.00 |
| | 3. PV VALVES | $ 3,250.00 |
| | 6. SWING CHECK RENEWAL | $ 2,028.00 |
| | 7. RELIEF VALVES | $ 3,120.00 |
| 8,130 | CARGO PUMPS | $ 5,810.00 |
| 8,200 | 1. HIGH JET | $ 2,080.00 |
| | 2. VAPOR SYSTEM BUTTERFLY VALVE RENEWAL | $ 6,700.00 |
| | 3. VAPOR LINE DESSER COUPLING RENEWAL | $ 5,300.00 |
| 8,201 | REACH ROD STAND RENEWAL, PACKING | $ 5,000.00 |
| | 45 valves packing renewal $5000.00 | |
| | | |
| **Section 13** | **PAINTING AND COTHODIC PROTECTION** | |
| 13,000 | BLASTING AND PAINTING DUE TO LAYUP | $ 66,000.00 |
| | Apportioned amount TBD | |
| 13,800 | ANODES | $ 9,600.00 |
| | | |
| **Section 14** | **TESTING** | |
| | | |
| | **TOTAL** | |
| | TOTAL RECERT WORK ITEMS ITEMS | $ 286,678.00 |

### SHIPYARD CHANGE ORDER CLAIM
#### VESSEL: ENERGY 8701

| | WORK ITEMS | TOTAL | |
|---|---|---|---|
| CO #2 | ANCHOR WINDLASS INSTALLATION , Frozen seals and electric motor | $ | 8,230.00 |
| CO #6 | SCRAPE HULL/Marine, Growth from laying up | $ | 11,425.00 |
| CO#9 | MSD TANK R/R, Bacteria dried out | $ | 3,510.00 |
| CO #10 | ULLAGE VALVE INSTALLATION (MMC), Gauging system | $ | 11,720.00 |
| CO#15 B | STEEL REPAIRS AS PER GAUGING REPORT Accelerated deterioration | $ | 150,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUB TOTAL | |
| | TOTAL EXTRA WORK ITEMS | | |

Exhibit 7
No.1:07-1030 (RCL)
Page 81

# EXHIBIT 8

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-0945
Phone: (202) 372-3739
Fax: (202) 372-3975
Email: Joseph.E.Kramek@uscg.mil

5890
February 21, 2007

Mr. Lawrence I. Kiern
Winston & Strawn, LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817

Re: Hornbeck Offshore Transportation, LLC Administrative
Claim of September 12, 2006 for Damages Incurred to the
Barge ENERGY 8701

Dear Mr. Kiern:

I have reviewed the administrative claim you submitted on behalf of Hornbeck Offshore Transportation, LLC, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, and all other payment authorities that might apply in accordance with 33 C.F.R. Part 25. Regrettably, I must deny your claim. In arriving at this decision, I considered the information that you provided as well as the Coast Guard's information, including its rules and regulations.

Hornbeck's claim is predicated on the Coast Guard's decision not to extend the phase-out date on the certificate of inspection ("COI") of Hornbeck's single hull tank barge ENERGY 8701. Hornbeck challenged the Coast Guard's decision under the Administrative Procedures Act ("APA"). The District Court did not agree with the Coast Guard's interpretation of OPA 90's phase-out dates, and remanded the matter back to the Coast Guard. The Coast Guard subsequently decided to extend ENERGY 8701's COI. Hornbeck now seeks money damages for the loss of use of ENERGY 8701 during the pendency of the APA litigation. This is not a claim the Coast Guard can pay, however, because the United States has not waived sovereign immunity for tort claims based on the Coast Guard's exercise of its discretion in making a vessel certification decision.

If you disagree with this decision, you may commence an action in the appropriate United States District Court not later than six months after the date of the mailing of this notice. Alternatively, prior to commencing an action you may file a written request for reconsideration of this decision. Such a request should include legal or factual grounds supporting the relief requested and must be filed with this office within six months after the date of the mailing of this notice. If you have any questions concerning this matter please contact me at (202) 372-3739.

Sincerely,

ROBERT BRUCE
U.S. Coast Guard
Acting Chief, Office of Claims and Litigation
By direction of the Commandant

Exhibit 8
No. 1:07-1030 (RCL)
Page 1

# EXHIBIT 9

**Civil Action No. 1:07-1030 (RCL)**

*Hornbeck Offshore Transportation, LLC v. United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HORNBECK OFFSHORE TRANSPORTATION, LLC | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-1030 (RCL) |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

## JOINT SCHEDULING REPORT

The parties to this action through counsel hereby submit to the Court this Joint Scheduling Report and the parties' proposed scheduling orders. On August 23, 2007, in person, on August 28 and 29, 2007 by telephone, and subsequently by email, counsel for the parties conferred pursuant to Federal Rules of Civil Procedure 16(b) and 26(f) and Local Rule 16.3. The following matters are addressed in the order set forth in Local Rule 16.3(c):

1. <u>Nature of the Case</u>: The parties differ as to the Nature of the Case. Plaintiff submits that this is an action under the Federal Tort Claims Act ("FTCA") alleging damages in the amount of $6,578,789.65 caused by tortious conduct of the U.S. Coast Guard ("Coast Guard") which refused to assign the proper phase-out date for the barge ENERGY 8701 thereby causing it to be forced out of service from January 1, 2005 to September 30, 2006 contrary to law. Plaintiff previously challenged the Coast Guard's actions in an Administrative Procedure Act ("APA") – Freedom of Information Act ("FOIA") case (the "APA-FOIA Action"). Finding in favor of Plaintiff, the district court (Judge Kollar-Kotelly) held the Coast Guard's actions arbitrary, capricious, and otherwise not in accordance with law. *Hornbeck Offshore Transportation, LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37 (2006). The Government did not

Exhibit 9
No. 1:07-1030 (RCL)
Page 1

appeal that decision. Plaintiff now seeks damages including for loss of use of the barge and other injuries and damages caused by the tortious acts of the Coast Guard. In the APA-FOIA Action, the district court also ordered the Government to submit a new *Vaughn* Index. Because the Government decided not to appeal the ruling on the APA counts, as a practical matter the remaining FOIA issues were rendered moot. Plaintiff agreed to dismiss the FOIA count without prejudice to seeking the documents withheld by the Coast Guard in a subsequent proceeding. This is that subsequent proceeding.

The United States, on the other hand, submits that this is an action under the FTCA filed by the owner of a single-hull petroleum tanker barge, which seeks monetary damages allegedly resulting from the Coast Guard's administrative decision, which it based on its interpretation of the Oil Pollution Act of 1990 ("OPA 90"), to issue a phase-out date for the barge of January 1, 2005. Plaintiff previously challenged the Coast Guard's decision in an APA case. Finding in favor of Plaintiff, the district court held that the Coast Guard misinterpreted the statutory provisions of OPA 90 and remanded the matter to the Coast Guard for further action. *Hornbeck Offshore Transportation, LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37 (2006). Following remand, the Coast Guard applied a phase-out date of January 1, 2015. Plaintiff now seeks monetary damages allegedly resulting from the period when the single-hull tanker barge was unable to transport petroleum products due to the Coast Guard's administrative decision.

    2.    <u>Agreement Upon Factual and Legal Issues</u>: The parties have agreed to those factual and legal issues that can be agreed upon or narrowed.

    3.    <u>Assignment to Magistrate Judge</u>: The case should not be assigned to a magistrate judge for any purpose, including trial.

    4.    <u>Settlement</u>: The Parties have explored settlement and believe there is not a reasonable possibility of settling the case before the Court determines liability.

Exhibit 9
No. 1:07-1030 (RCL)
Page 2

5.   <u>Alternative Dispute Resolution</u>:  The parties believe the case will not benefit from the alternative dispute resolution procedures at this point.

6.  <u>Dispositive Motions</u>:   The parties differ concerning the timing and usefulness of dispositive motions.   The United States submits that this dispute should be resolved by a dispositive motion on the threshold legal issue of whether Plaintiff can bring a tort claim for money damages after its successful appeal of an administrative ruling.  Although the issue may be easy to articulate, the analysis will be complex.  The United States asserts that the Court's decision on a dispositive motion should occur before discovery for three reasons.   First, discovery is not necessary to the resolution of the threshold legal issue.   Second, judicial economy favors resolution of the motion before discovery because the Court would not need to decide issues relating to the assertion of the deliberative process privilege, the attorney-client privilege, and the protections of the attorney work-product doctrine.  Third, the Coast Guard would not have to consider whether it should waive any of these privileges until and unless the Court decided to hear the case on the merits.

The United States proposes that dispositive motions be filed on November 16, 2007, with briefing due to be completed on December 17, 2007.  The proposed dates reflect the complexity of the issues involved, the scheduling demands of counsel, and the previously scheduled international vacation for counsel for the United States.

Plaintiff believes that discovery is necessary now and should proceed forthwith because of the multiple affirmative defenses asserted by the Government and because Plaintiff bears the burden of proof.  Plaintiff believes the Government's proposed approach prejudices Plaintiff by postponing discovery unreasonably, denying Plaintiff discovery before the filing of dispositive motions, and furthermore, that waiting until November 16, 2007 to file motions without discovery as proposed by the Government could result in delaying discovery for another year if neither party prevails on the motions.

-3-

Exhibit 9
No. 1:07-1030 (RCL)
Page 3

Plaintiff submits that the Government missed its chance to submit the motion to dismiss that it now proposes to submit on November 16, 2007. Since the Government represents that there is a threshold legal issue about whether Plaintiff can bring a tort claim for damages after prevailing in the APA Action, then it should have filed a motion to dismiss instead of answering the Complaint. Moreover, since the Government represents that it does not believe there are any factual issues of dispute on liability, then if it wishes to submit a motion on the pleadings it should do it now, not on November 16, 2007. Since the Government proposes no discovery before "dispositive" motions, its proposal is for motions on the pleadings because Plaintiff will have not been afforded any discovery and will be in no position to submit a summary judgment motion as the Government proposes.

7.    Initial Disclosures: The parties agreed to make any additional initial disclosures by September 14, 2007. The Government agreed that Plaintiff's FTCA administrative claim to the Coast Guard submitted on September 12, 2006 satisfies Plaintiff's initial disclosure requirement.

8.    Discovery: The parties fundamentally disagree about whether discovery should begin before or after the Court decides the United States' dispositive motion. The parties agree that, as an initial matter, discovery should be limited to the issue of liability.

The parties disagree over how expeditiously this discovery can be accomplished. Plaintiff believes discovery can be accomplished quickly because as a result of the previous APA-FOIA Action there is a known quantity of documents. These are the documents from the previous APA claim which were produced by the Government, plus 64 pages of documents that the Coast Guard identified in its *Vaughn* Index and withheld as exempt from release in Plaintiff's related FOIA. (The Government originally asserted the internal deliberative FOIA exemption regarding 45 pages and the commercially sensitive exemption for the remaining 19 pages.) Plaintiff believes those documents are discoverable and should be produced as they relate

- 4 -

Exhibit 9
No. 1:07-1030 (RCL)
Page 4

directly to the relevant actions by the Coast Guard at issue and these actions will be the subject of Plaintiff's examinations of Coast Guard witnesses at deposition, etc. Plaintiff has proposed that the Government submit the documents to the Court for *in camera* review and has also offered to enter into a protective order governing the disclosure of the documents. Plaintiff sees no reason for the Government to continue to withhold the 19 pages previously withheld pursuant to the commercially sensitive exemption of FOIA when Plaintiff has offered a protective order.

Plaintiff believes that the production of these 64 pages of documents should be addressed forthwith as they are key to the prompt and orderly progress of discovery. Plaintiff believes that the Court should order the Government to submit for immediate *in camera* review and determination of the approximately 64 pages of documents responsive to Plaintiff's FOIA requests, but withheld. Failing that, Plaintiff proposes that the Court schedule a conference to resolve the production of these key documents forthwith.

Beyond the matter of these 64 pages of documents, Plaintiff also proposes the following discovery schedule: (a) September 14, 2007 – complete any remaining initial disclosures; (b) October 1, 2007 – serve initial discovery requests; (c) October 22, 2007 – respond to discovery request and produce remaining responsive materials for which there is no claim of privilege; (d) November 7-16, 2007 – Plaintiff will conduct depositions of Coast Guard and former Coast Guard witnesses in Washington, D.C.; (e) December 17, 2007 – parties file dispositive motions; (f) January 28, 2008 – parties file oppositions to dispositive motions. Further scheduling should then await the Court's determination of any dispositive motions. Of course, if the parties conclude that no dispositive motions will be filed, Plaintiff recommends that at that time the parties should so inform the Court and request a trial date.

By contrast, the United States submits that, if discovery on the issue of liability is necessary, the schedule should be six months to allow time for the following to occur: (1) a thorough search for all pertinent agency documents; (2) a determination by the Coast Guard

-5-

Exhibit 9
No. 1:07-1030 (RCL)
Page 5

whether to waive some or all of the privileges that may be asserted over certain documents; (3) the Court's *in camera* review of privileged documents and its determination of the applicability of asserted privileges; and (4) the depositions of current and former Coast Guard employees.

    9.    <u>Experts</u>:  Neither Plaintiff nor the United States intends to retain experts during the liability phase.

    10.    <u>Class Action</u>: This is not a class action.

    11.    <u>Bifurcation</u>:  The parties have agreed to bifurcate the case and propose to postpone any consideration of damages until after the Court has determined liability.

    12.    <u>Pretrial</u>: A pretrial conference need not be scheduled at this time.

    13.    <u>Trial</u>: A firm trial date need not be set.

Dated: September 3, 2007

Respectfully submitted,

| _____/s/_____ | _____/s/_____ |
|---|---|
| WINSTON & STRAWN LLP | Rodney Patton |
| Lawrence I. Kiern #441154 | John S. Luce Jr. |
| Thomas L. Mills #911495 | Trial Attorneys, Civil Division |
| Gerald A. Morrissey III #488730 | Torts Branch |
| 1400 L Street, N.W. | Aviation and Admiralty Litigation |
| Washington, D.C. 20005-3502 | P.O. Box 14271 |
| (202) 282-5811 (direct) | Washington, D.C. 20044-4271 |
| (202) 282-5950 (fax) | (202) 616-4035 (direct) |
| Email - lkiern@winston.com | (202) 616-4159 (fax) |
|       tmills@winston.com | Email – rodney.patton@usdoj.gov |
|       gmorrissey@winston.com |       john.luce@usdoj.gov |

*Attorneys for Plaintiff Hornbeck*
*Offshore Transportation, LLC*

*Attorneys for the United States*

Exhibit 9
No. 1:07-1030 (RCL)
Page 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORNBECK OFFSHORE<br>TRANSPORTATION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:07-cv -1030 (RCL)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S PROPOSED ORDER

UPON CONSIDERATION of the parties' Rule 16.3 Report, it is this _____ day of

_____, 2007 hereby

ORDERED, that the Defendant will submit for *in camera* review and determination by

the Court the approximately 64 pages of documents responsive to Plaintiff's FOIA requests and

identified in Defendant's *Vaughn* Index, but withheld by Defendant on the internal deliberative

and commercially sensitive exemptions.

ORDERED, further that the following schedule shall apply to this case:

(a) September 14, 2007 – complete any remaining initial disclosures;

(b) October 1, 2007 – serve discovery requests;

(c) October 22, 2007 – respond to discovery requests and produce responsive materials

for which there is no claim of privilege;

(d) November 7-16 – Plaintiff will conduct depositions of Coast Guard witnesses in

Washington, D.C.;

(e) December 17, 2007 – parties file dispositive motions;

(f) January 28, 2008 – parties file oppositions to dispositive motions.

Exhibit 9
No. 1:07-1030 (RCL)
Page 7

Further scheduling will follow the Court's determination of dispositive motions.  If the parties conclude that no dispositive motions will be filed, they should so inform the Court and request a trial date.

Dated: _____

_____
Royce C. Lamberth
United States District Court Judge

cc:

Lawrence I. Kiern #441154
Thomas L. Mills #911495
Gerald A. Morrissey #488730
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5811 (direct)
(202) 282-5100 (fax)

*Attorneys for Plaintiff Hornbeck*
*Offshore Transportation, LLC*

Rodney Patton
John S. Luce Jr.
Trial Attorneys, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P.O. Box 14271
Washington, D.C. 20044-4271
(202) 616-4035 (direct)
(202) 616-4159 (fax)
Email – Rodney.patton@usdoj.gov
        john.luce@usdoj.gov
*Attorneys for Defendant United States*

-2-

Exhibit 9
No. 1:07-1030 (RCL)
Page 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORNBECK OFFSHORE ) <br> TRANSPORTATION, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 1:07-cv -1030 (RCL) |

### DEFENDANT'S PROPOSED ORDER

**UPON CONSIDERATION** of the parties' Rule 16.3 Report, it is this _____ day of

_____, 2007 hereby

**ORDERED,** that all discovery is stayed and the following schedule shall apply to this

case:

(a) November 16, 2007 – dispositive motions filed;

(b) December 10, 2007 – oppositions filed;

(c) December 17, 2007 – reply briefs filed.

Further scheduling, if necessary, will follow the Court's determination of dispositive

motions.

Dated: _____

_____
Royce C. Lamberth
United States District Court Judge

Exhibit 9
No. 1:07-1030 (RCL)
Page 9

cc:

Lawrence I. Kiern #441154
Thomas L. Mills #911495
Gerald A. Morrissey #488730
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5811 (direct)
(202) 282-5100 (fax)

*Attorneys for Plaintiff Hornbeck
Offshore Transportation, LLC*

Rodney Patton
John S. Luce Jr.
Trial Attorneys, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P.O. Box 14271
Washington, D.C. 20044-4271
(202) 616-4035 (direct)
(202) 616-4159 (fax)
Email – Rodney.patton@usdoj.gov
          john.luce@usdoj.gov
*Attorneys for Defendant United States*

2

Exhibit 9
No. 1:07-1030 (RCL)
Page 10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this third day of September 2007 I electronically filed the

foregoing JOINT SCHEDULING REPORT, PLAINTIFF'S PROPOSED ORDER and

DEFENDANT'S PROPOSED ORDER with the Clerk of the Court by using the CM/ECF

system which will send a notice of electronic filing to the following:

Rodney Patton
John S. Luce, Jr.
Trial Attorneys, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P.O. Box 14271
Washington, D.C. 20044-4271
(202) 616-4035 (direct)
(202) 616-4159 (fax)
Email – rodney.patton@usdoj.gov
            john.luce@usdoj.gov

Pursuant to the Order of August 8, 2007, the Proposed Scheduling Orders have also been

submitted in Microsoft Word format by email to RCL_ECF@dcd.uscourts.gov.

DC:529192.1

_____/s_____
Gerald A. Morrissey III

Exhibit 9
No. 1:07-1030 (RCL)
Page 11

# EXHIBIT 10

**Civil Action No. 1:07-1030 (RCL)**
*Hornbeck Offshore Transportation, LLC v. United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **HORNBECK OFFSHORE** | ) | |
| **TRANSPORTATION, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-1724 (CKK)** |
| | ) | |
| **UNITED STATES COAST GUARD, et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**JOINT SCHEDULING REPORT**</u>

Now come the parties to this action through counsel and submit to the Court this Joint

Scheduling Report and Proposed Scheduling Order.  On December 10, 2004, and January 6,

2005, counsel for the parties conferred pursuant to Federal Rules of Civil Procedure 16(b) and

26(f) and Local Rule 16.3.  The following matters are addressed in the order set forth in Local

Rule 16.3(c):

1.     <u>Nature of the Case</u>:  This action seeks judicial review of the decisions of

Defendants United States Coast Guard and United States of America ("Defendants") under the

Oil Pollution Act of 1990, the Administrative Procedure Act ("APA"), and the Freedom of

Information Act ("FOIA").  Plaintiff Hornbeck brought this action alleging Defendants

erroneously assigned a phase-out date of January 1, 2005 for the tank barge Energy 8701.

Defendants deny the allegations.

2.     <u>Agreement Upon Factual and Legal Issues</u>:  The parties have agreed to those

factual and legal issues that can be agreed upon or narrowed.

Exhibit 10
No. 1:07-1030 (RCL)
Page 1

3.    <u>Assignment to Magistrate Judge</u>:  The case should not be assigned to a magistrate judge for any purpose, including trial.

4.    <u>Settlement</u>:  The Parties have explored settlement and believe there is not a reasonable possibility of settling the case.

5.    <u>Alternative Dispute Resolution</u>:  The parties believe the case will not benefit from the alternative dispute resolution procedures.

6.    <u>APA Dispositive Motion</u>:  With respect to the APA aspects of the case, the parties believe that the case can be resolved by summary judgment.  The parties propose that the Plaintiff file a dispositive motion by January 19, 2005, that the Defendants file a cross- motion by February 17, 2005 and the Plaintiff may reply by March 17, 2005.  Plaintiff requests expedited briefing and disposition of the matter because it believes it is incurring damages in excess of $10,000.00 per day because it cannot use the tank barge ENERGY 8701.

7.    <u>Initial Disclosures</u>:  Defendants filed a certified copy of the administrative record on December 16, 2004.

8.    <u>Discovery and FOIA Dispositive Motion</u>:  Plaintiff may file an amended complaint to add an additional cause of action concerning its FOIA request of September 30, 2004.  The Plaintiff believes that the Court should order the Defendants to submit for immediate in camera review and determination the 31 pages of documents responsive to Plaintiff's FOIA requests, but withheld by the Defendants based on the "predecisional," "intra-agency communications," "deliberative process," and "attorney-client" privileges.

At this point, Plaintiff believes that discovery will be limited to the aforementioned documents concerning the FOIA requests.  However, Plaintiff reserves its right to reconsider this

2

Exhibit 10
No. 1:07-1030 (RCL)
Page 2

issue depending on the results of the FOIA aspect of this case and any new documents that come to light or fail to come to light.

The Defendants believe that discovery is not appropriate in this case because the case involves judicial review under the APA and FOIA. Under the APA, the Court reviews the administrate record to determine if the decision of the agency is supported by the record and is neither arbitrary, capricious or contrary to law. The Defendants have filed a copy of the certified record for the Court's review under the APA. The Plaintiff has not and cannot demonstrate the extraordinary circumstance which would be necessary before a Court would entertain a request for discovery in an APA case.

Similarly, the Defendants believe FOIA was not designed to benefit private litigants by serving as a supplement to the rules of discovery. This is would apply with particular force where discovery in an APA case is not permitted except in extraordinary circumstances not found here.

The Defendants will file a motion for summary judgment on Plaintiff's FOIA claim together with a <u>Vaughn</u> affidavit and index on February 17, 2005. The Plaintiff will file an opposition on March 17, 2005 and Defendants will reply on or before March 28, 2005. The Defendants do not believe an <u>in camera</u> review of the documents is necessary at this time.

9.    <u>Experts</u>: Expert reports will not be required.

10.    <u>Class Action</u>: This is not a class action.

11.    <u>Bifurcation</u>: Not applicable.

12.    <u>Pretrial</u>: A pretrial conference need not be scheduled.

13.    <u>Trial</u>: A firm trial date need not be set.

3

Exhibit 10
No. 1:07-1030 (RCL)
Page 3

Respectfully submitted,

---

LAWRENCE I. KIERN Bar #441154
GERALD MORRISSEY Bar #488730
Winston & Strawn
1400 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 371-5700
Facsimile: (202) 371-5950

Plaintiff's Counsel

---

KENNETH L. WAINSTEIN, DC Bar #451058
UNITED STATES ATTORNEY

---

R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney

---

DIANE M. SULLIVAN DC Bar #12765
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W., Room E4919
Washington, D.C. 20530
Telephone: (202) 514-7205
Facsimile: (202) 514-8780

Defendants' Counsel

Exhibit 10
No. 1:07-1030 (RCL)
Page 4

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **HORNBECK OFFSHORE TRANSPORTATION, LLC** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:07-1030 (RCL)** **Judge Lamberth** |
| **UNITED STATES OF AMERICA** | ) ) | |
| **Defendant.** | ) ) ) | |

## ORDER

Having considered the Motion to Dismiss filed by the United States of America, the
Opposition to this Motion filed by the Plaintiff, the Reply filed by the United States of America,
and the oral argument of the parties, **IT IS HEREBY ORDERED**, that the Motion to Dismiss
filed by the United States of America is **DENIED**.

      **SO ORDERED:**

              By the Court:

             _____

             Royce C. Lamberth
             United States District Court Judge

cc:

Lawrence I. Kiern
Thomas L. Mills
Gerald A. Morrissey
WINSTON & STRAWN, LLP
1700 K Street NW
Washington, D.C. 20006
(202) 282-5211 (direct)
(202) 282-5100 (fax)

Rodney Patton
John S. Luce Jr.
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
Aviation and Admiralty Litigation
P.O. Box 14271
Washington, D.C. 20044-4271
(202) 616-4105 (direct)
(202) 616-4002 (fax)

*Attorneys for Plaintiff,*
*Hornbeck Offshore Transportation, LLC*

*Attorneys for Defendant,*
*United States of America*

DC:540034.1