**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HORNBECK OFFSHORE TRANSPORTATION, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:07-cv-01030 ) Judge Lamberth |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) |

**UNITED STATES' REPLY TO PLAINTIFF'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN OPPOSITION TO THE UNITED STATES'**
**MOTION TO DISMISS UNDER RULE 12(b)(1) OR 12(b)(6)**

Hornbeck's FTCA claim should be dismissed because it failed to proffer a viable private-party analog for the Coast Guard's allegedly negligent or wrongful acts, failed to demonstrate why the FTCA's statute of limitations had not run by the time it filed this claim, and failed to come up with a viable reason why the Court should not bar this tort claim through application of the doctrine of claim preclusion. Each of these arguments are set forth below and in the United States' initial submission.

**I.    NO PRIVATE PARTY ANALOG EXISTS FOR HORNBECK'S PUTATIVE TORT CLAIM.**

As the United States argued in its initial memorandum, Hornbeck's Complaint must be dismissed because no private-party analog exists to support its FTCA claim based on the Coast Guard's misinterpretation of a federal statute. (Doc. 11-2, U.S. Mem. at 9-20). Hornbeck consumes a great deal of its opposition – twenty pages – in responding to this argument, but it comes up with only three possible private-party analogs: (1) the Coast Guard's allegedly negligent or wrongful conduct resulted from a voluntary undertaking; (2) the agency's actions constituted trespass to

chattels; and (3) the Coast Guard's decision is similar to those cases where courts have found that the government could be liable for failing to properly issue licenses. None of these proposed private party analogs is applicable to the facts of this case.

### A. The Coast Guard's Interpretation of the Pertinent Statute Does Not Constitute An Undertaking.

Hornbeck proffers as a private-party analog the legal rule that imposes a "duty of due care when a defendant undertakes to perform an act and injury to the defendant is reasonably foreseeable." (Doc. 12, at 19). Hornbeck is referring to what "has been variously termed" as the "doctrine of negligent rescue," "the good Samaritan rule," or the doctrine of "volunteer liability." Indian Towing Co. v. United States, 350 U.S. 61, 64-65 (1955); Federal Ins. Co. v. Thomas W. Perry, Inc., 634 F. Supp. 349, 353 (D.D.C. 1986); Warren v. District of Columbia, 444 A.2d 1 (D.C. 1981). This long-recognized doctrine is "presently expressed" in the Second Restatement of Torts, sections 323 and 324A. Federal Ins. Co., 634 F. Supp. at 353; Restatement (Second) of Torts §§ 323, 324A (1965).

According to the Second Restatement,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965). Section 324A makes the same actor liable under the same circumstances when rendering "services to another" that the actor "should recognize as

necessary for the protection of a third person or his things." <u>Id.</u> § 324A.[1]

"Although the local District of Columbia courts have not formally adopted the Restatement, these two provisions [sections 323 and 324A] have been cited with approval by both the D.C. Court of Appeals and the D.C. Circuit Court of Appeals." <u>Service Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc.</u>, 83 F. Supp.2d 70, 92 (D.D.C. 1999), <u>rev'd on other grounds by</u> 249 F.3d 1068 (D.C. Cir. 2001); <u>see</u> also, e.g., <u>Long v. District of Columbia</u>, 820 F.2d 409, 418-19 (D.C. Cir. 1987); <u>Arnold's Hofbrau, Inc. v. George Hyman Constr. Co., Inc.</u>, 480 F.2d 1145, 1148 (D.C. Cir. 1973); <u>Haynesworth v. D.H. Stevens Co.</u>, 645 A.2d 1095, 1097-98 (D.C. 1994); <u>Warren v. District of Columbia</u>, 444 A.2d 1, 11 (D.C. 1981).

Hornbeck argues that the Coast Guard's negligence arises out of its undertaking to conduct vessel inspections necessary for the issuance of Certificates of Inspection for the benefit of vessel owners, activities Hornbeck claims private entities such as marine surveyors and classification societies also perform. (Doc. 12, at 26). "The foundation of the good [S]amaritan rule is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently." <u>Patentas v. United States</u>, 687 F.2d 707, 716 (3d Cir. 1982) (adopting the "Restatement formulation in full"). Hornbeck has not alleged that the Coast Guard negligently inspected its vessel. (Doc. 1). Nor did Hornbeck allege that the Coast Guard negligently withheld its Certificate of Inspection. (Doc. 1). Instead, the alleged negligence is the "Coast Guard's lack of due care . . . in assigning an improper phase-out date for the Barge and failing to apply the proper phase-out date for the Barge." (Doc. 1, Compl. ¶ 6). This failure was an automatic consequence of the Coast Guard's misinterpretation of the pertinent statute. <u>Hornbeck Offshore Transp. LLC v.</u>

---

[1] This section also adds another ground for liability when the actor undertakes "to perform a duty owed by" another to the third person. Restatement (Second) of Torts § 324A (1965).

United States Coast Guard, 424 F. Supp.2d 37, 52 (D.D.C. 2006) ("The Agency's failure to recognize the plain language and meaning of [the pertinent statute] *ensured* that it gave ENERGY 8701 an incorrect phase-out date of January 1, 2005."). This makes the allegedly actionable conduct the misinterpretation of the statute, not the withholding of the Certificate of Inspection with a correct phase-out date. Cf. Hitchcock v. United States, 665 F.2d 354, 359-60 (D.C. Cir. 1981) (finding that, in a case involving a nurse in Virginia who followed established protocol when administering a vaccine, the allegedly negligent protocol for which was developed in the District of Columbia, the only "relevant" act was the development of the protocol).

The agency's decision that a phase-out date earlier than the one Hornbeck sought is simply not a voluntary undertaking by the Coast Guard. Congress entrusted the Coast Guard to administer the Oil Pollution Act of 1990. See 46 U.S.C. § 3703 (2000); (Doc. 1, Compl. ¶5). As part of its administration of this statute, the Coast Guard is charged by Congress with the responsibility of implementing the statutory mandate that single-hull tank vessels (including barges) that were in existence in 1990 must be equipped with double hulls by a certain date or be phased out of service based on an enumerated statutory schedule. See 46 U.S.C. § 3703a; Hornbeck, 424 F. Supp.2d at 39; Doc. 1, ¶ 7. The phase-out schedule is based on a vessel's gross tonnage, hull design, and construction date. See 46 U.S.C. § 3703a; Hornbeck, 424 F. Supp.2d at 39; Doc. 1, ¶ 7. Hornbeck is not alleging that the Coast Guard negligently conducted an inspection or otherwise negligently calculated the vessel's actual gross tonnage or its design or construction date. (Doc. 1). Instead, as noted, the alleged negligent act is the Coast Guard's misinterpretation of the pertinent statute when determining which of the statutorily imposed phase-out dates applied to the tank barge. That

4

decision did not arise from a voluntary undertaking to issue phase-out dates for tank barges.[2]

The facts of this case should be compared with the classic situations in which a federal government agency has actually undertaken to perform a service for the benefit of others. See, e.g., Indian Towing Co v. United States, 350 U.S. 61, 64-65, 69 (1955) (undertaking to warn mariners of danger through the operation of a lighthouse); United States v. DeVane, 306 F.2d 182, 186 (5th Cir. 1962) (undertaking to perform a maritime rescue). Even in other less-common situations, the government's undertaking is evident. See, e.g., Sowell v. United States, 835 F.2d 1133, 1134-35 (5th Cir. 1988) (government could be liable for negligently processing a soldier's life insurance allotment form, having undertaken to perform this service for him).

The case at bar is much more akin to the precedent cited by the United States in its initial memorandum that found no private-party analog when the agency's actions involved such quasi-adjudicative determinations. U.S. Mem. at 15-19; Central Airlines, Inc. v. United States, 169 F.3d 1174, 1175 (8th Cir. 1999). In that case, the Federal Aviation Administration (FAA) informed an airline that its aircraft did not comply with federal regulations. Id. Although the airline "protested the FAA's interpretation of the applicable regulations," the airlines took the steps necessary to comply with the FAA's interpretation. Id. "The FAA later admitted that it had incorrectly

---

[2] Hornbeck devotes a scant three sentences to the argument that a misinterpretation of a statute is an actionable tort under the FTCA. (Doc. 12, at 10). The cases Hornbeck cites in support are easily distinguishable. Hatahley v. United States, 351 U.S. 173 (1956); Devlin v. United States, 352 F.3d 525 (2d Cir. 2003); Tri-State Hosp. Supply Corp. v. United States, 341 F.3d 571 (D.C. Cir. 2003). In Hatahley the federal range agents ignored the applicable statute – rather than misinterpreting it – when conducting their round-up and sale of horses belonging to Native Americans. Hatahley, 351 U.S. at 174-180. In Devlin the court remarked that "legal malpractice" is cognizable under the FTCA. Devlin, 352 F.3d at 536. Hornbeck has not alleged that the Coast Guard committed legal malpractice for which it could be compensated. (Doc. 1). Finally, in Tri-State Hosp. Supply Corp., the private-party analog was malicious prosecution and/or abuse of process. Tri-State Hosp. Supply Corp., 341 F.3d at 573, 576-77. Hornbeck has made no such claims here.

interpreted the regulations." Id. The airline filed an FTCA claim based on the FAA's failure to fairly and accurately interpret and enforce the governing regulations. Id. The court held that the local tort law did "not recognize a negligence cause of action analogous to [the airline's] claim against the FAA for misinterpreting FAA regulations." Id.[3]

### B.    Hornbeck Does Not Have a Cognizable Claim for Trespass to Chattels.

Hornbeck argues that the Coast Guard committed a trespass to its chattel (the barge) when it decided that its phase-out date would be 2005 and not 2015. (Doc. 12, at 21-22).[4] Hornbeck is correct that the FTCA allows claims for trespass to chattels against the United States and that the District of Columbia recognizes such a tort. Hornbeck is wrong, though, about the applicability of this ancient intentional tort to the Coast Guard's decision in Washington, D.C. to assign an erroneous phase-out date for a tank barge located hundreds of miles away in Louisiana.

The Circuit Court of Appeals for the District of Columbia, while applying the District's tort law, quoted approvingly from and cited to the Restatement's formulation for the specified ways in which a trespass to chattel can occur. See Pearson v. Dodd, 410 F.2d 701, 707 & n.30 (D.C. Cir. 1969). According to the Second Restatement, "[a] trespass to a chattel may be committed by

---

[3] The FAA had also conducted an inspection of the aircraft. Id. The court did not rule upon the airline's theory of liability based on the FAA's negligent inspection of the aircraft because that theory was not presented below. Central Airlines, Inc., 169 F.3d at 1175. Here, Hornbeck has not alleged that the Coast Guard did anything negligent during any inspection of the barge.

[4] Hornbeck also notes that the D.C. Circuit Court of Appeals "recognized a similar tort action against the Coast Guard for arbitrary acts . . . that interfered with the use of a vessel." (Doc. 12, at 22 (citing Canadian Transp. Co. v. United States, 663 F.2d 1081 (D.C. Cir. 1980)). What Hornbeck does not tell the Court is that it was an admiralty case, not an FTCA case, and that the private-party analog under the Suits in Admiralty Act – not disputed by either party – was "intentional interference with contractual rights." Id. at 1091 & n.7 & 28. Such a private-party analog is not cognizable in an FTCA claim because it is one of the specifically enumerated exceptions to the waiver of sovereign immunity. See 28 U.S.C. § 2680(h) (2000). This case thus provides no support for Hornbeck's argument.

intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."  Restatement (Second) of Torts § 217 (1965).

In its opposition, Hornbeck did not argue that the United States had dispossessed it of its chattel or that the United States had used the chattel; instead, Hornbeck argued that the United States had "intentionally intermeddle[d]" with its barge.  (Doc. 12, at 21).  The Second Restatement states that "'[i]ntermeddling' means intentionally *bringing about a physical contact* with the chattel.  The actor may commit a trespass by an act which brings *him* into an *intended physical contact with a chattel in the possession of another . . .*"  Restatement (Second) of Torts § 217 cmt. e (1965) (emphasis added).

Courts have interpreted this comment so as to require that there be some "physical contact" by or on behalf of the alleged trespasser.  See, e.g., Universal Tube & Rollform Equip. Corp. v. Youtube, Inc., 504 F. Supp.2d 260, 267-69 (N.D. Ohio 2007); MCI Worldcom Network Servs., Inc. v. W.M. Brode Co., 411 F. Supp.2d 804, 810 (N.D. Ohio 2006); America Online, Inc. v. LCGM, Inc., 46 F. Supp.2d 444, 452 (E.D. Va. 1998); Compuserve Inc. v. Cyber Promotions, Inc., 962 F. Supp.2d 1015, 1021 (S.D. Ohio 1997); Woodis v. Oklahoma Gas & Elec. Co., 704 P.2d 483, 485 (Okla. 1985).

The authorities cited by Hornbeck in its opposition are not to the contrary because each involved a physical contact of some sort with the chattel.  See, e.g., Hatahley v. United States, 351 U.S. 173, 175-76, 180-81 (1956) (physical contact with the owners' horses); Black v. Sheraton Corp. of America, 564 F.2d 531, 534-35, 540 (D.C. Cir. 1977) (suit for "physical trespass" arising out of the FBI's installation of a hidden microphone); Downs v. United States, 522 F.2d 990, 1003-04 (6th Cir. 1975) (trespass was "forcibly" disabling an aircraft during a hijacking); Pearson v. Dodd, 410 F.2d 701, 703 (D.C. Cir. 1969) (physically moving and copying the chattels); Ira S. Bushey & Sons,

Inc. v. United States, 276 F. Supp. 518, 521, 526 (E.D.N.Y. 1967) (trespass to chattels when seaman physically "opened several floodgate valves" of the plaintiff's drydock").

Hornbeck has not – and cannot – allege the requisite "physical contact" in this case when the Coast Guard's decision occurred in the District of Columbia and the chattel itself was presumably hundreds of miles away.  As a result, Hornbeck's assertion of trespass to chattels as a private-party analog must fail.

### C.     The Licensing Cases Cited By Hornbeck Do Not Provide A Private-Party Analog in this Case.

Without specifying an applicable private-party analog, Hornbeck argues that this Court has jurisdiction over its claim because some courts have determined that the improper failure to issue a license or permit constituted actionable conduct.  (Doc. 12, at 8-9 (citing cases)).  We turn to the cases from this jurisdiction first.  See Harr v. United States, 705 F.2d 500 (D.C. Cir. 1983); Beins v. United States, 695 F.2d 591 (D.C. Cir. 1982); Hicks v. United States, 511 F.2d 407 (D.C. Cir. 1975);[5] Duncan v. United States, 355 F. Supp. 1167 (D.D.C. 1973).  The United States has detailed the facts of Harr, Beins, and Duncan in its initial memorandum.  (Doc 11-2 at 19-20).  Put succinctly, the allegations in each case were that there was no reasonable *medical basis* under the established regulatory criteria to support the denial of the aeromedical certificates.  (Doc 11-2 at 19-20).

Subsequent to the decisions in these three cases, the Circuit Court of Appeals for the District

---

[5] In this case, the parents of a woman who had been killed by her husband brought a negligence action against the United States alleging that the Hospital, which was an agent of the government, had negligently failed to make a full report to the court that discharged the husband from a psychiatric hospital.  Hicks, 511 F.2d at 409, 413.  The appellate court affirmed the district court's judgment for the plaintiffs which determined that the negligence arose from the "*violation of medical duty*."  Id. at 413 (emphasis added).  The court's articulation of the source of the duty in that case is sufficient to demonstrate that Hornbeck's reliance is misplaced.

of Columbia has criticized <u>Harr</u> and <u>Beins</u> (and by implication <u>Duncan</u> because all three cases have the same error) for failing to articulate the applicable private-party analog to the purportedly actionable conduct. <u>Art Metal-USA, Inc. v. United States</u>, 753 F.2d 1151, 1158-59 (D.C. Cir. 1985). In that case the court was faced with the issue of whether there was a private-party analog for an agency officials' conduct, leading to the severance of a government contractor's long-term contractual arrangement. <u>Id.</u> at 1153. The court had this to say about the cases Hornbeck cited:

> Contrary to Art Metal's suggestions, two recent decisions by this court do not assist us in resolving the issues raised in this case. Here we squarely address the relationship between a violation of federal regulations and a claim of negligence under local law. In neither <u>Beins</u> nor <u>Harr</u> did the court mention the particular local tort law duty that was allegedly breached by the violation of federal regulations. . . . . Since the relationship between the federal regulations and the local tort law was not discussed, . . . <u>Harr</u> and <u>Beins</u> shed no light on the determination of whether the acknowledged breach of the federal regulations in *this* case is a tort cognizable under District of Columbia law.

<u>Art Metal-USA, Inc.</u>, 753 F.2d at 1158 (emphasis in original) (citations omitted). Similarly, the three FAA aeromedical certificate cases Hornbeck relies upon do not assist this court in resolving the issue of what local tort law supplies the duty allegedly breached by the Coast Guard's misinterpretation of the statute. Regardless of whether there is actually a private-party analog for the agency's negligence in the aeromedical cases, there is no such analog for a government agency misinterpreting a statute it is charged with administering and enforcing.

The cases Hornbeck relies on from outside this jurisdiction can be readily dispatched. (Doc. 12, at 8-9).[6] In <u>Hendry v. United States</u>, 418 F.2d 774 (2d Cir. 1969), a ship's officer sought damages arising out of a government psychiatrist and psychologist's alleged negligence, which

---

[6] Hornbeck also cites a Supreme Court case for the proposition that the negligent issuance of a vaccine license is actionable. (Doc. 12, at 8 (citing <u>Berkovitz v. United States</u>, 486 U.S. 531 (1988)) The issue of the pertinent private-party analog was not before the Supreme Court. <u>Id.</u> at 535 n.2.

resulted in the Coast Guard not issuing him a license. Id. at 777-78, 783. The court applied the local tort law for medical malpractice because the complaint challenged "the way in which the Coast Guard and the Public Health Service applied medical principles to his case." Id. at 783-84. Like the other cases involving medical principles, this case is inapposite here because there is no similar tort law that is applicable.

Hornbeck cites Fireman's Fund Ins. Co. v. United States, 527 F. Supp. 328 (E.D. Mich. 1981) for the proposition that the negligent issuance of [an] FAA certificate" is actionable. (Doc. 12, at 9). This is just wrong. The case involved the government's assertion of the discretionary function exception to claims arising out of its allegedly negligent certification of an aircraft that subsequently crashed. Id. at 329-31.

Hornbeck also cites Dupree v. United States, 247 F.2d 819 (3d Cir. 1957) to no avail. In that case, a licensed ship's master was denied a security clearance and brought an FTCA suit, alleging that "insufficiencies in the [Coast Guard's] administrative procedure" caused him harm. Id. at 822-23. The court concluded that, with no allegation of lack of due care in the application of the regulations to the master, the case was barred. Id. at 825. The court did not analyze what local tort law would provide the analog in the event a lack of due care was alleged.[7]

Finally, Hornbeck relies on In re Sabin Oral Polio Vaccine Prods. Liab. Litig., 763 F. Supp.

---

[7] Hornbeck cites Pennsylvania R.R. Co. v. United States, 124 F. Supp. 52 (D.N.J. 1954) for the proposition that the Coast Guard's "negligent issuance" of a permit is actionable. (Doc. 12, at 9). That case arose out of an explosion that occurred while a shipment of explosives was being loaded onto vessels. Id. at 57. The plaintiffs alleged that the Coast Guard negligently issued a permit without verifying the facts and undertook to supervise the loading of the explosives and then failed to do so properly. Id. at 58, 61, 64-66. Although the court found that the agency's supervision was a voluntary undertaking, it made no specific finding regarding the private-party analog as to issuing the permit. Id. at 66, 68.

811 (D. Md. 1991) for the proposition that the "violation of regulations governing license of [a] polio vaccine constituted negligence." (Doc. 12, at 9). In that case injured plaintiffs brought suit against the United States contending that the appropriate federal entity had been negligent in approving the release to the public of this particular vaccine. Id. at 813. The court found that the federal agency's "critical error" was in electing to ignore the applicable federal regulations rather than seeking to amend them. Id. at 825. Although the district court does not discuss the applicable private-party analog in the case cited by Hornbeck, the court did so in a subsequent case. *In re* Sabin Oral Polio Vaccine Prods. Liab. Litig., 774 F. Supp. 952 (D. Md. 1991). In that case the court spelled out that the applicable analog was the good Samaritan doctrine because the government had voluntarily undertaken to regulate and inspect a potentially hazardous condition for the benefit of others. Id. at 954-55. No such undertaking is present here.

## II.    THE STATUTE OF LIMITATIONS BARS HORNBECK'S FTCA CLAIM.

Hornbeck's FTCA claim is barred by the statute of limitations because it accrued on March 29, 2004, more than two years before its administrative claim was presented, when Hornbeck knew of the harm to its property interest, suffered an immediate diminution in value of the barge, and knew who caused the harm. In its opposition to the United States' motion on this issue, Hornbeck presented third arguments: (1) its FTCA claim did not accrue until March 2006 when the APA decision was issued; (2) Hornbeck did not suffer any injury and damages until "the end of 2004"; and (3) its injury could not occur until after final agency action in September 2004. Each of these arguments will be addressed in turn.

### A.    The APA Decision Was Not a Legal or Factual Predicate to the FTCA Claim.

Hornbeck argues that its "legal injury did not accrue until" the APA decision was issued on "March 27, 2006, when this Court determined the Agency's conduct wrongful." (Doc. 12, at 28).

11

This argument is without merit for two reasons. First, as to the agency's legal error in misinterpreting the statute, this was not a legal predicate because the Court in this FTCA claim can determine the plain meaning of the pertinent statutory language just the same as the Court in the APA claim did. Courts make such determinations all the time.

Second, as to the APA Court's determination that the agency acted arbitrarily and capriciously, this finding does not establish a necessary predicate to the FTCA claim because such a determination does not lead inexorably to a finding of negligence. Cf. Beins v. United States, 695 F.2d 591, 598 (D.C. Cir. 1982) (finding that an APA claim that determines whether the agency acted in an "arbitrary and capricious" manner is "distinct conceptually from a finding of negligence, the linchpin of the FTCA").

The principal case Hornbeck relies upon is easily distinguishable. See Slaaten v. United States, 990 F.2d 1038 (8th Cir. 1993).[8] In Slaaten an oil and mineral rights claimant filed a letter of protest asserting that the United States had been converting royalty payments owed to her for decades. Slaaten, 990 F.2d at 1039-41. The agency determined that the United States properly held the mineral rights pursuant to the language of the claimant's deed, a determination that was

---

[8] Hornbeck also cites Hartford Life Ins. Co. v. Title Guar. Co., 520 F.2d 1170 (D.C. Cir. 1975). The Hartford Life decision provides no comfort to Hornbeck. In that case an assignee of a promissory note had pursued its substantial legal claim against the debtor's trustee who had defaulted on the note, rather than the assignor of the note. See Hartford Life Ins. Co., 520 F.2d at 1172-74. Both the Referee and the district court in that case had agreed that the assignee had a valid claim against the debtor's trustee. Id. at 1174. A divided court of appeals in that action ruled that the note was illegal. Id. In the subsequent action by the assignee against the assignor, the court found that, under "these circumstances, . . . it would be grossly inequitable to hold that the cause of action [against the assignor] arose prior" to the court's earlier divided decision holding the note invalid and establishing for the first time a predicate fact of injury that was central to the assignee's action. Id. at 1174. Here, as set forth above, neither the APA Court's statutory interpretation nor its finding of arbitrary and capricious conduct are predicates for this FTCA claim, ensuring that it would not be "grossly inequitable" to find that the FTCA claim accrued on March 29, 2004.

buttressed by prior agency determinations and, most importantly, a prior federal district court's decision in the same district interpreting the same language in the same way in a different deed. Id. at 1040. The claimant appealed this determination within the agency. Id. Even though the board reviewing the initial determination recognized that the agency had "long interpreted" the deed language in favor of the United States, the board "concluded that the United States never had a right to the minerals." Id.

The claimant then filed an FTCA claim, alleging that the United States had wrongfully converted her property to its own use for decades. Id. In addressing the defendant's statute of limitations defense, the Eighth Circuit held that the claimant did not know of her injury until the "*avulsive change* in the law occurred" because "[a]ll indications before that time were that [she] had no injury." Id. at 1042 (emphasis added). The court found that its ruling would not eviscerate the statute of limitations requirement because the facts before it were "unique" in that the "language in [the claimant's] deed was identical" to the language in the prior district court precedent, that case was decided in the same district where the claimant would file suit, the administrative agency relied on the prior district court precedent, and the claimant should not be penalized for her similar reliance when the precedent was "directly contrary" to her position. Id. at 1043.

These "unique" facts are not present here because Hornbeck had not slept on its rights by relying on long-standing district court and agency precedent that was contrary to its position such that the APA Court's decision constituted an "avulsive change in the law" that opened Hornbeck's eyes to its injury. To the contrary, Hornbeck was arguing vociferously to the Coast Guard that the agency's interpretation of the pertinent statute was erroneous at least by July 29, 2004, (Doc. 1, Compl. ¶ 20), and Hornbeck recognized, as set forth in its APA Complaint, filed on October 8, 2004, that this agency conduct "*causes immediate* harm and injury to Hornbeck." (Ex. 1, APA Compl.

13

¶¶35, 40 (emphasis added)).[9]

**B.    Hornbeck Suffered an Immediate Injury and Damages on March 29, 2004.**

Hornbeck must be presumed to have suffered an immediate injury and damages when the agency issued its March 29, 2004 determination because Hornbeck alleged in its APA claim on October 8, 2004 that it "*is* injured by the *diminution in value* . . . of the ENERGY 8701," (U.S. Ex. 1, ¶ 14), and that the agency action "causes *immediate* harm and injury to Hornbeck." (U.S. Ex. 1, ¶¶ 35, 40). This was as true on March 29, 2004 as it was on October 8, 2004.

Hornbeck's cry that it did not know a "sum certain" for its damages on the day its FTCA claim accrued misses the point. (Doc. 12, at 30-31). When the plaintiff has "sufficient knowledge [that] an injury has occurred," the statute of "limitations period begins to run even if the [plaintiff] does not know the full extent of [its] injuries." Loughlin v. United States, 230 F. Supp.2d 26, 40 (D.D.C. 2002). The limitations period began to run when Hornbeck had knowledge of the injury to its property interest in the barge, not when it could come up with a "sum certain" for its administrative claim.

Hornbeck's immediate knowledge of the harm it was being caused by the agency is to be contrasted with those of the plaintiffs in the cases Hornbeck cites for support. (Doc. 12, at 30-31 (citing Loughlin).[10] In Loughlin, property owners brought an action against the United States for

---

[9] The United States, as the party moving to dismiss pursuant to Rule 12(b)(6), can attach documents that are referenced in Plaintiff's Complaint without transforming its motion into one for summary judgment. GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997); Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993); Charles Alan Wright & Arthur R. Miller, Federal Practice & Proc. § 1366 (2007). Hornbeck references its APA Complaint – which it claims successfully established the necessary predicate for this FTCA action – in paragraph 24 of its Complaint before this Court. (Doc. 1, ¶ 24).

[10] Hornbeck also cited Lhotka v. United States, 114 F.3d 751 (8th Cir. 1997). In Lhotka, property owners brought claims against the United States for trespass and nuisance arising out of abnormal

damages based on the contamination of their property when the government used their land during World War One. <u>Loughlin</u>, 230 F. Supp.2d at 29-35. The court found that the limitations period began when the property owners became aware (or should have been aware) that the substance was a contaminant *and* that it was on *their* property. <u>Id.</u> In this case, Hornbeck was aware of the harm to its property interest on March 29, 2004.

Hornbeck also argues that "the Government knows full well that [Plaintiff] expressly stated in its administrative claim" that the "date of injury was '12/29/04.'" (Doc. 12, at 30).[11] Hornbeck presumably is asking the Court, for purposes of this motion to dismiss, to draw the inference in its favor that the FTCA claim did not accrue at least until December 29, 2004. The Court should decline the invitation. First, a court reviewing a Rule 12(b)(6) motion "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." <u>Kowal v. MCI Commc'n Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994); <u>see also</u> <u>Ellipso, Inc. v. Mann</u>, 460 F. Supp.2d 99, 103 (D.D.C. 2006) (Lamberth, J.). Here, according to its administrative claim, December 29, 2004 was the date that Hornbeck began to incur storage or dockage fees for the barge. (Pl. Ex. 7, at 3).[12] As is evident from the itemized damages set forth in its administrative claim,

---

flooding that occurred because of a dike that a federal agency had constructed. <u>Lhotka</u>, 114 F.3d at 751-52. The court held that the limitations period did not begin to run when the dike was constructed and began only when the abnormal flooding occurred. <u>Id.</u> at 753-54. This was because there was no "outward signs of any tort" which "remained hidden until the rainy season began." Here, this Court is not faced with a hidden tort (if there is such a thing for misinterpreting a statute). Hornbeck knew the harm to its property interest, who caused the harm, and that its injury was a diminution of its value and would be a loss of use as an oil tank barge from January 1, 2005 until January 1, 2015.

[11] More accurately, the Standard Form 95 states that the "date and day of accident" was "12/29/04." (Pl. Ex. 7, at 30).

[12] The United States can refer to this document in its motion to dismiss, without converting the motion to one for summary judgment, because the administrative claim is referenced in Hornbeck's

Hornbeck began to incur other expenses as a result of the Coast Guard's decision at least a couple of months previously.  (Pl. Ex. 7, at 3).  Hornbeck also, according to its APA Claim, was already "injured by the *diminution in value*" of the barge prior to December 29, 2004.  (U.S. Ex. 1, ¶ 14).  The facts in the Complaint and in those documents referenced in the Complaint do not support an inference that the injury first occurred on December 29, 2004.

Second, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  B.H. Papasan v. Allain, 478 U.S. 265, 286 (1986); Kowal, 16 F.3d at 1276.  This is precisely what Hornbeck is doing.  Choosing the date it  began to store the barge, Hornbeck asks the Court to accept its legal conclusion that this date (which is one of several it suggests) is the time when its FTCA claim accrued.

### C.    Hornbeck's Injury Occurred Before Final Agency Action.

Hornbeck argues that it could not have been injured (and thus the claim did not begin to accrue) when the Coast Guard's March 29, 2004 determination was issued because this action was simply an "initial disapproval" and "did not 'ensure' that the Barge would be removed from service . . . ."  (Doc. 1, at 33).  This argument is without merit.  Hornbeck asserted in its APA claim, filed on October 8, 2004, that the agency's action was causing "immediate harm and injury to Hornbeck."  (U.S. Ex. 1, ¶¶ 35, 40).  One of those immediate injuries was "the diminution in value" of its barge.  (U.S. Ex. 1, ¶ 14).  Although Hornbeck made this assertion after the final agency action occurred on September 15, 2004, a similar immediate harm to its property interest in the barge must have been caused by the March 29, 2004 decision.  This is because the Coast Guard's decision of March 29, 2004 was not some sort of tentative ruling without legal effect as Hornbeck tries to intimate.

_____

Complaint and is an essential predicate for filing an FTCA claim.  (Doc. 1, ¶ 41).

If Hornbeck had decided not to appeal the decision, it would automatically become final agency action by operation of the regulation. See 46 C.F.R. § 1.03-15(f) (2003). Even when Hornbeck chose to appeal the decision, it remained legally operative and in effect throughout the appeals process, 46 C.F.R. § 1.03-15(f) (2003), and was ultimately affirmed by the appropriate appellate authority within the agency.

Hornbeck also argues that the "continuing tort doctrine" should apply to toll the accrual of the FTCA claim until final agency action on September 15, 2004. (Doc. 12, at 36). "[T]he continuing tort doctrine applies only where no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm." Mittleman v. United States Dep't of Treas., 919 F. Supp. 461, 466-67 (D.D.C. 1995). That is not the case here. As the United States has argued above and in its initial memorandum, there is no private-party analog to a federal agency's misinterpretation of a statute. The only reason why this Court needs to address the statute of limitations argument is if the Court has found that a private-party analog such as an undertaking or trespass to chattels exists for the Coast Guard's wrongful withholding of the proper phase-out date for the barge.

Unlike those cases that fall within the continuing tort doctrine, there is a definite day when the Coast Guard decided to withhold the phase-out date requested by Hornbeck. That day was March 29, 2004, so that the tort, if any, began to accrue at that time. Nothing the Coast Guard did in its appeals decision on September 15, 2004 altered the allegedly tortious decision to withhold the proper phase-out date for the barge. The latter decision simply upheld the Coast Guard's earlier phase-out decision for the same reasons. This does not mean that the Coast Guard's decision constituted a *continuing* tort or even two separate torts; it was allegedly tortious conduct that had a continuing effect on Hornbeck, which is not the same.

17

For the reasons set forth above, the statute of limitations had expired on Hornbeck's FTCA claim when it filed suit.

### III. CLAIM PRECLUSION BARS HORNBECK'S FTCA CLAIM.

The doctrine of claim preclusion bars Hornbeck's FTCA claim because his earlier APA suit involved the same cause of action and the same parties, and it was a court of competent jurisdiction that issued a final judgment on the merits. (Doc. 11-2, at 21-29). In its opposition, Hornbeck made six arguments as to why this doctrine does not apply here: (1) the facts involved in the two claims are not related; (2) it had no opportunity to litigate its FTCA claim in the previous action; (3) it would have been "utterly impractical" for it to litigate the FTCA claim earlier; (4) the FTCA claim and the APA claim did not form a convenient trial unit; (5) the parties had no expectation that the two claims would be litigated together; and (6) the declaratory judgment exception to claim preclusion prevents the application here. These arguments will be addressed seriatim.

#### A. The FTCA and APA Claims Arise From the Same Nucleus of Facts.

Hornbeck argues that the facts of the two claims are not related because the necessary factual and legal predicates had not arisen by the time Hornbeck filed its APA claim on October 8, 2004. First, as to the purported requisite factual predicate, Hornbeck argues that "the injury in fact caused by the Agency's 'final agency action' did not occur until the vessel was removed from service in late 2004 . . . ." (Doc. 12, at 37-38). Hornbeck's own APA Complaint, filed on October 8, 2004, belies this assertion because it claimed then that it "*is* injured by the diminution in value" and that the agency's action "causes *immediate harm and injury* to Hornbeck." (U.S. Ex. 1, ¶¶ 14, 35, 40 (emphasis added)). Second, as to the purported legal predicate, the United States has already addressed this issue above where it demonstrated that there was no need for Hornbeck to wait to file an FTCA claim until after there was a legal determination that the agency had misinterpreted the

18

statute.

Hornbeck cannot dispute that the two claims are "related." When filing its FTCA claim with this Court, Hornbeck "checked the box" on the Court's form that this FTCA claim was "related" to the prior APA claim. (U.S. Ex. 2, Notice of Designation of Related Civil Cases). Hornbeck also cannot dispute that the underlying facts are the same for both the APA claim and the FTCA claim. Hornbeck told the Coast Guard as much when it submitted its tardy administrative claim in September 2006 and stated that the "basic facts of this [FTCA] case are undisputed and are as set forth by the [APA] Court's decision." (Pl. Ex. 7, at 6). Hornbeck is, of course, correct. The APA Court's decision states categorically that the 1997 Amendment to OPA 90 was "at the crux of this dispute" and the "Agency's failure to recognize the plain language and meaning of [the amendment] ensured that it gave [the barge] an incorrect phase-out date of January 1, 2005." Hornbeck Offshore Transp., LLC v. United States Coast Guard, 424 F. Supp.2d 37, 50, 52 (D.D.C. 2006). This is exactly the same conduct for which Hornbeck seeks tort damages now in its FTCA claim. In short, all the facts necessary for both claims had already occurred by October 8, 2004 and were all related to the agency's misinterpretation of the pertinent statute.

**B.     Hornbeck Had An Opportunity to Litigate Its Two Claims Together.**

Hornbeck argues that it did not have an opportunity to litigate the two claims at the same time because the issues of government negligence and Hornbeck's damages were not before the APA Court, nor was discovery into these matters permitted in the APA claim. (Doc. 12, at 38-39). This is a non-sequitur. Quite simply, Hornbeck is arguing that it could not litigate this claim before because it did not bring this claim before. But Hornbeck had the *opportunity* to litigate the claims at the same time; it simply chose not to take it.

19

### C.    It Was Not "Utterly Impractical" to Litigate the Claims Together.

Hornbeck argues that it was utterly impractical for it to litigate its two claims together because its tort claim did not accrue until the APA Court had issued its decision (on March 27, 2006), or until it allegedly began to suffer an injury and thus damages (late 2004), which was after it had filed its APA claim. (Doc. 12, at 38). The United States has already demonstrated above that the accrual of Hornbeck's tort claim was not dependent on any legal predicate that had to be established in the first suit. Similarly, the United States has also already demonstrated above that Hornbeck was already claiming that it was injured and suffering damages by the time it filed its APA claim on October 8, 2004.

Hornbeck also tries to squeeze the circumstances of this case into the factual mold of Velikonja v. Ashcrosft, 355 F. Supp.2d 197 (D.D.C. 2005), citing it for the proposition that it would have been utterly impractical for Hornbeck to litigate the two claims together because its FTCA claim was not ripe for filing in district court until well after it filed its APA claim. The Velikonja case cannot bear the burden Hornbeck puts on it. In that case a former FBI employee brought suit under Title VII, claiming retaliation and constructive discharge. Id. at 199. The defense moved to dismiss based on the doctrine of claim preclusion because she had previously brought suit making such claims. Id. at 199-201. Plaintiff countered that her new claims did not duplicate her earlier claims because the events giving rise to those claims had not occurred by the time she filed her complaint in her first action. Id. at 201. By the time she had exhausted her administrative remedies on those subsequently accruing claims, discovery "was essentially closed" on the earlier action. Id. at 201-02. The court found that "at least some of the facts relevant to plaintiff's new claims . . . had not yet occurred and thus could not have been included in her original complaint." Id. at 202.

The court held that, "with respect to events that occurred after [the date her original

20

complaint was filed in the earlier action], plaintiff is not barred by the doctrine of res judicata from litigating these events." Id.  In contrast, the court held that plaintiff "may not bring any claims based on events that occurred prior [to the date she filed her complaint in the earlier action] if those events are part of the same set of events as those already litigated." Id. at 204.  This is simply an example of the Circuit's rule that "*Res judicata* does not bar parties from bringing claims based on *material facts* that were *not in existence* when they brought the original suit." Apotex, Inc. v. FDA,  393 F.3d 210, 218 (D.C. Cir. 2004).

Velikonja provides no support for Hornbeck's argument because all of the events giving rise to Hornbeck's FTCA claim had already occurred by the time it filed its APA claim on October 8, 2004.  The Velikonja Court did not hold, as Hornbeck would wish, that a plaintiff may bring a subsequent claim based on events that had occurred prior to the filing of an earlier suit simply because the plaintiff had not timely filed an administrative claim with the appropriate agency so as to begin the running of the six-month FTCA period.  This situation is more akin to the facts outlined in Lafayette Fed. Credit Union v. United States, 76 F. Supp.2d 645 (D. Md. 1999), a case analyzed extensively in the United States' initial memorandum.  (Doc. 11, at 26-28).

### D.    The FTCA Claim Is Still Barred Regardless of Whether It Would Have Formed a Convenient Trial Unit With the APA Claim.

Hornbeck argues that claim preclusion does not bar its current lawsuit because the APA claim and FTCA claim would not fit into a "convenient trial unit." as they have "divergent characteristics" and require dissimilar proofs.  (Doc. 12, at 41-42).  Whether the claims constitute a "convenient trial unit" is a *factor* to be considered, not an *element* of claim preclusion.  When determining whether two claims are actually part of the same "cause of action" for purposes of applying claim preclusion, a court will determine if they share the same "nucleus of facts," Drake

v. FAA, 291 F.3d 59, 66 (D.C. Cir. 2002), by "*giving weight* to such *considerations* as whether the facts are related in time, space, origin, or motivation, whether they form a *convenient trial unit*, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Restatement (Second) of Judgments § 24 (2007) (emphasis added). According to the Restatement approach, which this Circuit has adopted, "no single factor is determinative." Restatement (Second) of Judgments § 24 cmt. b (2007).

> The Restatement Comment goes on to state that:
>
> the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded. But *the opposite does not hold true*; even when there is not a substantial overlap, the *second action may be precluded if it stems from the same transaction or series*.

Id. (emphasis added). Here, the second claim stems from the same transaction as the first for the reasons set forth above.

### E.    Litigating the Claims Together Conforms to the Parties' Expectations.

Hornbeck argues that litigating the two claims together could not have been within the United States' expectations because the government has argued that the tort claim is not actionable. (Doc. 12, at 43). Hornbeck confuses the parties' expectations about contemporaneous litigation with the United States' position on the merits of the putative tort claim. If Hornbeck were to bring such a novel tort claim, the United States reasonably would have expected it to be brought simultaneously with Hornbeck's APA claim which asserted it was suffering money damages. (U.S. Ex. 1, at ¶ 14). By listing the existence of such money damages when it filed its APA claim, Hornbeck *should* have expected that an FTCA claim based on the same nucleus of facts would be properly brought at the same time.

**F.**    **The Declaratory Judgment Exception to Claim Preclusion Does Not Apply Here**

Hornbeck argues that the declaratory judgment exception to the doctrine of claim preclusion allows it to bring this FTCA claim now because it only obtained declaratory relief, which was all that was available as a matter of law, in its APA claim. (Doc. 12, at 43-45). This is incorrect for several reasons. First, the declaratory judgment exception depends on what relief the plaintiff *sought*, not what relief it *obtained*. A "plaintiff who brings a declaratory judgment suit and *requests no coercive relief* may thereafter sue on those claims arising from the same cause of action that might have been raised in the first proceeding." Horn & Hardart Co. v. National R.R. Passenger Corp., 659 F. Supp. 1258, 1265 (D.D.C. 1987) (emphasis added); see also Restatement (Second) of Judgments § 33 cmt. c (2007).

Second, Hornbeck sought both declaratory and coercive relief in its APA claim. Specifically, in its APA Complaint, Hornbeck asked the court, inter alia, to:

> 1.    Hold unlawful and set aside the Agency's decisions and actions denying Plaintiff's request for an OPA 90 phase-out date of January 1, 2015 as arbitrary, capricious, contrary to the plain language of the statute, and otherwise not in accordance with law;
> 2.    *Order* the Agency to assign an OPA 90 phase-out date of January 1, 2015 to the tank barge ENERGY 8701 pursuant to the request and appeal of Plaintiff Hornbeck of July 29, 2004;
> 3.    *Order* the Agency *not to enforce* the erroneous OPA 90 phase-out date of January 1, 2005 assigned to the ENERGY 8701.

(U.S. Ex. 1, Wherefore Cl. (emphasis added)). The third prayer for relief is a request for an injunction because it asks the APA Court to enjoin the agency from doing something. When Hornbeck sought an injunction, it sought coercive relief. See, e.g., Samuels v. Mackell, 401 U.S. 66, 71 (1971) (referring to "an injunction or other coercive relief").

Third, declaratory and coercive relief are both available as a matter of law in APA claims. See, e.g., 5 U.S.C. § 706 (2000); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1094 (D.C. Cir.

23

1996); <u>Roberts v. United States Dep't of Justice</u>, 366 F. Supp.2d 13,  17 (D.D.C. 2005).  Hornbeck

brought its APA claim in two counts, the first alleging an error of law, the second alleging that the

agency had failed to treat two "legally indistinguishable" entities alike.  (U.S. Ex. 1, ¶ 39).  The APA

Court granted Hornbeck's count asserting a legal error and remanded the case to the agency for

"further action consistent with this opinion,"  <u>Hornbeck</u>, 424 F. Supp.2d at 58, rendering moot

Hornbeck's second count.  But this does not mean that the court lacked the authority to issue an

injunction.

     Hornbeck's assertion of the declaratory judgment exception is thus without merit:

> "[W]henever the plaintiff in a declaratory judgment suit demands both declaratory and coercive relief, res judicata [claim preclusion] applies [to the plaintiff]. . . . Having initiated a lawsuit for declaratory *and* coercive relief, a plaintiff has set out to prosecute claims in the ordinary manner and consequently should be bound to raise all of them at one time.  To allow otherwise would impermissibly allow a plaintiff to split his claims.

<u>Horn & Hardart Co.</u>, 659 F. Supp. at 1265; <u>see also</u> <u>American Forest Resource Council v. Shea</u>, 172

F. Supp.2d 24, 29 (D.D.C. 2001).

## IV.    CONCLUSION

     For all the reasons set forth above and in the United States' initial memorandum, this Court

should grant the United States' Motion to Dismiss Hornbeck's FTCA claim.

DATED: December 17, 2007.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

DARRELL VALDEZ
Assistant United States Attorney

s/ Rodney Patton
RODNEY PATTON
Trial Attorney, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P. O. Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4105
Facsimile:  (202) 616-4002
E-Mail: rodney.patton@usdoj.gov

/s John S. Luce Jr.
JOHN S. LUCE Jr.
Trial Attorney, Civil Division
Torts Branch
Aviation and Admiralty Litigation
P. O. Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4035
Facsimile:  (202) 616-4159
E-Mail:  john.luce@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of December 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Lawrence I. Kiern
> WINSTON & STRAWN, LLP

/s Rodney Patton_____
RODNEY PATTON
Trial Attorney,
Aviation and Admiralty Litigation
Torts Branch, Civil Division
P. O. Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4105
Facsimile:  (202) 616-4002
E-Mail: rodney.patton@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HORNBECK OFFSHORE TRANSPORTATION, LLC**<br>103 Northpark Boulevard, Suite 300<br>Covington, LA 70433,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES COAST GUARD &**<br>**THE UNITED STATES OF AMERICA**<br>2100 Second Street, S.W.<br>Washington, D.C. 20593-00001,<br><br>Defendants. | CASE NUMBER  1:04CV01724<br><br>JUDGE: Colleen Kollar-Kotelly<br><br>DECK TYPE: Administrative Agency Review<br><br>DATE STAMP: 10/08/2004 |

### COMPLAINT

Now comes Plaintiff, Hornbeck Offshore Transportation, LLC ("Hornbeck") and alleges upon information and belief as follows:

### JURISDICTION AND VENUE

1.     This action seeks judicial review of the decision of the Defendants United States Coast Guard and the United States of America (collectively the "Agency").  Jurisdiction is proper pursuant to the following statutes:  (1) 28 U.S.C. § 1331 (Federal Question); (2) 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act); (3) 33 U.S.C. § 2717(b) (Oil Pollution Act of 1990); and (4) 5 U.S.C. §§ 552 *et seq.* (Freedom of Information Act).

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391; 5 U.S.C. §§ 552(a)(4)(B) and 703; and 33 U.S.C. § 2717(b) because the U.S. Coast Guard headquarters is located in this district and the final agency action occurred in this district.

## PARTIES

3.    Plaintiff Hornbeck is a limited liability company, organized under the laws of the State of Delaware, and maintains its principal place of business in Covington, Louisiana. Hornbeck, through its subsidiaries, owns and operates oil transport vessels, including the tank barge "ENERGY 8701" (the "Barge" or "ENERGY 8701").

4.    Defendant Agency is an agency of the U.S. Government within the U.S. Department of Homeland Security.  The Agency's headquarters is located in Washington, D.C. Among other duties, the Agency administers the Oil Pollution Act of 1990 ("OPA 90"), Pub. L. No. 101-380, 104 Stat. 484 (1990), specifically the OPA 90 phase-out provision at issue.  OPA 90 § 4115, codified at 46 U.S.C. § 3703a.

## SUMMARY OF THE ACTION

5.    Plaintiff Hornbeck brings this action against the Agency seeking judicial review of the final agency action of September 15, 2004, whereby the Agency unlawfully assigned an incorrect OPA 90 phase-out date for the tank barge ENERGY 8701.  The Agency erroneously assigned a phase-out date of January 1, 2005 whereas the plain language of the statute yields the correct date of January 1, 2015.  Therefore, the final agency action was contrary to law, arbitrary and capricious, and in violation of the Administrative Procedure Act.  5 U.S.C. §§ 701 *et seq.*

2

6.    OPA 90 provides, in relevant part, that certain tank vessels that carry oil in bulk as cargo must be equipped with a double-hull by a certain date or be phased-out in accordance with a statutory schedule. The schedule is based on a vessel's tonnage, hull configuration, and construction date. OPA 90 § 4115; 46 U.S.C. § 3703a.

7.    OPA 90's statutory schedule provides a phase-out date of January 1, 2005 for certain vessels of 5000 gross tons or more. 46 U.S.C. § 3703a(c)(3)(A).

8.    OPA 90's statutory schedule also provides a phase-out date of January 1, 2015, for certain vessels of less than 5000 gross tons. 46 U.S.C. § 3703a(c)(2).

9.    A vessel's gross tonnage measurement describes its internal volume, not the weight the vessel can carry or the weight of the vessel itself. The United States recognizes different systems of gross tonnage measurement, including both the "Regulatory" and the "Convention" measurement systems. Depending on which measurement system is used, the calculations may produce different gross tonnages for a particular vessel.

10.    OPA 90 has always permitted a vessel to employ either the "Regulatory" or "Convention" measurement system to determine the gross tonnage of a vessel.

11.    In 1997, Congress amended OPA 90, adding section 3703a(e). *See* Pub. L. No. 105-85, § 3606, 111 Stat. 1629, 2077 (1997).

12.    The purpose of the 1997 amendment to OPA 90 was to restrict the practice of *physically* altering vessels to reduce tonnage in an effort to delay the phase-out requirements. It accomplished this by fixing July 1, 1997 as the date after which physical alterations of a vessel would not affect the vessel's tonnage measurements except by approval of the Secretary. *See* 46

3

U.S.C. § 3703a(e). The purpose was not to require the owners to *select* which permitted tonnage measurement system to apply.

13.     This action seeks judicial review of the Agency's erroneous application of the plain language of OPA 90, which identifies permissible tonnage measurement systems. The Agency refused to follow the plain language of the statute recognizing the Convention method of measurement of the ENERGY 8701 and further failed to assign the proper phase-out date of January 1, 2015.

14.     As a result, Plaintiff Hornbeck is injured by the diminution in value and loss of use of the ENERGY 8701, including actual, consequential, and other damages.

15.     As set forth herein, the Agency action is contrary to law and arbitrary and capricious.

## FACTUAL BACKGROUND

### Methods of Measurement -- Regulatory and Convention

16.     OPA 90 has always allowed the gross tonnage of vessels to be measured in accordance with either the Regulatory or Convention method. *See* OPA 90 § 1001(12) (defining "gross ton"). The 1997 amendment did nothing to change this recognition. *See* 46 U.S.C. § 3703a(e)(1) ("the gross tonnage of a vessel shall be . . . the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title").

17.     Measurement under 46 U.S.C. § 14502 is the traditional or "Regulatory" measurement system that developed in the United States. Use of this system yields the vessel's "Regulatory tonnage."

4

18.     Measurement under 46 U.S.C. § 14302 is a more modern system of measurement that conforms with the International Convention on Tonnage Measurement of Ships of 1969. Use of this system yields the vessel's "Convention tonnage."

### Tank Barge ENERGY 8701

19.     The tank barge ENERGY 8701 was constructed and delivered in 1976. The Regulatory tonnage of the Barge is 5323 gross tons.

20.     After the passage of OPA 90, the Coast Guard used the Regulatory gross tonnage to set the ENERGY 8701's phase-out date as January 1, 2005.

21.     U.S. law requires that "a vessel engaged in a foreign voyage" be measured under the Convention measurement system. 46 U.S.C. § 14301(a)(3); 46 C.F.R. § 69.11(a)(1). After acquiring and operating the ENERGY 8701, Hornbeck hired an American Bureau of Shipping[1] ("ABS") surveyor to measure the vessel under the Convention measurement system to permit the Barge to operate in Canada.

22.     On February 24, 2004, ABS determined that the ENERGY 8701's Convention tonnage is 4660 gross tons, i.e. less than the 5000 gross ton threshold for the January 1, 2005 phase-out date.

23.     Since original construction, the Barge has undergone no physical alterations to reduce tonnage and remains substantially unaltered for the purposes of tonnage measurement. The difference in Regulatory and Convention tonnage merely reflects different methods of measurement of the same unaltered vessel.

## Procedural History of the Agency Action

24.    Subsequent to the ABS issuing a Tonnage Certificate for the Barge indicating its Convention tonnage, on March 8, 2004, Hornbeck applied to the Coast Guard's Marine Safety Center ("MSC") in Washington D.C. and requested that the Agency recognize the proper OPA 90 phase-out date of January 1, 2015 because the Barge's Convention tonnage measurement is 4660 gross tons.

25.    On March 29, 2004, the Agency denied Hornbeck's request and stated:

> [W]e interpret the language of 46 U.S.C. 3703a(e)(1) as requiring the OPA 90 requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997[. S]ince at that time the laws of the United States were applied to the vessel using regulatory tonnage . . . the tonnage for applying the OPA 90 requirements is 5323 GRT.

26.    On July 29, 2004, Hornbeck appealed the initial Agency decision to Agency Headquarters. The appeal highlighted the Agency's erroneous application of 46 U.S.C. § 3703a(e) and the disparate treatment of other similar barges under the same statute.

27.    On September 15, 2004, the Agency denied Hornbeck's appeal. The Agency stated its reason for denying the appeal:

> We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA 90 phase out. The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [Regulatory] measurement system . . . .

28.    The Agency's only stated rational in support of the disparate treatment between the ENERGY 8701 and other tank barges, which were allowed to change their phase-out dates

---

[1] ABS is an American classification society. Classification societies are private organizations that develop and apply technical requirements for the design, construction, and maintenance of ships. With respect to tonnage measurement, ABS is qualified to perform the measurement and authorized to issue a certificate to the vessel.

from January 1, 2005 to January 1, 2015, was that the owners of the other barges had *applied* for a tonnage change before July 1, 1997.

29.     The governing statute does not set phase-out dates based on the date one applies to the Agency.

30.     The Agency has changed OPA 90 phase-out dates from January 1, 2005 to January 1, 2015 for at least two other barges that are legally indistinguishable from the ENERGY 8701.

## COUNT I

31.     Plaintiff repeats and realleges the foregoing allegations in this Complaint with the same force and effect as if hereinafter set forth at length.

32.     The Agency action is final agency action.

33.     The Agency action is contrary to the plain language of 46 U.S.C. § 3703a(e).

34.     The Agency action is therefore arbitrary and capricious and otherwise not in accordance with law in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

35.     The Agency's arbitrary and capricious action causes immediate harm and injury to Hornbeck.

## COUNT II

36.     Plaintiff repeats and realleges the foregoing allegations in this Complaint with the same force and effect as if hereinafter set forth at length.

37.    The Agency action is contrary to and inconsistent with the Agency's treatment of other vessels in legally indistinguishable circumstances.

38.    No change in circumstances has occurred to enable the Agency to disregard its own precedents.

39.    The Agency's failure to treat legally indistinguishable circumstances alike is arbitrary and capricious and otherwise not in accordance with law and is therefore contrary to the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).

40.    The Agency's arbitrary and capricious action causes immediate harm and injury to Hornbeck.

## COUNT III

41.    Plaintiff repeats and realleges the foregoing allegations in this Complaint with the same force and effect as if hereinafter set forth at length.

42.    On April 8, 2004, Plaintiff lawfully requested information from the Agency pursuant to the Freedom of Information Act.

43.    On May 25, 2004, the Agency improperly denied the request.

44.    On June 28, 2004, Plaintiff appealed the improper denial.

45.    The Agency has failed to make a determination of the appeal within twenty days as provided by law.

46.    Plaintiff has exhausted all administrative remedies and the Agency's decisions and failure to act constitute a final action.

47.    Plaintiff seeks judicial review of the Agency decision and actions in improperly failing to provide the requested information.

**WHEREFORE**, Plaintiff prays that this Court:

1.    Hold unlawful and set aside the Agency's decisions and actions denying Plaintiff's request for an OPA 90 phase-out date of January 1, 2015 as arbitrary, capricious, contrary to the plain language of the statute, and otherwise not in accordance with law;

2.    Order the Agency to assign an OPA 90 phase-out date of January 1, 2015 to the tank barge ENERGY 8701 pursuant to the request and appeal of Plaintiff Hornbeck of July 29, 2004;

3.    Order the Agency not to enforce the erroneous OPA 90 phase-out date of January 1, 2005 assigned to the ENERGY 8701;

4.    Order the Agency to provide the records and information improperly withheld from Plaintiff;

5.    Award costs and attorneys' fees to Plaintiff; and

6.    Award such other relief as it deems appropriate.

*Execution follows*

Respectfully submitted,

WINSTON & STRAWN LLP

Lawrence I. Kiern #441154
Bryant Gardner #473319
1400 L Street, N.W.
Washington, D.C.  20005-3502
(202) 371-5811 (direct)
(202) 371-5950 (fax)
email:  lkiern@winston.com

*Attorneys for Plaintiff Hornbeck Offshore*
*Transportation, LLC*

OF COUNSEL:

Samuel A. Giberga
General Counsel
Hornbeck Offshore Transportation, LLC
Covington, LA 70433
103 Northpark Boulevard, Suite 300
(985) 727-6804 (direct)
(985) 727-2006 (fax)
email:  samuel.giberga@hornbeckoffshore.com

Dated: October 8, 2004

CLERK=S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CO-932
Rev. 4/96

NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

Civil Action No. _____
(To be supplied by the Clerk)

**NOTICE TO PARTIES:**

Pursuant to Rule 40.5(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk=s records, one copy for the Judge to whom the cases is assigned and one copy  for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

**NOTICE TO DEFENDANT:**

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

**NOTICE TO ALL COUNSEL**

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff , defendant or counsel must  complete the following:

I.    RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(e=s) below.]

| | (a) | relates to common property |
| --- | --- | --- |
| | (b) | involves common issues of fact |
| | (c) | grows out of the same event or transaction |
| | (d) | involves the validity or infringement of the same patent |
| | (e) | is filed by the same pro se litigant |

2.    RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the <u>same</u> parties and <u>same</u> subject matter.

Check box if new case is related to a dismissed case:    [ **X** ]

3.    NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

**This Court**
_____

4.    CAPTION AND CASE NUMBER OF RELATED CASE(E=S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

**Hornbeck Offshore Transportation, LLC**          v.    **Unites States Coast Guard and the United St**   C.A. No.   **1:04cv1724 -CKK**

**6/8/2007**
_____                    _____
DATE                                     Signature of Plaintiff /Defendant (or counsel)